# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

MARILYN RAE BASKIN, *et al.*,                 )
                                              )
     Plaintiffs,                             )
                                              )
    v.                                       )   Case No.  1:14-cv-00355-RLY-TAB
                                              )
PENNY BOGAN, in her official capacity as      )
Boone County Clerk, *et al.*,                 )
                                              )
     Defendants.                             )

## DEFENDANTS' COMBINED MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION AND MOTION FOR SUMMARY JUDGMENT

ELIZABETH A. KNIGHT
Porter County Administrative Center
155 Indiana Avenue, Ste. 205
Valparaiso, IN 46383
Tel: (219) 465-3329
Fax: (219) 465-3362
eknight@porterco.org
*Counsel for Karen Martin*

DARREN J. MURPHY
Assistant Hamilton County Attorney
694 Logan St.
Noblesville, IN 46060
Tel: (317) 773-4212
Fax: (317) 776-2369
dmurphy@ori.net
*Counsel for Peggy Beaver*

NANCY MOORE TILLER
Nancy Moore Tiller & Associates
11035 Broadway, Suite A
Crown Point, IN 46307
Tel: (219) 662-2300
Fax: (219) 662-8739
nmt@tillerlegal.com
*Counsel for Michael A. Brown*

GREGORY F. ZOELLER
Attorney General of Indiana
THOMAS M. FISHER
Solicitor General
Office of the Attorney General
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
Tel: (317) 232-6255
Fax: (317) 232-7979
Tom.Fisher@atg.in.gov
*Counsel for Greg Zoeller and William C. VanNess II, M.D.*

ROBERT V. CLUTTER
Kirtley, Taylor, Sims, Chadd & Minnette, P.C.
117 W. Main Street
Lebanon, IN 46052
Tel: 765-483-8549
Fax: 765-483-9521
bclutter@kirtleytaylorlaw.com
*Counsel for Penny Bogan*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

STATEMENT OF MATERIAL FACTS NOT IN DISPUTE ........................................... 1

LEGAL STANDARDS .............................................................................................. 4

Preliminary Injunction Standard ........................................................................ 4

Summary Judgment Standard ............................................................................. 5

ARGUMENT .......................................................................................................... 5

I.      Defendant Zoeller Is Entitled to Summary Judgment Because He Cannot Provide Plaintiffs With Any Relief ................................................................................ 5

II.     Preliminary Injunctive Relief Is Inappropriate ................................................ 7

        A.      In challenges to traditional marriage definitions, the Supreme Court has ruled that injunctions are not appropriate prior to final appellate resolution .......... 8

        B.      Any legally cognizable injury to Plaintiffs is not irreparable, and a preliminary injunction would not preserve the status quo ..................................... 10

        C.      The public interest and balancing of equities weigh against preliminary relief .... 17

III.    Plaintiffs' Claims Fail on the Merits ............................................................... 19

        A.      Plaintiffs lack standing to assert claims for disparate treatment of children based on marital status of parents and for association, integrity, autonomy, and self-definition, insofar as those claims relate to "legal recognition of their parent-child relationships" .......................................................................... 20

        B.      There is no constitutional right to have one's out-of-state same-sex marriage or civil union recognized in Indiana ................................................................ 24

                1.      There is no due process right to interstate marriage recognition, particularly where an out-of-state marriage contravenes public policy ..... 25

                2.      Indiana's refusal to recognize the Quasney-Sandler marriage does not contravene the Equal Protection Clause ............................................. 29

        C.      Indiana's traditional marriage definition is constitutional ..................................... 32

                1.      Baker v. Nelson still controls, and the core meaning of Windsor is to preserve state prerogatives over marriage ................................................. 32

                2.      No fundamental rights or suspect classes are implicated .......................... 35

a.     There is no fundamental right to same-sex marriage, a concept having no roots in the Nation's history and traditions ..................35

b.     The traditional definition of marriage does not impinge on rights of personal autonomy, intimate association, self-definition, etc. ...............................................................................37

c.     Limiting marriage to the union of a man and a woman does not implicate a suspect class .........................................................39

     i.     Traditional marriage does not discriminate based on sex .....................................................................................39

     ii.     Traditional marriage does not discriminate based on sexual orientation .................................................................40

     iii.     Traditional marriage does not discriminate against children ...............................................................................46

3.     Traditional marriage satisfies constitutional review ..................................48

a.     States recognize opposite-sex marriages to encourage responsible procreation, and this rationale does not apply to same-sex couples ...................................................................50

b.     Many courts have rejected the theory that traditional marriage is about homosexual animus ........................................................55

4.     No other limiting principle for marriage rights is apparent ......................56

CONCLUSION ..............................................................................................................60

CERTIFICATE OF SERVICE .......................................................................................61

# TABLE OF AUTHORITIES

**CASES**

*Adams v. Howerton*,
　486 F. Supp. 1119 (C.D. Cal. 1980) ........................................................................50

*Alaska Packers Ass'n v. Industrial Accident Comm'n*,
　294 U.S. 532 (1935)................................................................................................24

*Alemite Mfg. Corp. v. Staff*,
　42 F.2d 832 (2d Cir. 1930)......................................................................................14

*Andersen v. King Cnty.*,
　138 P.3d 963 (Wash. 2006)...............................................................................49, 50

*Anderson v. Liberty Lobby, Inc.*,
　477 U.S. 242 (1986).................................................................................................5

*Baehr v. Lewin*,
　852 P.2d 44 (Haw. 1993) ........................................................................................42

*Baker by Thomas v. Gen. Motors Corp.*,
　522 U.S. 222 (1998)...........................................................................................24, 32

*Baker v. Nelson*,
　191 N.W.2d 185 (Minn. 1971)................................................................................50

*Baker v. Nelson*,
　409 U.S. 810 (1972)....................................................................................32, 33, 36

*Baker v. Wade*,
　769 F.2d 289 (5th Cir. 1985) ..................................................................................43

*Bd. of Trs. of Univ. of Ala. v. Garrett*,
　531 U.S. 356 (2001)................................................................................................49

*Bishop v. United States ex rel. Holder*,
　962 F. Supp. 2d 1252 (N.D. Okla. 2014) ...........................................................9, 40

*Bostic v. Rainey*,
　No. 2:13-cv-395, 2014 WL 561978 (E.D. Va. Feb. 13, 2014) ................9, 34, 37, 56

*Bourke v. Beshear*,
　No. 3:13-CV-750-H, 2014 WL 556729 (W.D. Ky. Mar. 19, 2014)....................9, 10

*Brock v. State*,
　85 Ind. 397 (1882)............................................................................................46, 47

*Brown v. Board of Education of Topeka*,
    347 U.S. 483 (1954)......................................................................................23

*C.E.W. v. D.E.W.*,
    845 A.2d 1146 (Me. 2004)...........................................................................57

*Catalano v. Catalano*,
    170 A.2d 726 (Conn. 1961) .........................................................................27

*Celebration Int'l, Inc. v. Chosun Int'l, Inc.*,
    234 F. Supp. 2d 905 (S.D. Ind. 2002).........................................................18

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).......................................................................................5

*Certain Underwriters of Lloyd's v. Gen. Accident Ins. Co. of Am.*,
    909 F.2d 228 (7th Cir. 1990) .........................................................................5

*Chicago United Indus., Ltd. v. City of Chicago*,
    445 F.3d 940 (7th Cir. 2006) ..................................................................10, 11

*Citizens for Equal Prot. v. Bruning*,
    455 F.3d 859 (8th Cir. 2006) ..................................................................43, 50

*City of Cleburne v. Cleburne Living Center*,
    473 U.S. 432 (1985).....................................................................................44

*Cnty. of Sacramento v. Lewis*,
    523 U.S. 833 (1998).....................................................................................35

*Cook v. Gates*,
    528 F.3d 42 (1st Cir. 2008)..........................................................................43

*Conaway v. Deane*,
    932 A.2d 571 (Md. 2007) .............................................................................50

*Cook v. Cook*,
    104 P.3d 857 (Ariz. Ct. App. 2005).............................................................26

*Cunningham v. Cunningham*,
    206 N.Y. 341 (1912).....................................................................................27

*Davis v. Federal Election Commission*,
    554 U.S. 724 (2008).....................................................................................22

*Dean v. District of Columbia*,
    653 A.2d 307 (D.C. 1995) ...........................................................................50

*De Leon v. Perry*,
    No. SA-13-CA-00982-OLG, 2014 WL 715741 (W.D. Texas Feb. 26, 2014) ........................9

*DeBoer v. Snyder*,
    No. 14-1341, Doc. 22-1 at 3 (6th Cir. Mar. 25, 2014) ...........................................................10

*Diversified Mortgage Investors v. U.S. Life Title Ins. Co. of New York*,
    544 F.2d 571 (2d Cir. 1976)....................................................................................................12

*E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*,
    414 F.3d 700 (7th Cir. 2005) ..................................................................................................18

*Equal. Found. of Greater Cincinnati, Inc. v. City of Cincinnati*,
    128 F.3d 289 (6th Cir. 1997) ..................................................................................................43

*Ex Parte Young*,
    209 U.S. 123 (1908)..............................................................................................................6, 7

*Family & Children's Ctr., Inc. v. Sch. City of Mishawaka*,
    13 F.3d 1052 (7th Cir. 1994) ..................................................................................................22

*Gianni Cereda Fabrics, Inc. v. Bazaar Fabrics, Inc.*,
    335 F. Supp. 278 (S.D. N.Y. 1971)........................................................................................19

*Gomez v. Perez*,
    409 U.S. 535 (1973)................................................................................................................48

*Gonzales v. North Township of Lake County, Indiana*,
    4 F.3d 1412 (7th Cir. 1993) ..............................................................................................13, 14

*Goodridge v. Dep't of Pub. Health*,
    798 N.E.2d 941 (Mass. 2003) .................................................................................................36

*Goodwin v. George Fischer Foundry Sys., Inc.*,
    769 F.2d 708 (11th Cir. 1985) ...........................................................................................25, 26

*Graham v. Med. Mut. of Ohio*,
    130 F.3d 293 (7th Cir. 1997) ..................................................................................................11

*Griswold v. Connecticut*,
    381 U.S. 479 (1965)................................................................................................................38

*Gunn v. Univ. Comm. to End War in Viet Nam*,
    399 U.S. 383 (1970)................................................................................................................14

*Harris v. City of Zion*,
    927 F.2d 1401 (7th Cir. 1991) ................................................................................................13

*Hawkins v. Moss*,
503 F.2d 1171 (4th Cir. 1974) ..............................................................................25

*Hearne v. Bd. of Educ. of Chicago*,
185 F.3d 770 (7th Cir. 1999) ..................................................................................6

*Hemphill v. Orloff*,
277 U.S. 537 (1928).................................................................................................25

*Henry v. Himes*,
No. 1:14-cv-00129-TSB, 2014 WL 1512541 (S.D. Ohio Apr. 16, 2014) ...............10

*Herbert v. Kitchen*,
134 S. Ct. 893 (Jan. 6, 2014)..................................................................................9

*Hernandez v. Robles*,
805 N.Y.S.2d 354 (N.Y. App. Div. 2005) ............................................................40

*Hernandez v. Robles*,
855 N.E.2d 1 (N.Y. 2006).......................................................................50, 51, 55

*Hesington v. Hesington's Estate*,
640 S.W.2d 824 (Mo. Ct. App. 1982).....................................................................27

*Hohe v. Casey*,
868 F.2d 69 (3d Cir. 1989)......................................................................................4

*Illinois Bell Tel. Co. v. WorldCom Tech., Inc.*,
157 F.3d 500 (7th Cir. 1998) ..............................................................................4, 5

*In re Kandu*,
315 B.R. 123 (Bankr. W.D. Wash. 2004) .............................................................50

*In re Lawrance*,
579 N.E.2d 32 (Ind. 1991) ....................................................................................16

*In re M.C.*,
195 Cal. App. 4th 197 (2011) ................................................................................57

*In re Marriage of J.B. & H.B.*,
326 S.W.3d 654 (Tex. App. 2010)................................................................50, 51, 56

*In re Parentage of L.B.*,
122 P.3d 161 (Wash. 2005).....................................................................................57

*In re Paternity of S.R.I.*,
602 N.E.2d 1014 (Ind. 1992) .................................................................................47

*Jackson v. Abercrombie*,
   884 F. Supp. 2d 1065 (D. Haw. 2012) .................................................................40, 49, 50

*Johnson v. Robinson*,
   415 U.S. 361 (1974) .........................................................................................35, 48

*K.M. v. E.G.*,
   37 Cal. 4th 130 (2005) ...........................................................................................57

*Kerrigan v. Comm'r of Pub. Health*,
   957 A.2d 407 (Conn. 2008) ....................................................................................36

*Kitchen v. Herbert*,
   961 F. Supp. 2d 1181 (D. Utah 2013) .......................................................... *passim*

*Korte v. Sebelius*,
   735 F.3d 654 (7th Cir. 2013) .................................................................................18

*LaChappelle v. Mitten*,
   607 N.W.2d 151 (Minn. Ct. App. 2000) .................................................................57

*Laikola v. Engineered Concrete*,
   277 N.W.2d 653 (Minn. 1979) ................................................................................27

*Laird v. Tatum*,
   408 U.S. 1 (1972) ...................................................................................................23

*Lawrence v. Texas*,
   539 U.S. 558 (2003) ...........................................................................38, 42, 43, 55

*Libertarian Party of Ind. v. Marion Cnty. Bd. of Voter Registration*,
   778 F. Supp. 1458 (S.D. Ind. 1991) .........................................................................6

*Lofton v. Sec'y of the Dep't of Children & Family Servs.*,
   358 F.3d 804 (11th Cir. 2004) .........................................................................43, 50

*Loving v. Virginia*,
   388 U.S. 1 (1967) ................................................................................... *passim*

*M.L.B. v. S.L.J.*,
   519 U.S. 102 (1996) ...............................................................................................41

*Manning v. Hunt*,
   119 F.3d 254 (4th Cir. 1997) ...................................................................................4

*Mason v. Mason*,
   775 N.E.2d 706 (Ind. Ct. App. 2002) ........................................................28, 29, 31

*Mathews v. Lucas*,
    427 U.S. 495 (1976)........................................................................48

*Michael H. v. Gerald D.*,
    491 U.S. 110 (1989)........................................................................53

*Morrison v. Sadler*,
    821 N.E.2d 15 (Ind. Ct. App. 2005)................................... *passim*

*Nguyen v. I.N.S.*,
    533 U.S. 53 (2001)..........................................................................53

*Nordlinger v. Hahn*,
    505 U.S. 1 (1992)............................................................................49

*Pers. Adm'r of Mass. v. Feeney,*
    442 U.S. 256 (1979)........................................................................41

*Pierce v. Soc'y of Sisters*,
    268 U.S. 510 (1925)........................................................................38

*Preston v. Thompson*,
    589 F.2d 300 (7th Cir. 1978) ..........................................................4

*Price-Cornelison v. Brooks*,
    524 F.3d 1103 (10th Cir. 2008) ....................................................43

*Raftopol v. Ramey*,
    12 A.3d 783 (Conn. 2011) ............................................................57

*Reno v. Flores*,
    507 U.S. 292 (1993)........................................................................52

*Roberts v. United States Jaycees*,
    468 U.S. 609 (1984)........................................................................39

*Robicheaux v. Caldwell*,
    No. 13-5090, 2013 WL 6198279 (E.D. La Nov. 27, 2013) ............7

*Roche v. Washington*,
    19 Ind. 53 (1862)............................................................................28

*Romer v. Evans*,
    517 U.S. 620 (1996)........................................................................43

*Schmidt v. Lessard*,
    414 U.S. 473 (1974)........................................................................14

*Schroeder v. Hamilton Sch. Dist.*,
  282 F.3d 946 (7th Cir. 2002) ............................................................43

*Sclamberg v. Sclamberg*,
  41 N.E.2d 801 (Ind. 1942) ...............................................................28

*Sevcik v. Sandoval*,
  911 F. Supp. 2d 996 (D. Nev. 2012)...............................14, 39, 40, 50

*Sherman v. Cmty. Consol. Sch. Dist. 21 of Wheeling Twp.*,
  980 F.2d 437 (7th Cir. 1992) ..............................................................7

*Siegel v. LePore*,
  234 F.3d 1163 (11th Cir. 2000) ...........................................................4

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976).............................................................................6

*Singer v. Hara*,
  522 P.2d 1187 (Wash. Ct. App. 1974) ..........................................50, 51

*Slaughter-House Cases*,
  83 U.S. 36 (1872).............................................................................38

*Smelt v. County of Orange*,
  374 F. Supp. 2d 861 (C.D. Cal. 2005) ..............................................50

*SmithKline Beecham Corp. v. Abbott Labs.*,
  740 F.3d 471 (9th Cir. 2014) ............................................................43

*Standhardt v. Superior Court ex rel. Cnty. of Maricopa*,
  77 P.3d 451 (Ariz. Ct. App. 2003) ........................................49, 50, 55

*Stanley v. Illinois*,
  405 U.S. 645 (1972)..........................................................................46

*Steffan v. Perry*,
  41 F.3d 677 (D.C. Cir. 1994) ............................................................43

*T.M.H. v. D.M.T.*,
  79 So.3d 787 (Fla. Dist. Ct. App. 2011) ...........................................57

*Tanco v. Haslam*,
  No. 3:13-cv-01159, 2014 WL 1117069 (M.D. Tenn. Mar. 20, 2014)....................10

*Tigner v. Texas*,
  310 U.S. 141 (1940)..........................................................................48

*Tucker v. Branker,*
    142 F.3d 1294 (D.C. Cir. 1998) .................................................................41

*United States v. Windsor,*
    133 S. Ct. 2675 (2013) ................................................................... *passim*

*Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,*
    454 U.S. 464 (1982)...................................................................................13

*V.C. v. M.J.B.,*
    748 A.2d 539 (N.J. 2000)...........................................................................57

*Varnum v. Brien,*
    763 N.W.2d 862 (Iowa 2009) ...............................................................36, 37

*Veney v. Wyche,*
    293 F.3d 726 (4th Cir. 2002) ....................................................................43

*Walgreen Co. v. Sara Creek Prop. Co.,*
    966 F.2d 273 (7th Cir. 1992) ......................................................................4

*Washington v. Davis,*
    426 U.S. 229 (1976)...................................................................................41

*Washington v. Glucksberg,*
    521 U.S. 702 (1997)..............................................................................36, 37

*Weber v. Aetna Cas. & Sur. Co.,*
    406 U.S. 164 (1972)...................................................................................47

*Westinghouse Elec. Corp. v. Free Sewing Mach. Co.,*
    256 F.2d 806 (7th Cir. 1958) ....................................................................12

*Wilson v. Ake,*
    354 F. Supp. 2d 1298 (M.D. Fla. 2005)....................................................50

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008).........................................................................................4

*Wis. Educ. Ass'n Council v. Walker,*
    705 F.3d 640 (7th Cir. 2013) ....................................................................49

*Wolf v. Walker,*
    No. 3:14-cv-00064-bbc (W.D. Wisc. Mar. 4, 2014)..................................10

*Woodward v. United States,*
    871 F.2d 1068 (Fed. Cir. 1989).................................................................43

**FEDERAL STATUTES**

28 U.S.C. § 1341 ...........................................................................................................17

42 U.S.C. § 666(a)(5)(G) .............................................................................................53

**STATE STATUTES**

13 Del. Code § 8-201 ....................................................................................................57

Conn. Gen. Stat. § 46b-20 ...........................................................................................37

Conn. Gen. Stat. § 46b-20-a .........................................................................................37

D.C. Code §§ 16-831.01 *et seq.* ..................................................................................57

Ind. Code § 16-36-1-3 ..................................................................................................16

Ind. Code § 16-36-1-7 ..................................................................................................16

Ind. Code § 29-1-2-7 ....................................................................................................47

Ind. Code § 29-1-2-8 ....................................................................................................47

Ind. Code § 31-1-1-1 ....................................................................................................41

Ind. Code § 31-7-1-2 ....................................................................................................41

Ind. Code § 31-9-2-88 ..................................................................................................46

Ind. Code § 31-11-1-1 .................................................................................... 6, 8, 42, 46

Ind. Code § 31-11-1-1(a) ...........................................................................................1, 5

Ind. Code § 31-11-1-1(b) .......................................................................................1, 5, 41

Ind. Code § 31-11-4-2 ..................................................................................................46

Ind. Code § 31-11-4-4 ..................................................................................................27

Ind. Code § 31-11-4-11 ................................................................................................27

Ind. Code § 31-11-8-6 ........................................................................................27, 29, 30

Ind. Code § 31-11-11-7 ..................................................................................................8

Ind. Code § 31-14-6-1 ..................................................................................................46

Ind. Code § 31-14-7 *et seq.* ........................................................................................53

Ind. Code § 31-14-7-1 .............................................................................................47

Ind. Code § 31-14-10-1 ...........................................................................................46

Ind. Code § 31-14-11 *et seq.* .................................................................................47

Ind. Code § 31-16-2 *et seq.* ..................................................................................47

**RULES**

Fed. R. Civ. P. 65 ...............................................................................................7, 8

Fed. R. Civ. P. 65(d) ...............................................................................................14

**REGULATIONS**

42 C.F.R. § 482.13(h)(3) ..........................................................................................16

410 Ind. Admin. Code 16.2-3.1-8(b)(9) ...................................................................16

**OTHER AUTHORITIES**

Frank Bruni, *The New Gay Orthodoxy*, N.Y. Times, Apr. 5, 2014, *available at*
      http://www.nytimes.com/2014/04/06/opinion/ sunday/bruni-the-new-gay-
      orthodoxy.html ..............................................................................................45

Harvey M. Applebaum, *Miscegenation Statutes: A Constitutional and Social Problem*,
      53 Geo. L.J. 49 (1964) ...................................................................................42

Jonathan Turley, *One Big, Happy Polygamous Family*, NY Times, July 21, 2011 ....................59

Joseph Story, *Commentaries on the Conflict of Laws* § 113a (Little Brown, & Co.
      6th ed. 1865) .................................................................................................26

Melanie B. Jacobs, *Why Just Two? Disaggregating Traditional Parental Rights and
      Responsibilities to Recognize Multiple Parents*, 9 J.L. & Fam. Stud. 309 (2007). ................57

Monica Davey, *In Diluting Measure to Ban Gay Marriage, Indiana Shows a Shift*, N.Y.
      Times, Feb. 14, 2014, *available at* http://www.nytimes.com/2014/02/18/us/ politics/in-
      diluting-measure-to-ban-gay-marriage-indiana-shows-a-shift.html ......................................45

Morgan Little, *Gay Marriage Movement Wins Significant Victories in 2013*
      http://www.latimes.com/nation/nationnow/la-pn-gay-marriage-movement-gains-2013-
      20131206,0,1888807.story#axzz2zdVzLoIA .........................................................45

Restatement (Second) of Conflict of Laws § 283(2) (1971)........................................26

Steve Sanders, *The Constitutional Right to (Keep Your) Same-Sex Marriage*,
      110 Mich. L. Rev. 1421 (2012).......................................................................30

*The History of Indiana Law* (Bodenhamer and Shepard, eds.) (2006) ...........................................42

Tony Cook & Barb Berggoetz, *Same-Sex Marriage Ban Won't be on November Ballot*, The
    Indianapolis Star (Feb. 14, 2014), *available at*
    http://www.indystar.com/story/news/politics/2014/02/13/hjr-3-last-minute-maneuver
    -could-spare-2nd-sentence-/5455299/............................................................................44, 45

Willystine Goodsell, *A History of the Family as a Social and Educational Institution* (The
    Macmillan Company 1915) .....................................................................................................58

  
**DEFENDANTS' COMBINED MEMORANDUM IN SUPPORT OF THEIR MOTION
FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTIONS
FOR PRELIMINARY INJUNCTION AND MOTION FOR SUMMARY JUDGMENT**

Defendants Greg Zoeller, William C. VanNess II, M.D., Penny Bogan, Michael A. Brown, Karen M. Martin, and Peggy Beaver respectfully submit this combined memorandum in support of their motion for summary judgment and in opposition to three motions filed by the Plaintiffs: (1) Plaintiffs Nikole Quasney, Amy Sandler, A.Q.-S., and M.Q.-S.'s Motion for Temporary Restraining Order and Preliminary Injunction [Doc. 31]; (2) Plaintiffs Marilyn Rae Baskin, Esther Fuller, Bonnie Everly, Linda Judkins, Dawn Lynn Carver, Pamela Eanes, Henry Greene, Glenn Funkhouser, and C.A.G.'s Motion for Preliminary Injunction [Doc. 35]; and (3) Plaintiffs' Motion for Summary Judgment [Doc. 38].

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Indiana's Defense of Marriage Act provides that "[o]nly a female may marry a male [and o]nly a male may marry a female."  Ind. Code § 31-11-1-1(a).  In addition, "[a] marriage between persons of the same gender is void in Indiana even if the marriage is lawful in the place where it is solemnized."  Ind. Code § 31-11-1-1(b).

Plaintiffs are Indiana residents and comprise five same-sex couples and three minor children of two of the couples.  First Am. Compl. ¶ 1 [Doc. 30].  Four couples are not married: (1) Marilyn Rae Baskin and Esther Fuller ("Baskin-Fuller couple"); (2) Bonnie Everly and Linda Judkins ("Everly-Judkins couple"); (3) Dawn Carver and Pamela Eanes ("Carver-Eanes couple"); and (4) Henry Greene and Glenn Funkhouser, with minor son C.A.G. ("Greene-Funkhouser couple").  *Id.* at ¶ 4.  Nikole Quasney and Amy Sandler ("Quasney-Sandler couple"), who have two daughters A.Q.-S. and M.Q.-S., were married in the Commonwealth of Massachusetts on August 29, 2013.  *Id.* at ¶¶ 27-28.  Sandler states that they were married in

Massachusetts, while on their annual summer vacation to Sandler's family home, because she "was afraid that Niki's health was deteriorating and [she] didn't know if that trip was going to be [their] last trip together."  Sandler Decl. ¶ 15 [Doc. 36-10].  Quasney suffers from Stage IV ovarian cancer and Sandler "worried that this trip could be [her and Niki's] last opportunity to get legally married."  *Id.* at ¶¶ 5, 15.

Plaintiffs assert a variety of harms to personal dignity and pride (*see, e.g.*, Pls.' Prelim. Inj. Mem. at 25 [Doc. 36]; Pls.' Summ. J. Mem. at 1, 4, 8, 18-19 [Doc. 39]), but seek only very limited direct, tangible relief:  The unmarried couples seek marriage licenses from the Defendant Clerks (Pls.' Prelim. Inj. Mem. at 29, and the Quasney-Sandler couple seeks a death certificate for Quasney that lists her as married, with Sandler as her surviving spouse.  Quasney's Prelim. Inj. Mem. at 32 [Doc. 32].  Plaintiffs also identify several possible ways that lack of marriage recognition or licensing may affect same-sex couples generally (*see* Pls.' Prelim. Inj. Mem. at 26-27; Pls.' Summ. J. Mem. at 9-10), but assert no facts showing that they presently incur or are likely in the future to incur any such hypothetical impacts or that any defendants have caused any such impacts to occur or could provide preliminary or final relief addressing any such hypothetical harms.

For example, The Quasney-Sandler couple states that they drive across state lines to receive treatment from a hospital that will recognize their marriage and that they were once denied family membership benefits at a health club run by a hospital.  Quasney's Prelim. Inj. Mem. at 5; *see also* Entry on Pls.' Mot. for TRO at 4 [Doc. 51] ("The Plaintiffs have shown cognizable injuries that a TRO can remedy because Niki drives across state lines to receive treatment from a hospital that will recognize her marriage, [and] Niki and Amy have been denied

a family fitness membership[.]").  But they do not allege facts showing such actions are required by, nor fairly traceable to, state or local government action.

Similarly, Plaintiff Linda Judkins states that she was once temporarily barred from the hospital room of her same-sex partner, Bonnie Everly.  Judkins Decl. ¶ 13 [Doc. 36-4] ("I tried to enter the ICU where Bonnie was, but one nurse tried to keep me out.  We had filled out a form beforehand designating me as a healthcare representative, but it didn't matter; I was blocked from being at Bonnie's side.").  Judkins states, however, that a different nurse eventually allowed her to enter the room.  *Id*. ("[F]inally a different nurse let me in.").  And again, Plaintiffs assert no facts showing such actions are traceable to any of the defendants.

Plaintiffs also argue that Indiana's marriage laws "preclud[e] Plaintiffs Greene and Funkhouser and other parents of same-sex couples from securing legal recognition of their parent-child relationships through established legal mechanisms available to married parents (*e.g.*, the spousal presumption of parenthood, stepparent adoption, and other marital parentage protections) . . . ."  Pls.' Prelim. Inj. Mem. at 11.  Yet Greene and Funkhouser also declare that the State recognizes them *both* as adoptive parents of C.A.G.  Greene Decl. ¶ 13 [Doc. 36-7]; Funkhouser Decl. ¶ 14 [Doc. 36-8].  Plaintiffs Quasney and Sandler allege that they are the parents of two minor children and do not assert that Indiana marriage law has interfered with their legal status as parents.  Quasney Decl. ¶¶ 2, 23 [Doc. 36-9]; Sandler Decl. ¶¶ 3, 17.

Ultimately, Plaintiffs seek no particular preliminary or final relief bearing on any of the general harms they claim same-sex couples suffer by virtue of Indiana's traditional definition of marriage or its law precluding recognition of out-of-state same-sex marriages.  Aside from their specific requests for marriage licenses and a specific type of death certificate, Plaintiffs generally demand only "recognition" of their relationships as marriages.

# LEGAL STANDARDS

## **Preliminary Injunction Standard**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In the injunction context, "irreparable harm" is harm that is "not rectifiable by the entry of a final judgment." *Walgreen Co. v. Sara Creek Prop. Co.*, 966 F.2d 273, 275 (7th Cir. 1992) (citations omitted). And while in some cases "[t]he existence of a continuing constitutional violation constitutes proof of an irreparable harm," *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978), "[c]onstitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction." *Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989). Even where constitutional violations are alleged, there must be "a clear showing of irreparable injury which is neither remote nor speculative, but actual and imminent." *Manning v. Hunt*, 119 F.3d 254, 264-65 (4th Cir. 1997) (internal quotation marks omitted). *See also Siegel v. LePore*, 234 F.3d 1163, 1177-78 (11th Cir. 2000) (per curiam) (rejecting the proposition that "the irreparable injury needed for a preliminary injunction can properly be presumed from a substantially likely equal protection violation" (citation omitted)).

In addition to irreparable harm, a plaintiff seeking a preliminary injunction must also show "that the probability of success on the merits is sufficiently high—or the injury from the enforcement of the order sufficiently great—to warrant a conclusion that the balance of error costs tilts in favor of relief." *Illinois Bell Tel. Co. v. WorldCom Tech., Inc.*, 157 F.3d 500, 503 (7th Cir. 1998). When the party opposing the motion for a preliminary injunction is a political

branch of government, the restraint for issuing such an injunction is particularly high due to public policy considerations, as "the court must consider that all judicial interference with a public program has the cost of diminishing the scope of democratic governance." *Id.*

**Summary Judgment Standard**

Summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Certain Underwriters of Lloyd's v. Gen. Accident Ins. Co. of Am.*, 909 F.2d 228, 231 (7th Cir. 1990). Under this standard, a dispute of fact that is relevant to the moving party's legal position will defeat summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48 (emphasis in original).

## ARGUMENT

**I.    Defendant Zoeller Is Entitled to Summary Judgment Because He Cannot Provide Plaintiffs With Any Relief**

Plaintiffs have sued to have Indiana's Defense of Marriage Act, Indiana Code Section 31-11-1-1, declared unconstitutional. First Am. Compl. at 33. In their Prayer for Relief, they request that the Court issue judgment " Preliminarily and permanently enjoining enforcement by Defendants of Indiana Code Sections 31-11-1-1(a), 31-11-1-1(b), and any other sources of state law that exclude same-sex couples from marriage or refuse recognition to the marriages of same-sex couples entered into in another jurisdiction[.]" First Am. Compl. at 33. However, they request no specific relief from Attorney General Zoeller. *See id.* at 33-34.

Plaintiffs allege that they have sued the Attorney General because he "has the authority to enforce the statutes of the State of Indiana, including its provisions related to the marriage ban,

and has the duty to defend the constitutionality of the enactments of the Indiana Legislature." *Id.* at ¶ 38.  However, a federal court may act "only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976).  Only the parties that actually enforce a challenged statute will be able to redress the asserted injury, which means that Governors and Attorneys General are not suitable defendants with respect to laws they do not actually enforce.  *See Hearne v. Bd. of Educ. of Chicago,* 185 F.3d 770, 777 (7th Cir. 1999) ("[T]he plaintiffs have not and could not ask anything of the governor that could conceivably help their cause [because] the governor has no role to play in the enforcement of the challenged statutes, nor does the governor have the power to nullify legislation once it has entered into force."); *Libertarian Party of Ind. v. Marion Cnty. Bd. of Voter Registration*, 778 F. Supp. 1458, 1461 (S.D. Ind. 1991) (holding that claims against the members of the Indiana State Election Board in a suit seeking to obtain copies of Marion County voter registration data were not justiciable because the Marion County Board could provide all requested relief and the State Election Board could not discipline or remove members of the county board).

The Attorney General has no authority to enforce, or other role respecting, Indiana Code Section 31-11-1-1, which is the only law Plaintiffs seek to have declared unconstitutional. Accordingly, Plaintiffs cannot succeed on their claims against the Attorney General, and the Attorney General is entitled to judgment as a matter of law.

For similar reasons, the Eleventh Amendment bars this action against the Attorney General because the State of Indiana, as a sovereign entity, has not consented to be sued by the Plaintiffs.  Under the doctrine of *Ex Parte Young,* "officers of the state, [who] are clothed with

some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings . . . to enforce against parties affected an unconstitutional act . . . may be enjoined by a Federal court of equity from such action." *Ex Parte Young*, 209 U.S. 123, 155-56 (1908).  Because *Young* presumes some ability of the defendant state official to enforce the law at issue, it does not apply where such responsibility is lacking.  In *Young* itself the Court acknowledged that the sovereign immunity exception it creates applies only when the named state officials have "some connection with the enforcement of the act[.]"  *Id.* at 157.

Accordingly, the Seventh Circuit has rejected lawsuits against a state Attorney General based only on general duties.  *Sherman v. Cmty. Consol. Sch. Dist. 21 of Wheeling Twp.*, 980 F.2d 437, 441 (7th Cir. 1992).  And very recently a district court in Louisiana dismissed a challenge to a traditional marriage definition that named only the Attorney General because the Attorney General had no official connection to enforcement of the law.  *Robicheaux v. Caldwell*, No. 13-5090, 2013 WL 6198279, at *2 (E.D. La Nov. 27, 2013)  ("The Attorney General's sweeping responsibility to enforce the laws of the State . . . lacks the *Ex parte Young* specificity nexus between the Attorney General and the alleged unconstitutional provisions [barring and precluding recognition of same-sex marriage] that is essential to defeat sovereign immunity.").  Again, the Attorney General has no authority to enforce the challenged statutes and is not a proper defendant under the *Young* exception to the Eleventh Amendment.  The Attorney General is therefore entitled to judgment as a matter of law.

## II.  Preliminary Injunctive Relief Is Inappropriate

Under Rule 65 of the Federal Rules of Civil Procedure, a request for preliminary injunctive relief must specify precisely what relief is to be awarded against which defendant. Here, Plaintiffs Quasney and Sandler seek preliminary relief that does the following:

7

(1) enjoins Defendants and all those acting in concert from enforcing the Indiana laws against recognition of Plaintiffs Niki Quasney and Amy Sandler's legal out-of-state marriage as applied to them; and

(2) should Plaintiff Niki Quasney pass away in Indiana, orders William C. VanNess II, M.D., in his official capacity as the Commissioner of the Indiana State Department Of Health, and all those acting in concert, to issue a death certificate that records her marital status as "married" and that lists Plaintiff Amy Sandler as the "surviving spouse;" said order shall require that Defendant VanNess issue directives to local health departments, funeral homes, physicians, coroners, medical examiners, and others who may assist with the completion of said death certificate explaining their duties under the order of this Court.

Quasney's Prelim. Inj. Mem. at 32. All other plaintiffs seek preliminary relief that:

(1) enjoins Defendants from enforcing Indiana Code § 31-11-1-1, prohibiting a person from marrying another person of the same sex or recognizing same-sex marriages;

(2) enjoins Defendants from enforcing any and all other state statutes, regulations or other laws which act as a barrier to or otherwise discourage same-sex couples from marrying, including but not limited to Indiana Code § 31-11-11-7 (prohibiting solemnization of a marriage by same-sex couples);

(3) requires the Defendant Bogan, Martin, Brown, Beaver, and all those acting in concert to issue a marriage license to the adult Plaintiffs and all other same-sex couples [] upon their application and satisfaction of all legal requirements for a marriage in Indiana except for the requirement that they be of different sexes, and requires the Defendant Clerks to register their solemnized marriage as is presently required for all other marriages.

Pls.' Prelim. Inj. Mem. at 28-29. For reasons largely unrelated to the merits of their claims, Plaintiffs' demands for preliminary relief are inappropriate under Rule 65. This memorandum discusses those reasons in this section. Plaintiffs' claims also must fail on the merits, and those arguments are in Part III, though they apply to demands for preliminary and final relief alike.

### A.   In challenges to traditional marriage definitions, the Supreme Court has ruled that injunctions are not appropriate prior to final appellate resolution

This case is one among many lawsuits around the country challenging traditional definitions of marriage (*i.e.*, state laws that define marriage as being between one man and one

woman).  Many, though not all, of these cases were either initiated or reached final judgment in the wake of *United States v. Windsor*, 133 S. Ct. 2675 (2013).  To date, in light of Supreme Court guidance on the issue, in *no case* does a fully contested preliminary or final permanent injunctive decree precluding enforcement of traditional marriage definitions remain in effect. The thrust of these cases is hard to miss:  The traditional definition of marriage has been around a long time.  Its validity is hotly contested, but the outcome of these legal disputes is uncertain, such that the status quo should remain until the Supreme Court squarely addresses the issue.

1.      On January 6, 2014, the Supreme Court of the United States stayed a *permanent* injunction issued by the United States District Court for the District of Utah in *Kitchen v. Herbert*, 961 F. Supp. 2d 1181 (D. Utah 2013), pending final disposition of an appeal to the Tenth Circuit.  *Herbert v. Kitchen*, 134 S. Ct. 893 (Jan. 6, 2014).  In that case, three same-sex couples challenged Utah's constitutional amendment and statutes upholding the traditional definition of marriage.  *Kitchen*, 961 F. Supp. 2d at 1187.  The district court entered a permanent injunction, now fully stayed, that required officials to issue marriage licenses to same-sex couples and to recognize same-sex marriages validly performed in other States.  *Id*. at 1215.

2.      Federal courts across the country have fallen into line by staying injunctions involving traditional marriage definitions, both with respect to licensure of same-sex marriages within a State and recognition of same-sex marriages performed in other jurisdictions.     *See Bishop v. United States ex rel. Holder*, 962 F. Supp. 2d 1252, 1296 (N.D. Okla. 2014) (licensure); *Bostic v. Rainey*, No. 2:13-cv-395, 2014 WL 561978, at *23 (E.D. Va. Feb. 13, 2014) (licensure and recognition); *De Leon v. Perry*, No. SA-13-CA-00982-OLG, 2014 WL 715741, at * 28 (W.D. Texas Feb. 26, 2014) (licensure and recognition); *Bourke v. Beshear*, No.

3:13-CV-750-H, 2014 WL 556729, at * 14 (W.D. Ky. Mar. 19, 2014) (recognition); *DeBoer v. Snyder*, No. 14-1341, Doc. 22-1 at 3 (6th Cir. Mar. 25, 2014) (licensure).

Most recently, in *Henry v. Himes*, No. 1:14-cv-00129-TSB, 2014 WL 1512541, at *1-*2 (S.D. Ohio Apr. 16, 2014), the District Court stayed its ruling pending an appeal to the Sixth Circuit but, with agreement from the defendants, implemented its order requiring defendants to issue birth certificates for the plaintiffs' children listing both same-sex spouses as parents.  The court stayed its final injunction in the main because "[i]t is best that these momentous changes occur upon full review, rather than risk premature implementation or confusing changes . . . [t]hat do[] not serve anyone well."  *Id.* at *1 (quoting *Bourke*, 2014 WL 556729, at *14).[1]

The Supreme Court "sent a strong message" with its "unusual intervention" in *Kitchen v. Herbert* that stayed a final, permanent injunction against enforcement of traditional marriage definitions.  *Bourke*, 2014 WL 556729, at *14.  If a *permanent* injunction must be stayed in this context, it follows that temporary or preliminary relief is inappropriate, particularly given the expedited schedule the parties are following for resolution of the merits of this case. *Wolf v. Walker*, No. 3:14-cv-00064-bbc, Doc. 53 at 3 (W.D. Wisc. Mar. 4, 2014), ("[i]f a preliminary injunction must be stayed as soon as it is entered, it is not clear what purpose it serves.").

**B.      Any legally cognizable injury to Plaintiffs is not irreparable, and a preliminary injunction would not preserve the status quo**

"Preliminary relief is properly sought only to avert irreparable harm to the moving party." *Chicago United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 944 (7th Cir. 2006).  Plaintiffs

---

[1] Similarly, the court in *Tanco v. Haslam*, No. 3:13-cv-01159, 2014 WL 1117069, at *5 (M.D. Tenn. Mar. 20, 2014) denied a stay of injunction that broadly "bar[s] the defendants and those under their supervision from enforcing [Tennessee's anti-recognition statute and constitutional amendment] against the six named plaintiffs in this action." This injunction would appear ripe for issuance of a stay under *Kitchen*, but officials defending the Tennessee statute have not sought a stay from the Sixth Circuit, which issued a stay in *DeBoer v. Snyder*.

have not shown that they stand to suffer immediate irreparable harm absent a preliminary injunction.

1.      Plaintiff Quasney claims that, absent an injunction, she stands to suffer immediate harm if she passes away before conclusion of the litigation and her death certificate lists her as unmarried.  As the declaration of Hilari A. Sautbine, a staff attorney for the Indiana State Department of Health, makes clear, however, a certificate of death can be amended at the request of any interested person.  Sautbine Decl. ¶¶ 10-11.  The statutes do not define "interested person," and the decision whether to honor a request for correction is up to the professional judgment of the funeral director.  *Id.*  Any refusal to honor such a request is subject to legal action in state court.  *Id.* at ¶ 12.  If the Court were later to determine on the merits that Quasney's out-of-state same-sex marriage is entitled to recognition in Indiana, her certificate of death—which is an electronic record—could easily be corrected to reflect that fact. Accordingly, there is no likely irreparable harm with respect to the accuracy of the certificate of death itself.

Furthermore, "preliminary injunctions are intended to preserve the status quo" pending litigation.  *Chicago United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 944 (7th Cir. 2006) (internal quotation marks omitted); *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997) ("[A] mandatory preliminary injunction, that is, an injunction requiring an affirmative act [is] ordinarily cautiously viewed and sparingly issued.").  But an injunction requiring the Commissioner to take a particular action concerning Quasney's as-yet-unneeded death certificate would compel affirmative action, not preserve the status quo.

2.      The remaining plaintiff couples seek a preliminary injunction requiring the defendant clerks to issue marriage licenses.  Pls.' Prelim. Inj. Mem. at 29.  First, again, such

11

relief would not preserve the status quo pending litigation, but would require affirmative acts that would radically change administration of state marriage laws.  This request goes well beyond what Rule 65 authorizes, especially considering that Plaintiffs cite no imminent external event that would prevent them from applying for, and receiving, marriage licenses once their claims are fully adjudicated.  And if these licenses were issued preliminarily and then solemnized, it is hard to see how they could later be "taken back."  With marriage licenses, preliminary relief would amount to final relief for these plaintiffs, and is therefore not authorized by Rule 65.  *See Westinghouse Elec. Corp. v. Free Sewing Mach. Co.*, 256 F.2d 806, 808 (7th Cir. 1958) (affirming a partial denial of a preliminary injunction because "to have granted all the plaintiff asked would have decided this case upon the merits [and s]uch is not the function of a preliminary injunction"); *see also Diversified Mortgage Investors v. U.S. Life Title Ins. Co. of New York*, 544 F.2d 571, 575-76 (2d Cir. 1976) (holding that it "is not the proper function of [a preliminary] injunction order" to "irrevocably alter[ the rights of all the parties and] permanently deprive[ a party] of a [] defense which, under normal circumstances, would be a valid one").

3.      Plaintiff C.A.G. claims that the marriage law injures him "in both tangible and intangible ways."  Pls.' Prelim. Inj. Br. at 16 [Dkt. No. 36].  In this regard, however, Plaintiffs point only to a vague description of a denial of "an economic safety net and other protections and government benefits automatically given to children of married parents."  *Id.*  They also cite to Indiana law presuming parentage of children born to married couples during the marriage and to legitimation of children born out of wedlock.  *Id.* Plaintiffs, however, in no way establish that C.A.G. could benefit from either any of these incidental effects of marriage.  According to the declarations of Plaintiffs Greene and Funkhouser, they are *both* C.A.G.'s legal parents.  Greene

12

Decl. ¶ 13; Funkhouser Decl. ¶ 14.  Plaintiffs do not explain how issuing marriage licenses to Greene and Funkhouser would benefit C.A.G. for purposes of recognition of his parentage.

4.      All Plaintiffs assert that without a preliminary injunction "the State inflicts grave dignitary harm when its law announces that the adult Plaintiffs' relationships are not 'deemed by the State worthy of dignity in the community equal with all other marriages.'"  Pls.' Prelim. Inj. Mem. at 26; Pls.' Summ. J. Mem. at 25 (quoting *Windsor*, 133 S. Ct. at 2692).  Plaintiffs further argue that Indiana's traditional definition of marriage "demeans them and humiliates their children . . . making it even more difficult for the children to understand the integrity and closeness of their own family . . . ."  Pls.' Prelim. Inj. Mem. at 27; Pls.' Summ. J. Mem. at 25 (quoting *Windsor*, 133 S. Ct. at 2694) (internal quotation marks omitted).

Such harm, however, is insufficiently concrete and particularized even to justify Article III cognizability, let alone a preliminary injunction.  In *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 485-86 (1982), the Court held that "psychological consequences presumably produced by observation of conduct with which one disagrees . . . is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms."   And the Seventh Circuit has squarely held that mere offense is insufficient to create the controversy needed to confer Article III standing.  In *Harris v. City of Zion,* 927 F.2d 1401, 1405 (7th Cir. 1991), the court held that "[t]he requirement that the plaintiff allege an 'injury-in-fact,' whether economic or non-economic, excludes simple indignation as a basis for Article III standing. That the plaintiff may be offended by the defendants' conduct is not enough to confer standing."   Similarly, when considering the constitutionality of a crucifixion display in *Gonzales v. North Township of Lake*

13

*County, Indiana*, 4 F.3d 1412, 1416 (7th Cir. 1993), the court stated that "[o]ffense to moral . . . sensitivities does not constitute an injury in fact and is insufficient to confer standing."

*Windsor* does nothing to make these asserted harms cognizable under Article III.  While *Windsor* alluded to the offense or indignity of the plaintiffs in that case, it neither declared those reactions to be sufficient for Article III standing nor made them the object of relief.  Rather, the relief was favorable tax treatment, not simply an abstract directive to no one in particular to "recognize" the plaintiffs' same-sex marriages.  Indeed, if all Plaintiffs seek is to quash an affront to their dignity or the humiliation of their children, there is no apparent reason for any decree to be directed to any particular defendant, for it would do nothing to alter anyone's conduct.  As the district court observed in *Sevcik v. Sandoval*, 911 F. Supp. 2d 996, 1018 (D. Nev. 2012)**,** "[a]ny stigma arising out of the State's refusal to recognize same-sex relationships as "marriages" simply cannot be removed by judicial decree."  Accordingly, it is hard to understand how such a preliminary injunction would, as an exercise of the judicial power, afford any relief.

What is more, the Supreme Court has held that the requirement under Rule 65(d) of the Federal Rules of Civil Procedure that a "federal court [must] frame its [preliminary injunctions] so that those who must obey them will know what the court intends to require and what it means to forbid . . . is absolutely vital in a case where a federal court is asked to nullify a law duly enacted by a sovereign State."  *Gunn v. Univ. Comm. to End War in Viet Nam*, 399 U.S. 383, 389 (1970).  Plaintiffs must state with specificity not only *who* is to be bound, *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832 (2d Cir. 1930) ("[N]o court can make a decree which will bind any one but a party; . . . it cannot lawfully enjoin the world at large, [and i]f it assumes to do so, the decree is pro tanto brutum fulmen, and the persons enjoined are free to ignore it." (opinion of Hand, J.)), but also *how* they are to be bound, *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (per

curiam) ("Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed.").   These requirements implicitly foreclose preliminary symbolic relief.

5.      Plaintiffs also list a variety of incidental harms that *may* follow from non-recognition of same-sex marriages in Indiana, but they neither support a claim that these harms are inevitable, nor trace them to any defendant, nor establish that they will be avoided by a preliminary injunction.  For example, Quasney worries that a hospital may not let her family "be together in an emergency or permit Amy to make medical decisions on [Niki's] behalf[;] . . . apply for insurance or other benefits, settle claims and access assets, transfer title of real and personal property, and provide legal evidence of the face of a family member's death." Quasney's Prelim. Inj. Mem. at 5, 29.  Additionally, she states that "Amy may also be denied survivor benefits under Indiana law . . . [such as] a $25,000 allowance from Niki's estate . . . and [the ability] to elect to receive 'one-half of the net personal and real estate of' [Niki], regardless of the disposition made in the will."  *Id*. at 30 (internal citations omitted).

The remaining Plaintiffs list similar incidental harms broadly denied to all same-sex couples, including:

- The ability to make caretaking decisions for one another in times of death and serious illness, including the priority to make medical decisions for an incapacitated spouse, the automatic right to make burial decisions, and other decisions concerning disposition and handling of remains of deceased spouses.

- The right to inheritance under the laws of intestacy and the right of a surviving spouse to an elective share[.]

- Other protections, benefits, rights, and responsibilities, including survivor benefits for spouses of public safety officers killed in the line of duty, state retirement fund survivor benefits for spouses, legal protections granted to spouses and their children through mandatory waiting periods prior to marriage dissolution, requirements of fair division of marital property, protection of the criminal code

that makes it a crime to fail to support a needy spouse, and the right to file joint state income tax returns.

Pls.' Prelim. Inj. Mem. at 26; Pls.' Summ. J. Mem. at 9-10.  Plaintiffs further argue that even if they were to marry in another jurisdiction and return to live in Indiana, "they and their children still may be denied certain federal benefits or have challenges obtaining them[.]"  Pls.' Prelim. Inj. Mem. at 26.  Specifically, Plaintiffs allege they *may* be unable to obtain "Social Security benefits, . . . spousal veterans benefits[,] . . . Family Medical Leave Act [benefits, and] . . . spousal benefits under copyright statute[.]" *Id*. at 26-27.

None of the Plaintiffs, however, ever substantiate that they will, in fact, suffer these harms, but speak in terms only of what *may* occur.  One would think, for example, that Plaintiffs could avert uncertainty about hospital visitation and medical decision making through a series of advance directives.  Hospitals must honor a patient's directive concerning who may visit and who may make medical decisions if the patient lacks capacity to make them.  Ind. Code §§ 16-36-1-3, -7 (Health Care Consent Act); *In re Lawrance*, 579 N.E.2d 32, 39 (Ind. 1991) ("Indiana's statutes reflect a commitment to patient self-determination[, and] the decision to allow the transfer of authority [to make healthcare decisions] rests on the principle of the basic human need of self-determination and individual autonomy." (citation omitted)); 410 Ind. Admin. Code 16.2-3.1-8(b)(9) (subject to reasonable restrictions, a hospital "must provide immediate access to any resident by . . . [anyone] visiting with the consent of the resident."); *see also* 42 C.F.R. § 482.13(h)(3) (hospitals participating in Medicare and Medicaid programs cannot "restrict, limit, or otherwise deny visitation privileges on the basis of . . . sexual orientation . . . ").

One would also think that Plaintiffs could address concerns about post mortem property distribution by executing will and trust documents that carry out their wishes, and even by way of transferring property to each of their partners in advance of their passing.  In fact, at least

16

some of the Plaintiffs *have* undertaken such preventative measures.   The Baskin-Fuller couple has "set[] up trusts, advanced directives, and health-care powers of attorney in order to protect [them]selves and [their] relationship . . . ."   Fuller Decl. ¶ 9 [Doc. 36-2].   None of the other Plaintiffs has explained why it is not possible for them to protect their rights in a similar fashion.

Nor do Plaintiffs explain how any of these incidental harms is traceable to any defendant. None of the defendants can take official action that would permit hospital visitation or medical decision making, secure Social Security benefits, permit intestate succession, authorize handling of funeral arrangements, apply for insurance, settle claims or access assets, or transfer title of real and personal property.   Accordingly, no injunction on account of these incidental impacts of marriage law is appropriate.[2]

Similarly, Plaintiffs do not demonstrate that a preliminary injunction would prevent any of these incidental harms from occurring.   A preliminary injunction governing a death certificate, for example, would plainly have no impact on hospital visitation or medical decision making for Quasney.   And it is highly dubious to suppose that, being less than final, it would govern settlement of Quasney's legal affairs or Sandler's insurance or social security claims.   In any event, none of the Plaintiffs have provided any showing that the injunctions they request would have any such impact.   Accordingly, these injunctions must be denied because the claimed relief is far too speculative.

### C.  The public interest and balancing of equities weigh against preliminary relief

As the Supreme Court expressly declared in *United States v. Windsor*, 133 S. Ct. 2675, 2691 (2013), and as the Court's stay of final relief in *Kitchen* implies, States have a compelling

---

[2]  With respect to Plaintiffs' mention of the ability to file joint tax returns, not only have plaintiffs failed to link that injury to any defendant, but in any event the Tax Injunction Act would preclude jurisdiction over a request for such relief.   *See* 28 U.S.C. § 1341 ("The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.").

interest in defining marriage and administering their own marriage laws that outweighs claimed violations of constitutional rights.  Again, the stay in *Kitchen* (and subsequent stays in lower federal courts) demonstrates this principle.  *See Korte v. Sebelius,* 735 F.3d 654, 665 (7th Cir. 2013) ("If the moving party [shows irreparable harm and some likelihood of success on the merits,] the court . . . also considers the public interest.").

Here, the public interest in the continuity of Indiana's marriage laws—*i.e.*, the interest in avoiding the potential for public confusion over a series of judicial injunctions that keep re-setting the definition of marriage—works against preliminary relief.  Preliminary injunctive relief would disrupt public understanding of the meaning and purpose of marriage in Indiana, prompt unreasonable expectations for the defendant clerks in this case and other clerks around the State to issue unauthorized marriage licenses to all same-sex couples that demand them, raise expectations that any number of Indiana laws pertaining to marriage are suddenly suspended or modified, and generally create unnecessary confusion among the public.  This would be especially damaging with respect to public acts that cannot be undone, such as the issuance of marriage licenses, even if it technically applies only to the plaintiffs in this case.

This is also a matter of balancing the equities, and in this regard, timing matters.  For a preliminary injunction to be appropriate, a Plaintiff's irreparable harm must not be speculative.  *See E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005).  Nor, however, can it be an injury that a plaintiff has endured for a substantial period without seeking relief.  *See Celebration Int'l, Inc. v. Chosun Int'l, Inc.*, 234 F. Supp. 2d 905, 920 (S.D. Ind. 2002) (Though not dispositive, "tardiness weighs against a plaintiff's claim of irreparable harm . . . .").  Here, the timing of Plaintiffs' lawsuit weighs against their claims for preliminary relief.

18

1.      Plaintiffs' claims for specific relief (concerning the certificate of death and the marriage licenses) are premature.  Plaintiff Quasney's request to prevent an inaccurate certificate of death is premature, precisely because it is so highly contingent.  Whether Quasney will pass away during the course of this litigation is simply unknowable.  And if she were to pass away during the course of this litigation, either her estate or Sandler could at that point seek a TRO (subject to the same defenses otherwise applicable now) concerning information to be included on her certificate of death.   Claims for preliminary relief in the form of marriage licenses are premature because, once granted, they cannot unilaterally be undone.  There is no procedure for cancelling or taking back a marriage license.

2.      Plaintiffs' demands for a preliminary injunction designed to assuage incidental harms as well as injuries to pride and dignity, even aside from lack of Article III cognizability, come too late.  Plaintiffs do not claim that the various indignities they claim to suffer are newly inflicted.  They all claim to be in long-term relationships lasting years, if not decades.  Pls.' Prelim. Inj. Mem. at 2-5; Quasney's Prelim. Inj. Mem. at 3.  Indiana law has never during any of that time recognized same-sex marriages, yet no plaintiffs have sought judicial relief for their alleged dignity harms until now.  A plaintiff who suffers supposedly irreparable harm for a substantial period before filing a lawsuit to redress it is not entitled to preliminary relief.  *Gianni Cereda Fabrics, Inc. v. Bazaar Fabrics, Inc.*, 335 F. Supp. 278, 280 (S.D. N.Y. 1971). Accordingly, the balancing of equities weighs against preliminary relief.

## III.    Plaintiffs' Claims Fail on the Merits

The fundamental merits issue is whether States may confer the special status of "marriage" on qualified opposite-sex couples without also conferring it on any other relationships, including same-sex couples.  Legitimate justifications for traditional marriage are

long-established, even if sometimes forgotten or deemed old-fashioned. In short, a State may rationally confer civil marriage on one man and one woman in order to encourage the couple to stay together for the sake of any children that their sexual union may create.   Traditional marriage focuses on protecting children and creating optimal childrearing environments, not on celebrating adult romantic relationships. The male-female relationship alone enables the married persons—in the ideal—to beget children who have a biological relationship to both legal parents. In this way, a State's decision to ratify the sexual union between a man and a woman confirms a deeply significant understanding of human relationships and encourages such unions as the standard for the human family.

In contrast, Plaintiffs supply no alternative governmental rationale for bestowing special civic status on same-sex couples.  While same-sex couples may do an excellent job of raising children, they cannot provide the family structure where those who raise a child combine both legal responsibility for and a biological connection with that child.  Instead, the central rationale for same-sex marriage is social approval of the couple's sexual relationship as such.  But there is no reason for government to take any interest in that sexual relationship—and certainly nothing like the government's interest in encouraging long-term care for the children produced by heterosexual intercourse.  And because any interest in same-sex couples bears no link to any characteristic innately limited to them, it contains no limiting principle for excluding other groupings of individuals.  Ultimately, there is no legal argument *for* same-sex marriage, only an argument *against* civil marriage as a special, limited status.

**A. Plaintiffs lack standing to assert claims for disparate treatment of children based on marital status of parents and for association, integrity, autonomy, and self-definition, insofar as those claims relate to "legal recognition of their parent-child relationships"**

In their complaint, Plaintiffs assert that Indiana' marriage laws are unconstitutional owing to what Plaintiffs describe as "Discrimination Based on Parental Status."  First Am. Compl. ¶ 104.  They say that Indiana law "impermissibly classifies children, including the child Plaintiffs, on the bases of their parents' sex, sexual orientation, and marital status[.]"  *Id.*  They also assert that Indiana's traditional marriage definition impinges constitutional rights to "family integrity and association."  *Id*. at ¶ 81.  Plaintiffs more specifically argue infringement of a right to secure "legal recognition of their parent-child relationships through established legal mechanisms available to married parents (*e.g.*, the spousal presumption of parenthood, stepparent adoption and other marital parentage protections) . . . ."  Pls.' Summ. J. Mem. at 18.  To the extent these claims are analytically distinguishable from the other equal protection and due process claims asserted by the Plaintiffs, however, no Plaintiff has standing to raise them.

The declarations submitted by Plaintiffs Quasney and Sandler demonstrate that they are the legal parents of Plaintiffs A.Q.-S. and M.Q.-S., and the declarations of Greene and Funkhouser establish that they are the legal parents of Plaintiff C.A.G.  Quasney Decl. ¶¶ 2, 23; Sandler Decl. ¶¶ 3, 17; Greene Decl. ¶ 13; Funkhouser Decl. ¶ 14.  This is important because the only specific legal impact of Indiana's marriage laws relating to a supposed "disparate treatment of children of unmarried parents based on the status or conduct of their parents" and the supposed right to "family integrity and association" have to do with the presumption of parentage and the conferral of legitimacy occasioned by marriage.  With respect to the parental presumptions and legitimacy they discuss, A.Q.-S., M.Q.-S., C.A.G., and their parents would not benefit by prevailing in this litigation.  Their parent-child relationships are fully established, according to the allegations of the First Amended Complaint and their respective declarations. First Am. Compl. ¶¶ 25, 28; Quasney Decl. ¶¶ 2, 23; Sandler Decl. ¶¶ 3, 17; Greene Decl. ¶ 13;

Funkhouser Decl. ¶ 14.  They may have acquired those rights by means other than "established legal mechanisms available to married parents," but they do not allege that if they prevail in this litigation Plaintiffs will undo the current legal underpinnings of their parental rights and then re-establish those rights via some other "established legal mechanisms."

Where plaintiffs cannot benefit from success on a particular legal claim, they do not have standing to assert it.  As the Supreme Court recently held in *Davis v. Federal Election Commission*, 554 U.S. 724 (2008), "standing is not dispensed in gross. Rather, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Id.* at 734 (internal quotation and citation omitted).  And to have standing to bring a claim, a plaintiff "must have an actual stake in the outcome" of the dispute.  *Family & Children's Ctr., Inc. v. Sch. City of Mishawaka*, 13 F.3d 1052, 1058 (7th Cir. 1994).

Plaintiffs vaguely assert that Indiana's traditional definition of marriage denies them "an economic safety net and other protections and government benefits automatically given to children of married parents, causing these families to have less money to spend on child-related expenses."  Pls.' Summ. J. Mem. at 24.  They cite only the declarations of Funkhouser and Greene.  The Funkhouser declaration, however, refers only to a general desire for "the same benefits and protections" as children of married couples.  Funkhouser Decl. ¶ 15.  The Greene declaration says only that he and Funkhouser "fear the future" for C.A.G. if one of them were to pass away, that they "likely will not be able to pass on the assets [they] acquired together in the same way that married couples can," and that C.A.G. will most likely be penalized financially because [they] are not legally married."  Greene Decl. ¶¶ 16-17.

Such vague hypotheticals do not establish concrete or particularized harm, traceability to the defendants, or the likelihood that the Court could provide redress.  It does not explain what

assets could not be passed on, why they could not be passed on, and whether plaintiffs have already taken action to ameliorate any potential problems.  All of these are critical for standing, because without providing such specifics Plaintiffs cannot establish that adjudication of this claim will amount to anything more than an advisory opinion.  *See Laird v. Tatum*, 408 U.S. 1, 14 (1972) (There must be "a claim of specific present objective harm or a threat of a specific future harm; the federal courts established pursuant to Article III of the Constitution do not render advisory opinions.") (internal quotation marks omitted).

Finally on this point, Plaintiffs also assert "intangible" or "dignitary" injury, but again, those are not cognizable Article III harms.  *See* Part II.B., *supra*.  In neither *Windsor* nor *Brown v. Board of Education of Topeka*, 347 U.S. 483 (1954), which Plaintiffs cite as grounds for making these claims, did any plaintiffs litigate claims based solely on a need to redress harm to dignity.  While both cases alluded to such harms as part of the rationales for their decisions, they did not rely on them to justify standing.  In *Windsor*, the plaintiffs were adults seeking specific tax treatment, and the potential impact of DOMA on children was only relevant to the majority's reasoning on the merits.  *Windsor*, 133 S. Ct. at 2682, 2695-96.  In *Brown*, the plaintiffs were injured by a law requiring segregated education that directly impacted each plaintiff, children especially.  While dignity harms factored into the analysis, they were not the basis for the claims asserted or the object of the relief entered.  *Brown*, 347 U.S. at 493 (The question presented is "[d]oes segregation of children in public schools solely on the basis of race, even though the physical facilities and other 'tangible' factors may be equal, deprive the children of the minority group of equal educational opportunities?").

Accordingly, the Court has no jurisdiction to consider the claim for an equal protection violation based on a supposed classification of children according to parents' marital status,

action or conduct or for due process violation based on inability to establish parentage "through established legal mechanisms available to married parents."

### B. There is no constitutional right to have one's out-of-state same-sex marriage or civil union recognized in Indiana

Quasney and Sandler claim a federal constitutional right under the Equal Protection and Due Process Clauses to have their Massachusetts marriage recognized by Indiana courts under Indiana law. Pls.' Summ. J. Mem. at 12-13, 15-19, 22. The thrust of their argument seems to be that Indiana must accord full faith and credit to the marriage laws of other States, but they do not make any claims under the Full Faith and Credit Clause. Such a claim would be unavailing in any event, as the Full Faith and Credit Clause requires recognition of *judgments* of other States and does not extend to a State's *acts* or *statutes*. *Baker by Thomas v. Gen. Motors Corp.*, 522 U.S. 222, 232 (1998) ("The Full Faith and Credit Clause does not compel a state to substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate." (quotation and citation omitted)). And even with respect to judgments, "there are some limitations upon the extent to which a state will be required by the full faith and credit clause to enforce even the judgment of another state, in contravention of its own statutes or policy." *Alaska Packers Ass'n v. Industrial Accident Comm'n*, 294 U.S. 532, 546 (1935).

If the Full Faith and Credit Clause cannot compel one state to recognize marriages from another, the Fourteenth Amendment has no greater role to play. Plaintiffs cite *Loving v. Virginia*, 388 U.S. 1 (1967), for the proposition that same-sex couples with valid out-of-state marriages have a substantive federal right to have their marriages recognized in Indiana. Pls.' Summ. J. Mem. at 15. *Loving*, however, turned not on a fundamental right of interstate marriage recognition, but on a combination of the fundamental right to marry (which includes interracial

couples but not same-sex couples, *see* Part III.B.2.a., *infra*) and the Fourteenth Amendment's protections against racial discrimination.

Ultimately, *Loving* itself demonstrates that a claim for interstate marriage recognition is not a free-standing right, but only a derivative claim that turns entirely on the validity of a state's underlying marriage laws.  There, Virginia could not itself exclude interracial couples from marriage, so it also could not refuse to recognize out-of-state interracial marriages.  *Loving*, 388 U.S. at 4, 11.  Here, whether Indiana can refuse to recognize out-of-state same-sex marriages turns entirely on whether Indiana may itself adhere to the traditional definition of marriage.  The staggering implications of Plaintiffs' broader claim for interstate marriage recognition starkly illustrate its foundational flaws.

### 1. There is no due process right to interstate marriage recognition, particularly where an out-of-state marriage contravenes public policy

For starters, there is no federal due process right to have a license issued in one State— whether for professional, weapons, driving, or marriage purposes—treated as valid by government and courts in another.  *See Hawkins v. Moss*, 503 F.2d 1171, 1176 (4th Cir. 1974) ("[L]icenses to practice law granted by . . . one state, have no extraterritorial effect or value and can vest no right in the holder to practice law in another state."); *see also Hemphill v. Orloff*, 277 U.S. 537, 544, 549, 551 (1928) (holding, against a due process challenge, that a corporation permitted to conduct business in Massachusetts may not do so in Michigan without obtaining a certificate of authority from the Michigan Secretary of State).  Otherwise, States would have to recognize and treat as valid one another's law licenses, medical licenses, concealed-carry gun permits, driver's licenses, and notary public commissions, just to name a few.

Next, even if an out-of-state marriage is viewed as a purely private contract—which it is not—state and federal constitutions permit rejection of out-of-state contracts that contravene

25

public policy.  *See Goodwin v. George Fischer Foundry Sys., Inc.*, 769 F.2d 708, 712-13 (11th Cir. 1985) ("A state may refuse to enforce a contract, valid in the state where made, if the contract conflicts with the public policy of that state.").

Plaintiffs' constitutional theory in contravention of these baseline principles would effectively require Indiana to conform its marriage policy to the varying marriage policies enacted in other States.  Rather than fostering the States' freedom to experiment with different approaches to difficult social questions, Plaintiffs' theory would empower one laboratory to commandeer the others, essentially nationalizing the marriage policy of the most inventive State, including those that might one day permit plural marriages.

Marriage-recognition principles are rooted in the common law of comity, not due process or any other substantive state or federal constitutional doctrine.  The common law choice-of-law starting point is usually the *lex loci* rule, which says a marriage valid in the state of licensure is valid in other states as well.  But that is not, and never has been, the end of the matter. The Restatement (Second) of Conflict of Laws § 283(2) (1971) states that even if a marriage "satisfies the requirements of the state where the marriage was contracted," that marriage will not "be recognized as valid" if "it violates the strong public policy of another state which had the most significant relationship to the spouses and the marriage at the time of the marriage."  This "public policy" exception comports with the "Nation's history, legal traditions, and practices," and indeed dates back before the Fourteenth Amendment.  *See* Joseph Story, *Commentaries on the Conflict of Laws* § 113a, at 168 (Little Brown, & Co. 6th ed. 1865) (noting that exceptions to out-of-state marriage recognition included "those positively prohibited by the public law of a country from motives of policy").

Such public policy exceptions exist across the country.  *See, e.g., Cook v. Cook*, 104 P.3d 857, 860 (Ariz. Ct. App. 2005) (upholding but not applying Arizona's prohibition on marriages between first cousins); *Hesington v. Hesington's Estate*, 640 S.W.2d 824, 826 (Mo. Ct. App. 1982) (denying recognition of a common-law marriage consummated on a temporary trip to another State); *Laikola v. Engineered Concrete*, 277 N.W.2d 653, 656 (Minn. 1979) (same); *Catalano v. Catalano*, 170 A.2d 726, 731-32 (Conn. 1961) (uncle-niece marriage lawfully contracted in Italy would not be recognized in Connecticut, the domiciliary State of the husband); *Cunningham v. Cunningham*, 206 N.Y. 341, 349 (1912) (holding that a minor female who validly married an adult male in New Jersey could annul her marriage in New York as "repugnant to . . . public policy and legislation").  In none of these cases was there any suggestion whatever that federal due process rights might guarantee interstate marriage recognition.

Indiana is entirely free, therefore, to treat as void marriages from other states that contravene state public policy.  Statutorily, the state not only refuses to recognize out-of-state same-sex marriages, but also any out-of-state marriage entered into for the purpose of evading Indiana's marriage laws—in terms equally applicable to both same-sex *and* opposite-sex couples. Indiana Code Section 31-11-8-6 provides that:

[a] marriage is void if the parties to the marriage:

(1) are residents of Indiana;

(2) had their marriage solemnized in another state with the intent to:

(A)  evade IC 31-11-4-4 [requiring a marriage license] or IC 31-11-4-11 [precluding issuance of a license if the applicant is mentally incompetent or under the influence]; and

27

> > (B)   subsequently return to Indiana and reside in Indiana;
> > and
>
> (3)   without having established residence in another state in good
> faith, return to Indiana and reside in Indiana after the marriage
> is solemnized.

Furthermore, as a matter of common law, in the only Indiana Supreme Court decision that defendants are aware of that addresses an out-of-jurisdiction marriage that could not have been entered into in Indiana, the Court refused to recognize the marriage on public policy grounds. *Sclamberg v. Sclamberg*, 41 N.E.2d 801, 802-03 (Ind. 1942) (treating as void a marriage between uncle and niece). The parties in that case conceded voidness, but conceding what the law obviously required does not undermine the legal principle the Court employed.

The Indiana Supreme Court has otherwise made it clear that the *lex loci* principle applies only against a backdrop where all agree as to what constitutes a valid marriage. More than one hundred forty years ago, the court asked, "[W]hat . . . then constitutes the thing called a marriage? What is it in the eye of the *jus gentium* [law of nations]? It is the union of one man and one woman, 'so long as they both shall live,' to the exclusion of all others, by an obligation which, during that time, the parties can not, of their own volition and act, dissolve, but which can be dissolved only by authority of the State." *Roche v. Washington*, 19 Ind. 53, 57 (1862). Continuing, the court said, "[n]othing short of this is a marriage. And nothing short of this is meant, when it is said, that marriages, valid where made, will be upheld in other States." *Id.* This passage confirms the implicit understanding underlying the *lex loci* principle—that it works only if all States basically agree on what constitutes a valid marriage. When other States recognize same-sex marriages, but Indiana does not, that prerequisite is not met.

Plaintiffs cite one decision from the Indiana Court of Appeals that has given *retrospective* effect to a marriage from another jurisdiction that could not have been undertaken in Indiana,

*Mason v. Mason*, 775 N.E.2d 706, 709 (Ind. Ct. App. 2002) (recognizing, for purposes of divorce action and division of property, marriage of first cousins who married under age 65). But one case from the Indiana Court of Appeals issued in 2002 that essentially seeks to do equity in a particular circumstance does not conclusively establish Indiana common law governing the *prospective* effect of out-of-state marriages that contravene Indiana public policy.

In all events, this is not about weighing one fairly recent Indiana intermediate court decision—*Mason*—against earlier decisions of its hierarchical superior, the Indiana Supreme Court. It is instead about whether Indiana's statutory refusal to recognize out-of-state same-sex marriages, as a means of carrying out state public policy, is consistent with the American constitutional tradition. There can hardly be any debate that it is, as ample case law from around the country, only a small fraction of which is cited above, demonstrates. Indiana does not suffer some special disability in this regard simply because the out-of-state recognition issue has not been litigated enough to provide a robust body of Indiana decisions. The Constitution does not mean one thing in Oklahoma and another in Indiana when it comes to out-of-state recognition of marriages that contravene state public policy.

## 2. Indiana's refusal to recognize the Quasney-Sandler marriage does not contravene the Equal Protection Clause

Quasney and Sandler also assert that Indiana violates their equal protection rights because out-of-state opposite-sex marriages are generally afforded "recognition" but out-of-state same-sex marriages are not. Pls.' Summ. J. Mem. at 19, 22. First, however, it is not clear Quasney and Sandler have standing to assert this claim. As described in the Statement of Material Facts Not in Dispute, *supra*, Quasney and Sandler were married in Massachusetts, but were not at the time residents of Massachusetts. They were residents of Indiana. Knowing that they could not be married in Indiana, they decided to get married elsewhere, which runs afoul of  Indiana Code

Section 31-11-8-6, quoted above.  This statute is neutral with respect to whether the marriage is same-sex or opposite-sex, so to the extent they married in another State to evade Indiana's marriage laws, Quasney and Sandler are being treated exactly the same as would be a similarly situated opposite-sex couple.  Steve Sanders, *The Constitutional Right to (Keep Your) Same-Sex Marriage*, 110 Mich. L. Rev. 1421, 1433-34 (2012) ("[E]vasive marriages are essentially about the right to marry in the first instance." Therefore, "[w]hen an Indiana couple flies to Boston for the weekend to get married, they . . . have no reasonable expectation from the outset that Indiana will honor their marriage.").  Plaintiffs do not purport to challenge Section 31-11-8-6 in any event.

Regardless, for the reasons described in Part III.C., *infra*, the proper level of scrutiny here is rational basis, and to the extent out-of-state opposite-sex marriages are generally treated as valid under Indiana law but same-sex marriages are not, that differential treatment is fully justifiable.  Generally speaking, opposite-sex couples whose marriages are recognized here could get married in Indiana anyway, but same-sex couples could not.  While Indiana *could* refuse recognition to all opposite-sex marriages from other States, doing so would be pointless given that out-of-state opposite-sex couples who move here could easily obtain Indiana licenses and have their marriages solemnized.

Furthermore, laws pertaining to opposite-sex marriage do not differ significantly from one State to the next, and the population of opposite-sex couples (1) who wish to marry; (2) who would not be authorized to marry in Indiana; (3) who live in (or find) a State authorizing them to marry, and (4) who return or relocate to Indiana, is self-evidently quite small.  Society no longer sees many first cousins, minor teenagers, or mentally disabled individuals seeking marriage.  Accordingly, even if Indiana's general recognition of out-of-state opposite-sex marriages results

in occasional retrospective recognition of a marriage that contravenes Indiana's marriage restrictions (such as in *Mason*), such a possibility does not present an existential threat to vindication of Indiana marriage policy.

In contrast, the population of same-sex couples married in other States who will return or relocate to Indiana is presumably quite large, and accepting those marriages would permit wholesale evasion of Indiana's traditional marriage definition and fatally undercut vindication of state marriage policy. Same-sex couples living here could easily be married in Illinois (or one of the sixteen other states and District of Columbia that provide same-sex marriage), return to Indiana and demand *prospective* recognition, thereby rendering Indiana's own definition of marriage meaningless. So in a very visible and undeniable way, recognizing out-of-state same-sex marriages would be tantamount to providing for same-sex marriage.

What is more, the decision by some States to recognize same-sex marriages marks a significant departure not only from Indiana policy but also from the fundamental understanding of the purpose of marriage embodied by our State's laws. For Indiana, marriage is about encouraging responsible procreation so as to ameliorate the consequences of unplanned pregnancies. *See Morrison v. Sadler*, 821 N.E.2d 15, 30 (Ind. Ct. App. 2005). For States recognizing same-sex marriages, the purpose of marriage is obviously something else—something that cannot be reconciled with Indiana's marriage philosophy. Notably, the same is *not* true with respect to other variations in state marriage laws, which may reflect marginal differences about the proper age of majority or the proper distance of consanguinity, but which do not call into question the fundamental purpose of the entire enterprise. Indiana has a legitimate interest in maintaining the integrity of its fundamental rationale for civil marriage rather than letting it be redefined by other States.

***

Fundamentally, the constitutional validity of Indiana's decision not to recognize out-of-state same-sex marriages turns on the constitutional validity of its traditional marriage definition. If Indiana can constitutionally adhere to that definition and thereby refuse to provide for same-sex marriages, it can also refuse to recognize same-sex marriages from other States. For Indiana has a legitimate—nay, compelling—interest in ensuring that its democratic process—not that of Massachusetts or any other State—would continue to set marriage policy within the State.

**C.   Indiana's traditional marriage definition is constitutional**

**1.   *Baker v. Nelson* still controls, and the core meaning of *Windsor* is to preserve state prerogatives over marriage**

*Baker v. Nelson*, 409 U.S. 180 (1972), was a ruling on the merits that upheld Minnesota's traditional definition of marriage. *Baker* was not overruled by *United States v. Windsor,* 133 S.Ct. 2675 (2013), or any other Supreme Court case and therefore precludes these challenges. Yet Plaintiffs rely heavily on *United States v. Windsor*, 133 S. Ct. 2675 (2013), and claim that it stands for the proposition that "marriage is not inherently defined by the sex or sexual orientation of the couples" and "[i]t is thus unconstitutional to 'deprive some couples . . . but not other couples, of [the] rights and responsibilities [of marriage].'" Pls.' Summ. J. Mem. at 14 (quoting *Windsor*, 133 S. Ct. at 2694). *Windsor*, however, is plain and narrow and does not require States to recognize same-sex marriages from other States. Section 3 of DOMA, which had "the purpose and effect to disparage and to injure those whom *the State*, by its marriage laws, sought to protect in personhood and dignity[,]" violated the Fifth Amendment principally because it was an "*unusual* deviation from the tradition of recognizing and accepting *state definitions* of marriage . . . ." *Id.* at 2693, 2696 (emphases added); *see also id.* at 2697 (Roberts, C.J., dissenting) (observing that "[t]he dominant theme of the majority opinion is that the Federal

32

Government's intrusion into an area central to state domestic relations law applicable to its residents and citizens is sufficiently 'unusual' to set off alarm bells." (internal quotation marks omitted)).  It was critical to the Court's analysis that New York had *previously granted* marital interests that federal DOMA then threatened.  *Id.* at 2689.

In contrast, traditional state marriage definitions are, as *Windsor* amply affirms, the "usual" course of business.  *Id*. at 2691.  So "usual" are they that the Supreme Court in 1972 dismissed a challenge to Minnesota's traditional marriage law for want of a substantial federal question.  *Baker v. Nelson*, 409 U.S. 810 (1972).  *Windsor*'s careful distinction between "unusual" federal marriage law and "usual" state marriage law does not imply the invalidity of the latter.   What is more, the majority opinion expressly rejects any theory that its scope can be expanded to include laws that preserve the traditional marriage definition.  In no uncertain terms, the majority forcefully states that "[t]his opinion and its holding are confined to [New York's] lawful marriages."  *Id.* at 2696.  It is therefore improper to extrapolate from "this opinion" any rule that affects any other state's marriage laws.

The post-*Windsor* cases that have struck down States' traditional marriage laws not only ignore this plain injunction, but also give short shrift to the principles of federalism underlying the majority opinion and fundamentally misread *Windsor* in at least three ways: (1) that *Windsor* supports the decoupling of marriage and procreation and diminishes the "fundamental" right to marriage to "a loving, rewarding, monogamous relationship with a partner to whom they are committed for life[;]" (2) that *Windsor* deems the relevant question to be whether same-sex marriages harm opposite-sex marriages and/or children, and not whether same-sex marriages further a State's interest in marriages; and (3) that *Windsor*'s denunciation of dignitary harm caused by Section 3 to children of New York's state-provided same-sex marriages can be used

against States that do not provide for same-sex marriage.  *See, e.g., Bostic v. Rainey*, No. 2:13-cv-395, 2014 WL 561978, at *17-*20, *22 (E.D. Va. Feb. 13, 2014).

First, there is no doubt that the Constitution gives its blessing to New York to recognize out-of-jurisdiction same-sex marriages.  *Windsor*, 133 S. Ct. at 2692 (explaining that New York's "actions were without doubt a proper exercise of its sovereign authority within our federal system, [which] allow[s] the formation of consensus respecting the way the members of a discrete community treat each other in their daily contact and constant interaction with each other").  It is a considerable leap from this conclusion, however, to read *Windsor*, which struck down Section 3 of DOMA for discriminating against "basic personal relations *the State* has found it proper to acknowledge and protect[,]" *id.* at 2694 (emphasis added), to establish a singular vision of a fundamental right to marriage that must be respected by *all States*.

Lower courts therefore err when they judicially define marriage incompatibly with how a State has chosen to do so.  The *Bostic* court, for example, labels marriage as "the right to make a public commitment to form an exclusive relationship and create a family with a partner with whom the person shares an intimate and sustaining emotional bond."  *Bostic*, 2014 WL 561978 at *12 (quoting *Kitchen v. Herbert*, 961 F. Supp. 2d 1181, 1202-03 (D. Utah 2013)).  Under *Windsor*, the purpose of marriage should instead come from the State, particularly in light of the fact that, as the Court in *Windsor* observed, "marriage between a man and a woman no doubt had been thought of by most people as essential to the very definition of that term and to its role and function throughout the history of civilization."  *Windsor*, 133 S. Ct. at 2689.

Second, *Windsor* does not imply that anything more stringent than rational basis review applies.  *Id.* at 2696 (ruling that "no legitimate purpose"—a hallmark of rational basis review—justified Section 3).  Under that level of scrutiny, the claim that "recognizing same-sex marriage

or unions will not *harm* the institution of opposite-sex marriage is not dispositive of the constitutional issue[, but, instead, the] key question . . . is whether the recognition of same-sex marriage would promote all of the same state interests that opposite-sex marriage does, including the interest in marital procreation." *Morrison v. Sadler*, 821 N.E.2d 15, 23 (Ind. Ct. App. 2005); *see Johnson v. Robinson*, 415 U.S. 361, 383 (1974). It is a simple biological truth that same-sex couples cannot further a State's interest in responsible procreation because they cannot procreate unintentionally. *See* Part II.B.3.a., *infra*. The State is not obligated under rational basis review to circumscribe marriage so tightly as to also exclude those who are not willing or unable to procreate. *See* Part II.B.3, *infra*.

Lastly, *Windsor* does not establish that harm to the dignity of children of same-sex couples equates to a constitutional violation notwithstanding a State's legitimate interests in preserving the traditional definition of marriage. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998). The Court carefully observed in *Windsor* that New York had already granted the "recognition and protection" of marriage to same-sex couples, and it was the *removal* of that status for federal purposes, in essence "creating two contradictory marriage regimes within the same State[,]" that "places same-sex couples in an unstable position of being in a second-tier marriage [and] humiliates tens of thousands of children now being raised by [them]." *Windsor*, 133 S. Ct. at 2694-95. With traditional marriage laws, any harm to dignity is not similarly the result of withdrawing rights once granted, which was the focus of *Windsor*.

### 2. No fundamental rights or suspect classes are implicated

#### a. There is no fundamental right to same-sex marriage, a concept having no roots in the Nation's history and traditions

Supreme Court precedent does not support the notion that there is a fundamental constitutional right to same-sex marriage, or that any fundamental right to marry includes same-

sex couples.  Fundamental rights are those that are "objectively, deeply rooted in this Nation's history and tradition . . . and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."  *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (internal quotations and citations omitted).  A "careful description of the asserted fundamental liberty interest" is required, and courts must "exercise the utmost care whenever [they] are asked to break new ground in this field . . . ."  *Id.* at 720, 721 (internal quotations and citations omitted).

"Marriage" is a foundational and ancient social institution whose meaning, until recently, was universally understood as limited to the union of a man and a woman.  *Windsor*, 133 S. Ct. at 2689.  Plaintiffs cannot assert a fundamental right to "marriage" because same-sex couples plainly fall outside the scope of the right itself, unlike the opposite-sex couples.  That is why, a mere five years after *Loving v. Virginia*, 388 U.S. 1 (1967), the Supreme Court rejected a constitutional same-sex marriage claim as failing even to present a "substantial federal question."  *Baker v. Nelson*, 409 U.S. 810, 810 (1972).

Furthermore, no separate fundamental right to "same-sex marriage" is "deeply rooted in this Nation's history and tradition . . . and implicit in the concept of ordered liberty."  *Glucksberg*, 521 U.S. at 720-21.  Indeed, the "universally understood and celebrated status of marriage," First Am. Compl. ¶ 40, has never included same-sex couples and no judicial decree can change that.  Barely a decade ago, in 2003, Massachusetts became the first State to extend the definition of marriage to same-sex couples.  It did so through a 4-3 court decision, without a majority opinion, by interpreting its state constitution.  *Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941, 969 (Mass. 2003).  Other state supreme courts followed suit, *see Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407, 482 (Conn. 2008), *Varnum v. Brien*, 763 N.W.2d 862,

906 (Iowa 2009), but only twelve States and the District of Columbia have extended marriage to same-sex unions legislatively, the first not occurring until 2009.  *See* Conn. Gen. Stat. §§ 46b-20, -20-a.

Same-sex marriage cannot be transformed into a fundamental right by repackaging marriage as the freedom "to select the partner of one's choice[.]"  Pls.' Prelim. Inj. Mem. at 8. Divining a "right to make a public commitment to form an exclusive relationship and create a family with a partner with whom the person shares an intimate and sustaining emotional bond," *Bostic*, 2014 WL 561978, at *12, plainly fails to meet the "careful description of the asserted fundamental liberty interest" rule.  *Glucksberg,* 521 U.S. at 720-21.  Declaring that same-sex marriage claimants seek "nothing more than to exercise a right that is enjoyed by the vast majority of Virginia's adult citizens," *Bostic*, 2014 WL 561978, at *12, leaves out the only part of the asserted right that matters: that the claimants seek this right as same-sex couples.

The asserted interest, properly defined, is the right to state-sanctioned marriage for a same-sex couple—not the right to "marriage" redefined by *fiat*.  Same-sex marriage is not a fundamental right—as the Supreme Court itself indicated in *Windsor*, 133 S. Ct. at 2689.

> **b.** **The traditional definition of marriage does not impinge on rights of personal autonomy, intimate association, self-definition, etc.**

Plaintiffs claim that Indiana's traditional marriage definition infringes not only a right to marry or have an out-of-state same-sex marriage recognized in Indiana, but also "a host of other related fundamental liberty interests."  Pls.' Summ. J. Mem. at 18.  They variously describe these "interests" as "autonomy," "personal decisions relating to . . . family relationships," the ability "to participate fully in society as married couples," "intimate association," "self-definition," "family integrity and association," and "direct[ing] the upbringing and education" of their

children.  *Id.*  Plaintiffs, however, fail to specify how lack of government endorsement of their adult relationships interferes with individual autonomy, self-definition, private decision making, private relationships, or parental rights.  They point to no private conduct that Indiana bans, no educational decisions they may not make, no government disruptions of their lives, and no interference with their ability to associate with their loved ones, including their children.

The only cases Plaintiffs cite have to do with federal government interference with state-conferred status or rights (*Windsor*) or state interference with private conduct (*Lawrence v. Texas*, 539 U.S. 558 (2003)*; Griswold v. Connecticut*, 381 U.S. 479 (1965)*; Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925)).  Here, by contrast, Plaintiffs demand positive rights, *i.e.*, affirmative state government recognition and acceptance of their relationships, announced through a public act and a public document.  This is the antithesis of the claims for privacy or government restraint that characterized *Windsor*, *Lawrence*, *Griswold*, and *Pierce*.  The claims thus do not even meet the terms of the general constitutional rights Plaintiffs seem to invoke.

The idea of liberty and privacy under the Constitution, as informed by the Declaration of Independence, rests on the proposition that each individual has freedom and dignity apart from the government; *i.e.*, that government exists to protect the freedom and dignity of the individual "endowed by their Creator," not to *create* that freedom and dignity in the first instance.  *See Slaughter-House Cases*, 83 U.S. 36, 105 (1872) ("[T]he Creator had endowed all men with certain inalienable rights . . . [and] to secure these rights[,] governments are instituted among men.") (internal quotation marks omitted).  Plaintiffs either forget or reject this starting point for the American system of government and seek to turn a presumption of liberty from government interference into a presumption of governmental approval of every individual's way of life.  No

Supreme Court case—including *Windsor*—even remotely suggests the existence of any such constitutional right.

In any event, the Supreme Court has made it clear that constitutional rights of "intimate association" inhere only in "personal bond[s]" that have also "played a critical role in the culture and traditions of the Nation." *Roberts v. United States Jaycees*, 468 U.S. 609, 618-19 (1984). Aside from their arguments about the right of marriage itself, Plaintiffs make no attempt to identify and substantiate a right that both conforms to this definition and that Indiana's traditional marriage definition cognizably interferes with. If the Constitution does not protect a right to same-sex marriage, Plaintiffs cannot prompt the emanation of its equivalent from broad, largely undifferentiated appeals to rights of "liberty," "privacy," and "association." *See Sevcik*, 911 F. Supp. 2d at 1014 ("[T]he right to privacy is not implicated here, as Plaintiffs desire not to be left alone, but, on the contrary, desire to obtain public recognition of their relationships.").

**c.**      **Limiting marriage to the union of a man and a woman does not implicate a suspect class**

The traditional definition of marriage existed at the very origin of the institution and predates by millennia the current political controversy over same-sex marriage.  It neither targets, nor disparately impacts, either sex; nor does it classify based on sexual orientation or parentage.  Accordingly, there is no basis for subjecting traditional marriage definitions to heightened scrutiny.

**i.**      **Traditional marriage does not discriminate based on sex**

The traditional definition of marriage draws no distinction based on sex.  As the court observed in *Sevcik*, 911 F. Supp. 2d at 1005, laws protecting traditional marriage "are not directed toward persons of any particular gender, nor do they affect people of any particular gender disproportionately such that a gender-based animus can reasonably be perceived." *See*

39

*also, e.g.*, *Bishop v. United States ex rel. Holder*, 962 F. Supp. 2d 1252, 1286 (N.D. Okla. 2014) (Oklahoma's Marriage Protection Amendment "does not draw any distinctions between same-sex male couples and same-sex female couples, does not place any disproportionate burdens on men and women, and does not draw upon stereotypes applicable only to male or female couples."); *Jackson v. Abercrombie*, 884 F. Supp. 2d 1065, 1098-99 (D. Haw. 2012) ("agree[ing] with the vast majority of courts considering the issue that an opposite-sex definition of marriage does not constitute gender discrimination") (listing cases).

Accordingly, there is no parallel to *Loving v. Virginia*, 388 U.S. 1 (1967), in this regard because race and sex are not constitutionally fungible concepts.  *See Hernandez v. Robles*, 805 N.Y.S.2d 354, 371 (N.Y. App. Div. 2005) (Catterson, J., concurring) ("To elevate the issue of same sex unions to that of discrimination on the basis of race does little service to the legacy of the civil rights movement, and ignores the history of race relations in this country.").  The racially discriminatory classification in *Loving* was "designed to maintain White Supremacy" to the clear favor of one racial class.  *See Loving*, 388 U.S. at 11.  A *Loving* analogy involving sex discrimination would, for example, ban *only* lesbians from marrying women, but not gay men from marrying other men. That is plainly not the case here, where men and women are equally affected by Indiana's traditional marriage definition.

### ii.   Traditional marriage does not discriminate based on sexual orientation

Furthermore, traditional marriage laws in no way target homosexuals as such.  With traditional marriage, "the distinction is not by its own terms drawn according to sexual orientation.  Homosexual persons may marry . . . but like heterosexual persons, they may not marry members of the same sex."   *Sevcik*, 911 F. Supp. 2d at 1004.  While traditional marriage laws *impact* heterosexuals and homosexuals differently, they do not create classifications based

on sexuality, particularly considering the benign history of traditional marriage laws generally. *See, e.g.*, *Washington v. Davis*, 426 U.S. 229, 242 (1976) (holding that disparate impact on a suspect class is insufficient to justify strict scrutiny absent evidence of discriminatory purpose). And when a facially neutral statute is challenged on equal protection grounds, the plaintiff must show that "a state legislatur[e] ... selected or reaffirmed a particular course of action *at least in part because of, not merely in spite of,* its adverse effects [on] an identifiable group." *Pers. Adm'r of Mass. v. Feeney,* 442 U.S. 256, 279 (1979) (emphasis added) (internal quotation marks omitted).[3]

Deducing any such discriminatory intent (unaccompanied by any actual statutory classification) is both unsupported and highly anachronistic.  Plaintiffs misleadingly claim that "the Indiana General Assembly passed the marriage ban in 1997."  Pls.' Summ. J. Mem. at 31. While the precise statute on the books was passed in 1997, Indiana has *never* authorized or recognized same-sex marriages.  Before 1986, state statute provided that "[a] male who has reached his seventeenth birthday may marry a female who has reached her seventeenth birthday . . . ."  Ind. Code  § 31-1-1-1.  From 1986 to 1997, it said that "[o]nly a female may marry a male. Only a male may marry a female."  Ind. Code § 31-7-1-2.  In 1997, the legislature re-enacted this exact wording and added "[a] marriage between persons of the same gender is void in Indiana even if the marriage is lawful in the place where it is solemnized." Ind. Code § 31-11-1-1(b).

---

[3] *M.L.B. v. S.L.J.*, 519 U.S. 102 (1996), cited by Plaintiffs, is not to the contrary.  There, the Court applied heightened scrutiny to a law requiring pre-payment of costs to appeal a termination of parental rights on the grounds that it affected fundamental parental and access-to-justice rights.  *Id.* at 107, 118-21.  It provides no grounds for inferring discrimination where no unequal treatment or fundamental right is implicated.  *See Tucker v. Branker*, 142 F.3d 1294, 1301 (D.C. Cir. 1998) (upholding filing fee under the Prison Litigation Reform Act using rational basis, rejecting *M.L.B.* discrimination theory).  Regardless, Indiana's traditional marriage laws permit all Hoosiers to marry, as the experiences of Plaintiffs Bonnie Everly, Linda Judkins, and Dawn Carver demonstrate.  *See* Everly Decl. ¶ 6; Judkins Decl. ¶ 5; Carver Decl. ¶ 6.  Thus, Indiana's marriage laws do not negatively impact *all* homosexuals, some of whom marry members of the opposite sex and some of whom do not wish to marry at all, and they do not negatively affect *only* homosexuals, but also those interested in other non-traditional marriages.  If marriage law must be scrutinized for impact on everyone's ability to marry based on their sexual preferences, such a rule would presumably set the stage for claims for plural marriages, underage marriages, and marriages within prohibited lines of consanguinity.

Plaintiffs assert, with no actual evidence, that Indiana Code Section 31-11-1-1 was passed in 1997 with "animus-driven motive." There is no legislative history or other evidence supporting such calumny. And as Plaintiffs' own secondary source on the subject makes clear, the rationale for the 1997 legislation was far more likely related to preserving the State's ability to define marriage following the Hawaii Supreme Court's 1993 decision calling traditional marriage law into question in *Baehr v. Lewin*, 852 P.2d 44 (Haw. 1993). *See The History of Indiana Law* 80 (Bodenhamer and Shepard, eds.) (2006)

Besides, the validity of Indiana's traditional marriage definition must turn on whether such laws are generally permissible, not on local motivations. And there is no plausible argument that the traditional definition of marriage was invented as a way to discriminate against homosexuals. Indeed, in *Lawrence*, the Court examined only the past fifty years for the history of laws directed at homosexuals because "there is no longstanding history in this country of laws directed at homosexual conduct as a distinct matter." *Lawrence*, 539 U.S. at 568. Implicit in this statement is an acknowledgement that traditional marriage is *not* "law[] directed at homosexual conduct as a distinct matter."

On this score, there is again no appropriate comparison with *Loving*. Unlike traditional marriage laws, antimiscegenation laws *contravened* common law and marriage tradition in Western society. The entire phenomenon of banning interracial marriages originated in the American colonies: "[T]here was no ban on miscegenation at common law or by statute in England at the time of the establishment of the American Colonies." Harvey M. Applebaum, *Miscegenation Statutes: A Constitutional and Social Problem*, 53 Geo. L.J. 49, 49-50 (1964). *Loving*, in short, invalidated efforts to thwart the traditional parameters of marriage (which took no account of race) based on racial animus. It involved relationships that were plainly within the

42

historical understanding and purposes of marriage.  In contrast, same-sex relationships were never thought to be marriages—or to further the purposes of marriage—anywhere at any time, until recently (in some jurisdictions).  Accordingly, there is no basis for inferring that group animus underlies traditional marriage.

Regardless, the Supreme Court has never held that homosexuality constitutes a suspect class, and the law in this circuit, as well as most others, is that homosexual persons do *not* constitute a suspect class.  *See Schroeder v. Hamilton Sch. Dist.*, 282 F.3d 946, 953-54 (7th Cir. 2002) ("[H]omosexuals are not entitled to any heightened protection under the Constitution."); *see also Cook v. Gates*, 528 F.3d 42, 61 (1st Cir. 2008); *Veney v. Wyche*, 293 F.3d 726, 731-32 (4th Cir. 2002); *Baker v. Wade*, 769 F.2d 289, 292 (5th Cir. 1985) (en banc); *Equal. Found. of Greater Cincinnati, Inc. v. City of Cincinnati*, 128 F.3d 289, 294 (6th Cir. 1997); *Citizens for Equal Prot. v. Bruning*, 455 F.3d 859, 866-67 (8th Cir. 2006); *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1113-14 & n.9 (10th Cir. 2008); *Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 818 (11th Cir. 2004); *Steffan v. Perry*, 41 F.3d 677, 684 n.3 (D.C. Cir. 1994) (en banc); *Woodward v. United States*, 871 F.2d 1068, 1076 (Fed. Cir. 1989); *see also Romer v. Evans*, 517 U.S. 620, 631-35 (1996) (applying rational basis scrutiny to classification based on sexual orientation).  *But see SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471, 481 (9th Cir. 2014) (applying heightened scrutiny to juror challenges based on sexual orientation; subject to a *sua sponte* en banc call).

Neither *Windsor*, nor *Romer*, nor *Lawrence*, supports heightened scrutiny for legislation governing marriage.  *Romer* expressly applied rational basis scrutiny, while *Lawrence* and *Windsor* implied the same.  *Romer,* 517 U.S. at 631-32; *Lawrence,* 539 U.S. at 578; *Windsor,* 133 S. Ct. at 2696.  In *Windsor* the Court invalidated Section 3 of DOMA as an "unusual

43

deviation from the usual tradition of *recognizing and accepting state definitions of marriage*[,]"
133 S. Ct. at 2693 (emphasis added), which required analyzing whether DOMA was motivated
by improper animus.   It ruled that "no legitimate purpose"—a hallmark of rational basis
review—justified the law.  *Id.* at 2696.   There is nothing about a State's centuries-old traditional
definition of marriage that either targets sexual orientation or constitutes an "unusual deviation
from tradition."

Furthermore, Plaintiffs make no claim that sexual orientation—the supposed basis for
discrimination—is an "immutable" characteristic, as the *Cleburne* decision deems significant for
suspect class status.  *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 441-42
(1985).  *Cleburne* also cautioned that suspect-class status is inappropriate "where individuals in
the group affected by a law have distinguishing characteristics relevant to interests the State has
the authority to implement."   *Id.* at 441-42.   The distinguishing characteristic with respect to
same-sex couples is their inability to procreate (as a couple).   As explained in more detail in Part
III.B.3.a., the general capacity of opposite-sex couples to procreate through sexual activity—
even unintentionally—gives rise to State interests in marriage.   This distinction erodes any claim
that homosexuals constitute a suspect class vis-à-vis traditional marriage laws.

Finally, suspect class status is reserved for groups that are "politically powerless in the
sense that they have no ability to attract the attention of the lawmakers."  *Cleburne*, 473 U.S. at
445.  Plaintiffs cannot credibly claim that homosexuals as a class are unable "to attract the
attention of lawmakers."  *Id.*   Just this winter Indiana's lawmakers, having passed once already a
resolution to enshrine the traditional definition of marriage in the Indiana Constitution, and
nearing a vote to put the measure to statewide referendum in November 2014, effectively started
the process over and killed the measure for this year.  Tony Cook & Barb Berggoetz, *Same-Sex*

*Marriage Ban Won't be on November Ballot*, The Indianapolis Star (Feb. 14, 2014), *available at* http://www.indystar.com/story/news/politics/2014/02/13/hjr-3-last-minute-maneuver-could-spare-2nd-sentence-/5455299/.   This is far from the only political victory advocates for homosexual rights have scored in recent years; it is only the most dramatic close to home.  *See* Morgan Little, *Gay Marriage Movement Wins Significant Victories in 2013*, LA Times (Dec. 9, 2013), *available at* http://www.latimes.com/nation/nationnow/la-pn-gay-marriage-movement-gains-2013-20131206,0,1888807.story#axzz2zdVzLoIA (summarizing legislative and judicial victories of 2013 and stating that "the gay rights movement as a whole is only becoming more popular nationwide, leading many to speculate that it's the fastest moving civil rights movement in U.S. history."); Monica Davey, *In Diluting Measure to Ban Gay Marriage, Indiana Shows a Shift*, N.Y. Times, Feb. 14, 2014, *available at* http://www.nytimes.com/2014/02/18/us/politics/in-diluting-measure-to-ban-gay-marriage-indiana-shows-a-shift.html?_r=0 (stating that "Indiana offers a look at a different side of the nation's shifting landscape—a glimpse at a growing struggle for Republican politicians over how to satisfy a conservative base that now finds itself at odds with some business leaders and a changing electorate").

National success persuading voters and lawmakers to provide for same-sex marriage—the very issue over which plaintiffs claim protected status—confirms the sort of political clout that prevents recognition of homosexuals as a suspect class.  *Cf.* Frank Bruni, *The New Gay Orthodoxy*, N.Y. Times, Apr. 5, 2014, *available at* http://www.nytimes.com/2014/04/06/opinion/sunday/bruni-the-new-gay-orthodoxy.html (claiming that "the debate is essentially over, in the sense that the trajectory is immutable and the conclusion foregone[:] The legalization of same-sex marriage from north to south and coast to coast is merely a matter of time, probably not much of it at that").

### iii. Traditional marriage does not discriminate against children

In their complaint, Plaintiffs assert that heightened scrutiny should apply owing to what plaintiffs describe as "Discrimination Based on Parental Status." First Am. Compl. ¶ 104. They say that Indiana law "impermissibly classifies children, including the child Plaintiffs, on the bases of their parents' sex, sexual orientation, and marital status." *Id*. For the reasons provided in Part III.A., *supra*, no Plaintiff has standing to bring this claim. Even aside from the lack of any injury to plaintiffs arising from this supposed discrimination, this claim is hard to understand. The statutes Plaintiffs challenge—Indiana Code Sections 31-11-1-1 and 31-11-4-2—do not classify children in any way.

Plaintiffs point to the vague, incidental impact of marriage laws on the "economic safety net and other protections and government benefits automatically given to children of married parents," Pls.' Prelim. Inj. Mem. at 16, but do not provide sufficient detail to substantiate a claim of unequal treatment. And the rule from *Brock v. State*, 85 Ind. 397 (1882), that "children born outside marriage will be legitimized by subsequent marriage of parents," has no apparent current significance. Indeed, a series of United States Supreme Court decisions, beginning with *Stanley v. Illinois*, 405 U.S. 645 (1972), recognized that unmarried fathers, linked by both biology and involvement in a child's life, have both rights and responsibilities recognized under the law. Since *Stanley*, the law has moved from a definition of "fatherhood" or "parentage" based on marriage to a definition based on biology. *See*, Indiana Code §§ 31-14-6-1 ("…the court shall order all of the parties to a paternity action to undergo blood or genetic testing"), 31-14-10-1 ("upon the finding that man is the child's biological father…"), 31-9-2-88 (parent "means a biological or an adoptive parent").

The legitimizing effect of marriage in *Brock* had only to do with the father's susceptibility to "prosecution for maintenance of a bastard child," a cause of action that no longer exists. Nowadays, an action for child support lies against a parent regardless of marriage. *See* Ind. Code §§ 31-16-2 *et seq.*, 31-14-11 *et seq. See also In re Paternity of S.R.I.,* 602 N.E.2d 1014, 1016 (Ind. 1992). The *Brock* case also alludes to the legitimized child's status as an heir to the father, but under current law a child is an heir of all parents regardless whether they are married. Ind. Code §§ 29-1-2-7, -8. In any event, there is no presumption of parentage when the mother marries more than 300 days after a child is born. *See* Ind. Code § 31-14-7-1.

Plaintiffs also cite the presumption of parentage that arises when children are born during the marriage, but in this regard their complaint is not with the marriage definition as such but with the statutes governing parental rights and responsibilities, which they do not challenge (probably because their parental rights are secure). In any event, cases concerning rights of illegitimate children have to do with preventing children from becoming the means for punishing parents. *See, e.g., Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164, 175 (1972) ("Obviously, no child is responsible for his birth and penalizing the illegitimate child is an ineffectual—as well as an unjust-way of deterring the parent."). They do not support the notions that States have minimal interests in regulating the determination of legitimacy or that laws affecting paths to legitimacy implicate suspect classes. State laws bearing on allocation of parental rights and responsibilities balance a web of sometimes competing policy interests, including the needs to identify biological parents, ensure financial support, provide stability and identity, and address public health issues. *In re Paternity of S.R.I.,* 602 N.E.2d at 1016. Given this matrix of issues that States must address, the Supreme Court has expressed solicitude both for drawing reasonable inferences about parentage and dependency based on a child's circumstances, and for

47

addressing parental rights and obligations based on concerns about "proof of paternity." *See Mathews v. Lucas*, 427 U.S. 495, 515-16 (1976)*; Gomez v. Perez,* 409 U.S. 535, 538 (1973).

Ultimately, Plaintiffs say that Indiana's traditional definition of marriage is unconstitutional because it "prevent[s] children of same-sex couples ever from having married parents based on the sex and sexual orientation of their parents." Pls.' Prelim. Inj. Mem. at 16-17. They thereby simply restate their more straightforward (but no more meritorious) theory that Indiana's traditional marriage definition discriminates on the basis of sex or sexual orientation. Accordingly, as a separate basis for heightened scrutiny, "discrimination based on parental status" must fail.

### 3.   Traditional marriage satisfies constitutional review

Because no fundamental rights or suspect classes are implicated, the proper test under the federal due process and equal protection clauses is rational basis review. Courts must examine the issue from the State's perspective, not the challenger's perspective.

In particular, this means that the State may justify limits on government benefits and burdens by reference to whether *including* additional groups would accomplish the government's underlying objectives. *Johnson v. Robinson*, 415 U.S. 361, 383 (1974) ("When . . . the inclusion of one group promotes a legitimate governmental purpose, and the addition of other groups would not, we cannot say that the statute's classification of beneficiaries and nonbeneficiaries is invidiously discriminatory."). This framework accords with the longstanding principle that "[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same," *Tigner v. Texas*, 310 U.S. 141, 147 (1940), and, therefore, "where a group possesses distinguishing characteristics relevant to interests the State has the authority to implement, a State's decision to act on the basis of those differences does not give

48

rise to a constitutional violation." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366-67 (2001) (internal quotations and citation omitted). *See also Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) ("The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.").

Accordingly, the proper constitutional question has nothing to do with justifications for "excluding" access to marriage and its benefits—an inquiry that inherently presupposes the existence of a right to such "access" and thereby amounts to a *rejection* of rational-basis review. Rather, "the relevant question is whether an opposite-sex definition of marriage furthers legitimate interests that would not be furthered, or furthered to the same degree, by allowing same-sex couples to marry." *Jackson v. Abercrombie*, 884 F. Supp. 2d 1065, 1107 (D. Haw. 2012); *Andersen v. King Cnty.*, 138 P.3d 963, 984 (Wash. 2006) (en banc); *Morrison v. Sadler*, 821 N.E.2d 15, 23 (Ind. Ct. App. 2005); *Standhardt v. Superior Court ex rel. Cnty. of Maricopa*, 77 P.3d 451, 463 (Ariz. Ct. App. 2003).

The State has no greater burden to justify its decision not to license or recognize same-sex marriages than it has to justify refusing benefits to *any* group. Again, the motivations behind any particular perpetuation of the status quo (evidence of which does not exist in any event) are irrelevant. *Cf. Wis. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 653-54 (7th Cir. 2013) (explaining that "under rational basis review, [courts] cannot search for the legislature's motive [because a]ll that matters is whether the statute, as written, furthers a legitimate government objective"). *Windsor* does not permit inquiry into motivations because there is no departure here from the usual course. *See* Part III.C.1., *supra.* It need only articulate reasons to confer benefits on opposite-sex couples that do not apply to same-sex couples. The exclusive capacity and

tendency of heterosexual intercourse to produce children, and the State's need to ensure that those children are cared for, provide those reasons.

### a. States recognize opposite-sex marriages to encourage responsible procreation, and this rationale does not apply to same-sex couples

Civil marriage recognition exists for important reasons having nothing to do with same-sex couples. It arises from the need to protect the only procreative sexual relationship that exists and to make it more likely that unintended children, among the weakest members of society, will be cared for. *See Morrison*, 821 N.E.2d at 15, 29 (marriage exists "to encourage responsible procreation by opposite-sex couples"); *id.* at 25 ("The institution of marriage not only encourages opposite-sex couples to form a relatively stable environment for the 'natural' procreation of children in the first place, but it also encourages them to stay together and raise a child or children together if there is a 'change in plans.'"). This analysis is dominant in our legal system and should continue to carry the day.[4]

Traditional marriage protects a norm where sexual activity that *can* beget children should occur in a long-term, cohabitive relationship. *See, e.g., Hernandez v. Robles*, 855 N.E.2d 1, 7 (N.Y. 2006) ("The Legislature could rationally believe that it is better, other things being equal, for children to grow up with both a mother and a father."). It provides the opportunity for children born within it to have a biological relationship to those having original *legal* responsibility for their well-being, and accordingly is the institution that provides the greatest

---

[4] *See Citizens for Equal Protection v. Bruning*, 455 F.3d 859, 867 (8th Cir. 2006); *Lofton v. Sec'y of the Dep't of Children and Family Servs.*, 358 F.3d 804, 818-19 (11th Cir. 2004); *Sevcik v. Sandoval*, 911 F. Supp. 2d 996, 1015-16 (D. Nev. 2012); *Jackson v. Abercrombie*, 884 F. Supp. 2d 1065, 1112-13 (D. Haw. 2012); *Smelt v. County of Orange*, 374 F. Supp. 2d 861, 880 (C.D. Cal. 2005), *aff'd in part, vacated in part*, 477 F.3d 673 (9th Cir. 2006); *Wilson v. Ake*, 354 F. Supp. 2d 1298, 1309 (M.D. Fla. 2005); *In re Kandu*, 315 B.R. 123, 147-48 (Bankr. W.D. Wash. 2004); *Adams v. Howerton*, 486 F. Supp. 1119, 1124 (C.D. Cal. 1980), *aff'd* 673 F.2d 1036 (9th Cir. 1982); *In re Marriage of J.B. & H.B.*, 326 S.W.3d 654, 677-78 (Tex. App. 2010); *Conaway v. Deane*, 932 A.2d 571, 619-21, 630-31 (Md. 2007); *Hernandez v. Robles*, 855 N.E.2d 1, 7 (N.Y. 2006); *Andersen v. King County*, 138 P.3d 963, 982-83 (Wash. 2006) (en banc); *Standhardt v. Superior Court*, 77 P.3d 451, 463-65 (Ariz. Ct. App. 2003); *Dean v. District of Columbia*, 653 A.2d 307, 337 (D.C. 1995); *Singer v. Hara*, 522 P.2d 1187, 1195 (Wash. Ct. App. 1974); *Baker v. Nelson*, 191 N.W.2d 185, 186 (Minn. 1971).

likelihood that both biological parents will nurture and raise the children they beget. States have a strong interest in supporting and encouraging this norm.

Unlike opposite-sex couples, the sexual activity of same-sex couples implies no unintentional pregnancies. Whether through surrogacy or reproductive technology, same-sex couples can become biological parents only by deliberately choosing to do so, requiring a serious investment of time, attention, and resources. *Id.* at 24. Consequently, same-sex couples do not present the same potential for unintended children, and the State does not necessarily have the same need to provide such parents with the incentives of marriage. *Id.* at 25; *see also In re Marriage of J.B. & H.B.*, 326 S.W.3d 654, 677 (Tex. Ct. App. 2010) ("Because only relationships between opposite-sex couples can naturally produce children, it is reasonable for the state to afford unique legal recognition to that particular social unit in the form of opposite-sex marriage.").

The fact that non-procreating opposite-sex couples may marry does not undermine marriage as the optimal procreative context. *Cf.* Entry on Pls.' Mot. for TRO at 7-8 (finding the State's "responsible procreation" justification for traditional marriage "problematic" because "the State of Indiana generally recognizes the marriages of individuals who cannot procreate"). Opposite-sex couples without children who are married model the optimal, socially expected behavior for other opposite-sex couples whose sexual intercourse may well produce children. *See Morrison*, 821 N.E.2d at 27 ("There was a rational basis for the legislature to draw the line between opposite-sex couples, who as a generic group are biologically capable of reproducing, and same-sex couples, who are not. This is true, regardless of whether there are some opposite-sex couples that wish to marry but one or both partners are physically incapable of reproducing."); *see also Singer v. Hara*, 522 P.2d 1187, 1195 (Wash. Ct. App. 1974) (confirming

marriage "as a protected legal institution primarily because of societal values associated with the propagation of the human race[]" "even though married couples are not required to become parents and even though some couples are incapable of becoming parents and even though not all couples who produce children are married").

Moreover, inquiring of every applicant for a marriage license whether they can or intend to procreate would impose serious, constitutionally questionable intrusions on individual privacy. The state is not required to go to such extremes simply to prove that the purpose of marriage is to promote procreation and child rearing in the traditional family context. It suffices to observe that only members of the opposite sex have even a chance at procreating, so it is fair to limit marriage to opposite-sex unions as an initial matter, regardless whether there are further regulations of marriage.

The state may prefer childrearing by biological parents, "whom our society . . . [has] always presumed to be the preferred and primary custodians of their minor children." *Reno v. Flores*, 507 U.S. 292, 310 (1993). But that does not mean it must foreclose all other parenting scenarios by outlawing adoptions or otherwise preventing parents from raising children to whom they are not biologically related. The State's interest in ensuring that children are properly cared for may take many forms, the fundamental one being traditional marriage. And the mere ability of same-sex couples to become parents does not put such couples on the same footing as opposite-sex couples, whose general ability to procreate, especially unintentionally, legitimately gives rise to state policies encouraging the legal union of such sexual partners. *Morrison*, 821 N.E.2d at 25 ("[T]he legislative classification of extending marriage benefits to opposite-sex couples but not same-sex couples is reasonably related to a clearly identifiable, inherent characteristic that distinguishes the two classes: the ability or inability to procreate by 'natural'

52

means.").   Parental rights are an important aspect of traditional marriage, but it does not follow that marriage rights go wherever parental rights lead.  The purpose of traditional marriage is not to encourage just *any* two people who could be good parents to assume parental responsibility for children.  It is instead to encourage the two *biological* parents to care for their children in tandem.    Neither same-sex couples nor any other inherently non-procreative grouping of individuals fits that bill.

In this regard, the presumption of parentage that Plaintiffs seek makes sense only with respect to opposite-sex couples.  Both state and federal law presume a biological relationship where a child is born to married parents. 42 U.S.C. § 666(a)(5)(G); *see also, e.g.*, Ind. Code §§ 31-14-7 *et seq.*  This presumption is justified insofar as marriage carries with it a tradition and expectation of sexual monogamy and fidelity—in a context where monogamy and fidelity can, in general, produce children.  While children may occasionally result from extramarital liaisons or donor-enabled assisted reproductive technology, the vast majority of children born within marriage are biologically related to their mother's husband.  Traditional marriage is a reliable indicator of the biological relationship between parent and child.  *See Nguyen v. I.N.S.*, 533 U.S. 53, 73 (2001) (upholding naturalization rules that presume a child's biological relationship to married parents but not to unmarried parents).  The presumption of a biological relationship where a child is born to married parents furthers the government's important interest in protecting the integrity of the family unit by "excluding inquiries into the child's paternity that would be destructive of family integrity and privacy."  *Michael H. v. Gerald D.*, 491 U.S. 110, 120 (1989) (upholding a California statute creating a presumption that the child born to a married woman living with her husband is a child of the marriage).

In response to Plaintiff's argument that traditional marriage laws burden children of same-sex couples because there is no presumption of parentage in such cases (Pls.' Summ. J. Mem. at 24-25), it is important to bear in mind that the presumption of parentage exists to protect the marriage.  If the State may provide for traditional marriage (without similarly recognizing other relationships) as a way of promoting optimal childrearing by biological parents, it may take steps to protect that union from post-birth parentage claims by outsiders and to prevent likely biological parents from disclaiming children without evidence.  Traditional marriage and the presumption of parentage are mutually reinforcing concepts.  Marriage exists to encourage responsible procreation, and the presumption of parentage both imposes automatic responsibility on the married couple and protects them from parentage claims by outsiders.  Plaintiffs seek to turn the system from one that understandably uses a presumption of legitimacy to protect a traditional marriage into one that uses a redefined marriage to presume legitimacy.

Critically, however, the presumption of parentage works only if it is facially plausible to all the world that the married couple could in fact be the child's biological parents.  The law need not provide that same presumption where a biological relationship to both members of the couple is facially *im*plausible.  In this way, traditional marriage, and the uniquely suitable parentage expectations that accompany it, facilitates family privacy in a way that same-sex marriage cannot.  Children of same-sex couples are *necessarily* unrelated biologically to at least one of their parents.  In *every* case where a same-sex couple has a child, a third person's parental rights and responsibilities must be dealt with, either before or after the child's birth.  Requiring officials to list both members of a same-sex couple as parents on a birth certificate without a prior showing of release or termination of a biological parent's rights carries risks of unwarranted

exclusion of a biological parent—including as a source of support for the child that the law would otherwise impose—on a scale not true for opposite-sex couples.

> **b.    Many courts have rejected the theory that traditional marriage is about homosexual animus**

Plaintiffs posit that traditional marriage is about harming homosexuals and promoting gender stereotypes.  Pls.' Prelim. Inj. Mem. at 12, 15-16.  They complain about the "stigma" that States create when they recognize opposite-sex marriages but not same-sex marriages.  *Id.* at 23-24.  But as Justice O'Connor wrote in her concurrence in *Lawrence*, legitimate state interests, such as "preserving the traditional institution of marriage," "exist to promote the institution of marriage beyond mere moral disapproval of an excluded group."  *Lawrence v. Texas*, 539 U.S. 558, 585 (2003) (O'Connor, J., concurring).

Traditional marriage is not about sending "messages," Pls.' Prelim. Inj. Mem. at 4, concerning homosexuality or sexual roles.   It is about biology, about regulating sexual relationships that create children that must be cared for.  No amount of modern thinking about male and female roles can change these facts of life.  Accordingly, many state and federal courts have expressly rejected the theory that restricting marriage to opposite-sex couples evinces unconstitutional animus toward homosexuals as a group. The plurality in *Hernandez*, 855 N.E.2d at 8, observed that "the traditional definition of marriage is not merely a by-product of historical injustice. Its history is of a different kind."  As those judges explained, "[t]he idea that same-sex marriage is even possible is a relatively new one. Until a few decades ago, it was an accepted truth for almost everyone who ever lived, in any society in which marriage existed, that there could be marriages only between participants of different sex. A court should not lightly conclude that everyone who held this belief was irrational, ignorant or bigoted."  *Id. See also Standhardt*, 77 P.3d at 465 ("Arizona's prohibition of same-sex marriages furthers a proper

55

legislative end and was not enacted simply to make same-sex couples unequal to everyone else."); *In re Marriage of J.B. & H.B.*, 326 S.W.3d at 680 (rejecting argument that Texas laws limiting marriage and divorce to opposite-sex couples "are explicable only by class-based animus").  Indeed, *all* courts upholding traditional marriage definitions at least tacitly reject the theory that homosexual animus is at work.  *See* Part III.C.2.c, *supra.*

### 4.    No other limiting principle for marriage rights is apparent

In its Temporary Restraining Order, the Court commented that the State's responsible procreation rationale for civil marriage "cannot be the entire rationale underlying the traditional marriage[, and, a]dditionally, this philosophy is problematic in that the state of Indiana generally recognizes marriages of individuals who cannot procreate."  Entry on Pls.' Mot. for TRO at 7. With respect, however, it remains the case that the vast majority of courts to address the issue have been persuaded that the purpose of marriage is exactly that.  Only since the Supreme Court's decision in *Windsor* have courts regularly begun to question that premise, yet *Windsor* neither addressed this theory nor altered history. Even more important, neither Plaintiffs nor judicial decisions invalidating traditional marriage definitions offer meaningful alternative rationales or definitions.  For example, the *Bostic* court declared that any "public commitment to form an exclusive relationship and create a family with a partner with whom the person shares an intimate and sustaining emotional bond" is entitled to marriage recognition.  *Bostic*, 2014 WL 561978, at *12.  This proposal for redefinition, however, in no way explains why government has any interest in recognizing marriage or in regulating *sexual* relationships.  The district court in *Bostic* spoke of "an intimate and sustaining emotional bond," but never said why that matters to the State.

Such an omission is glaring and significant.  If the desire for social recognition and validation of self-defined "intimate" relationships are the bases for civil marriage, no adult relationships can be excluded *a priori* from making claims upon the government for recognition.

A central argument for recognizing same-sex marriages arises from a fashionable insistence that the "modern family" is not what it used to be.  Indeed, there seems to be no end to the variety of *de facto* family permutations that can arise.  By virtue of statutory amendment and judicial fiat, some states bestow parental rights and responsibilities even on entire groups of "co-parents."   In recent years, Delaware and the District of Columbia have passed laws that recognize third "de facto" parents who have parental rights and responsibilities.  D.C. Code §§ 16-831.01 *et seq.*; 13 Del. Code § 8-201.  Courts in several other states have also recognized three parents.  *See In re Parentage of L.B.*, 122 P.3d 161, 176-77 (Wash. 2005) (*en banc*) (recognizing third "de facto" parent); *C.E.W. v. D.E.W.*, 845 A.2d 1146 (Me. 2004) (same); *V.C. v. M.J.B.*, 748 A.2d 539 (N.J. 2000) (recognizing third "psychological" parent); *LaChappelle v. Mitten*, 607 N.W.2d 151 (Minn. Ct. App. 2000) (recognizing third-parent rights); *see also In re M.C.*, 195 Cal. App. 4th 197, 214, 223 (2011) (observing that "M.C. does have three presumed parents, a situation the Supreme Court has acknowledged may exist," but remanding for reconciliation of competing parentage claims).[5]

But none of these social changes—whether one views them as good, bad, or inconsequential—justifies marriage for same-sex couples.  Surely no one argues that the liberty of adults to engage freely in consensual sex means States must also celebrate (or even

---

[5] Still more States' courts have conferred joint parental rights on unmarried same-sex couples in circumstances that would imply the availability of third-parent rights.  *See Raftopol v. Ramey*, 12 A.3d 783, 799 (Conn. 2011) (recognizing paternal rights in both biological father and gay partner, parties to gestational agreement with maternal surrogate); *K.M. v. E.G.*, 37 Cal. 4th 130, 142-44 (2005) (recognizing maternal rights in both egg-donor mother and birth mother); *T.M.H. v. D.M.T.*, 79 So.3d 787, 803 (Fla. Dist. Ct. App. 2011) (holding it constitutionally mandated that both egg-donor mother and birth mother have parental rights); *see also* Melanie B. Jacobs, *Why Just Two? Disaggregating Traditional Parental Rights and Responsibilities to Recognize Multiple Parents*, 9 J.L. & Fam. Stud. 309 (2007).

acknowledge) each individual's sexuality.   Nor, then, does the government's interest in the sexuality of its citizens suddenly spring forth at the origination of particular romantic or cohabitational relationships as such.   There has to be something more to justify government involvement. *See* Willystine Goodsell, *A History of the Family as a Social and Educational Institution* 7 (The Macmillan Company 1915) ("It seems clear enough that the sexual instinct of itself could not have brought about permanent relationships between male and female.").

For qualified opposite-sex couples, the "something more" is the natural capacity of their relationship to produce children unintentionally.  This natural capacity gives rise to the state's interest in encouraging responsible procreation, *i.e.*, where the sexual partners live in a long-term, committed relationship for the sake of any children they may produce, even unintentionally.  *See id.* at 7-8 ("The source of marriage . . . must probably be looked for in the utter helplessness of the newborn offspring . . . ."). The ability of same-sex couples to raise children together is not the same thing.  The primary rationale for traditional marriage is responsible *procreation*, not responsible parenting more generally.  Hence, what is missing is society's interest in encouraging couples to consider and plan for the children that inevitably result from impulsive decisions to act on sexual desires.  The sexual activity of same-sex couples implies no consequences similar to that of opposite-sex couples.

It is no response for same-sex couples to say that the State *also* has an interest in encouraging those who acquire parental rights without procreating (together) to maintain long-term, committed relationships for the sake of their children.  Such an interest is not the same as the interest that justifies marriage as a special status for sexual partners *as such*.  Traditional marriage reflects the ideal of family life, recognizing the love between a mother and a father *and the ability of this relationship to bear children*.  The same is true for opposite-sex couples that do

not procreate because they model the optimal ordering of family life.  Responsible *parenting* is not a theory supporting marriage for same-sex couples because it cannot answer two critical questions: Why two people?  Why a sexual relationship?

In other words, if marriage rights must follow parental rights, and if States cannot restrict *joint* parental rights to opposite-sex couples as an optimal setting for childrearing, there would be no basis for precluding joint parentage—and, hence, marriage—by *any* social grouping, regardless of the existence of a sexual relationship.  Sisters, brothers, platonic friends, groups of three or more—all would be on equal footing for purposes of the right to parent jointly and, thus, the right to marry.[6]   Consequently, responsible *parenting* is not a justification for same-sex-couple marriage, as distinguished from recognition of any other human relationships. It is instead a rationale for eliminating marriage as government recognition of a *limited* set of relationships. Once the natural limits that inhere in the relationship between a man and a woman can no longer sustain the definition of marriage, the conclusion that follows is that any grouping of adults would have an equal claim to marriage. *See, e.g.*, Jonathan Turley, *One Big, Happy Polygamous Family*, NY Times, July 21, 2011, at A27 ("[Polygamists] want to be allowed to create a loving family according to the values of their faith.").

Marriage is not a device traditionally used to acknowledge acceptable sexuality, living arrangements, or parenting structures.  It is a means to encourage and preserve something far more compelling and precise: the relationship between a man and a woman in their natural capacity to have children.  It attracts and then regulates couples whose sexual conduct may create

---

[6] In this regard it is important to bear in mind that, under this model, it is only the *potential* for a group of adults to acquire parental rights—not the *actual* conferral of parental rights on any particular grouping—that would be the necessary predicate for marriage.  In other words, taken to its logical conclusion, Plaintiffs' argument for "marriage equality" would insist that, just as opposite-sex couples are eligible for marriage by reference to their *theoretical* procreative capacity, so too would other groups be eligible for marriage by reference to *their* theoretical ability to acquire joint parental rights, regardless whether they actually (or even intend) to do so.

children in order to ameliorate the burdens society ultimately bears when unintended children are not properly cared for.  Neither same-sex couples nor any other social grouping presents the same need for government involvement, so there is no similar rationale for recognizing them.

## CONCLUSION

The Court should deny all Plaintiffs' Motions for Preliminary Injunction and Motion for Summary Judgment and Grant Defendants' Motion for Summary Judgment.

*s/ Nancy Moore Tiller*
Nancy Moore Tiller
Nancy Moore Tiller & Associates
11035 Broadway, Suite A
Crown Point, IN 46307
Tel: (219) 662-2300
Fax: (219) 662-8739
nmt@tillerlegal.com
*Counsel for Michael A. Brown*

*s/ Robert V. Clutter*
Robert V. Clutter
Kirtley, Taylor, Sims, Chadd & Minnette, P.C.
117 W. Main Street
Lebanon, IN 46052
Tel: (765) 483-8549
Fax: (765) 483-9521
bclutter@kirtleytaylorlaw.com
*Counsel for Penny Bogan*

*s/ Darren J. Murphy*
Darren J. Murphy
Assistant Hamilton County Attorney
694 Logan St.
Noblesville, IN 46060
Tel: (317) 773-4212
Fax: (317) 776-2369
dmurphy@ori.net
*Counsel for Peggy Beaver*

GREGORY F. ZOELLER
Attorney General of Indiana
*s/ Thomas M. Fisher*
Thomas M. Fisher
Solicitor General
Office of the Attorney General
IGC South, Fifth Floor
302 W. Washington Street
Indianapolis, IN 46204
Tel: (317) 232-6255
Fax: (317) 232-7979
Tom.Fisher@atg.in.gov
*Counsel for Greg Zoeller and William C. VanNess II, M.D.*

*s/ Elizabeth A. Knight*
Elizabeth A. Knight
Porter County Administrative Center
155 Indiana Avenue
Suite 205
Valparaiso, IN 46383
Tel: (219) 465-3329
Fax: (219) 465-3362
eknight@porterco.org
*Counsel for Karen Martin*

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2014, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system, which sent notification of such filing to the following:

Barbara J. Baird
The Law Office Of Barbara J Baird
bjbaird@bjbairdlaw.com

Paul D. Castillo
Camilla B. Taylor
Christopher R. Clark
Lambda Legal Defense & Education Fund, Inc.
pcastillo@lambdalegal.org
ctaylor@lambdalegal.org
cclark@lambdalegal.org

Robert V. Clutter
Kirtley, Taylor, Sims, Chadd & Minnette, P.C.
bclutter@kirtleytaylorlaw.com

Darren J. Murphy
Assistant Hamilton County Attorney
dmurphy@ori.net

Jordan Heinz
Brent Phillip Ray
Kirkland & Ellis LLP
jordan.heinz@kirkland.com
brent.ray@kirkland.com

Nancy Moore Tiller
Nancy Moore Tiller & Associates
nmt@tillerlegal.com

Elizabeth A. Knight
Porter County Administrative Center
eknight@porterco.org

*s/ Thomas M. Fisher*
Thomas M. Fisher
Solicitor General

Office of the Attorney General
Indiana Government Center South 5th Floor
302 W. Washington St.
Indianapolis, IN 46204-2770
Phone:  (317) 232-6255
Fax:  (317) 232-7979
Email: Tom.Fisher@atg.in.gov