# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

MARILYN RAE BASKIN and ESTHER FULLER; BONNIE EVERLY and LINDA JUDKINS; DAWN LYNN CARVER and PAMELA RUTH ELEASE EANES; HENRY GREENE and GLENN FUNKHOUSER, individually and as parents and next friends of C.A.G.; and NIKOLE QUASNEY and AMY SANDLER, individually and as parents and next friends of A.Q.-S. and M.Q.-S.,  )
)
)
)
)
)
)
)
)
)

        Plaintiffs,  )

v.  )
)

PENNY BOGAN, in her official capacity as BOONE COUNTY CLERK; KAREN M. MARTIN, in her official capacity as PORTER COUNTY CLERK; MICHAEL A. BROWN, in his official capacity as LAKE COUNTY CLERK; PEGGY BEAVER, in her official capacity as HAMILTON COUNTY CLERK; WILLIAM C. VANNESS II, M.D., in his official capacity as the COMMISSIONER, INDIANA STATE DEPARTMENT OF HEALTH; and GREG ZOELLER, in his official capacity as INDIANA ATTORNEY GENERAL,  )
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

        Defendants.  )

Civil Action No.:
1:14-cv-00355-RLY-TAB

**PLAINTIFFS' CONSOLIDATED REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT, REPLY IN SUPPORT OF PLAINTIFFS NIKOLE QUASNEY, AMY SANDLER, A.Q.-S., AND M.Q.-S.'S MOTION FOR PRELIMINARY INJUNCTION, AND OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.     THE MARRIAGE BAN HARMS REAL PEOPLE AND THOSE INJURIES
       ARE OF A CONSTITUTIONAL MAGNITUDE THIS COURT HAS THE
       POWER TO ADDRESS. .................................................................................... 1

       A.     Plaintiffs And Their Children Have Asserted Both Tangible And
              Dignitary Harms Resulting From The Marriage Ban, Which Are All
              Legally Cognizable, And Which Defendants Do Not And Cannot
              Dispute. ........................................................................................................ 1

       B.     Plaintiff Children Have A Personal Stake In The Outcome. ........................... 3

       C.     It Is The Role Of This Court To Safeguard Plaintiffs' Constitutional
              Rights. .......................................................................................................... 6

       D.     *Baker v. Nelson* Has No Bearing On This Court's Ability To Address
              Those Constitutional Questions. ................................................................... 8

II.    PLAINTIFFS SEEK THE SAME RIGHT TO MARRY AND RIGHT TO
       MARITAL RECOGNITION AS ALL OTHER HOOSIERS. ..................................... 9

       A.     Defendants Err In Attempting To Reframe The Fundamental Right
              Asserted Here As A "New" Right To Marry Someone Of The Same
              Sex................................................................................................................ 9

       B.     Defendants Misapprehend The Role Of History When Considering
              The Scope Of Fundamental Rights. ............................................................. 11

       C.     Denying Recognition To Marriages Of Same-Sex Couples From Other
              States Violates Both The Due Process And Equal Protection
              Guarantee. ................................................................................................... 15

III.   THE COURT MUST APPLY HEIGHTENED SCRUTINY UNDER THE
       EQUAL PROTECTION CLAUSE. ................................................................... 17

IV.    EVEN IF THE COURT WERE TO APPLY RATIONAL BASIS REVIEW,
       THE MARRIAGE BAN MUST BE FOUND UNCONSTITUTIONAL. ................... 21

       A.     Defendants Urge An Erroneous Application Of Rational Basis
              Review. ........................................................................................................ 21

       B.     Defendants Misapprehend The Significance Of An Improper
              Legislative Purpose Under Any Level Of Review. ......................................... 22

       C.     Defendants Misapprehend The Significance Of An Outright Exclusion
              Of A Class Of People Under Rational Basis Review. ..................................... 23

**D.**     **There Is No Rational Relationship Between The Marriage Ban And Any Asserted State Interest In "Encouraging Responsible Procreation."** ................................................................. 25

**V.**     **ATTORNEY GENERAL ZOELLER IS A PROPER PARTY DEFENDANT.** ........ 28

**VI.**    **THIS COURT SHOULD PRELIMINARILY ENJOIN THE STATE FROM ENFORCING THE MARRIAGE BAN AGAINST PLAINTIFFS QUASNEY AND SANDLER.** ................................................................. 30

      **A.**     **Plaintiffs Only Seek Preliminary Relief For Plaintiffs Quasney, Sandler, And Their Two Daughters, And Withdraw The Remaining Plaintiffs' Preliminary Injunction Motion.** ........................................ 30

      **B.**     **Plaintiffs Quasney, Sandler, And Their Daughters Face Irreparable Harm.** ................................................................. 30

      **C.**     **Preliminarily Enjoining The State From Enforcing The Marriage Ban Against Plaintiffs Quasney, Sandler, And Their Daughters Serves The Public Interest And Will Not Harm Defendants.** ............................... 32

      **D.**     **A Preliminary Injunction Preventing Enforcement Of The Marriage Ban Against Niki And Amy Should Not Be Stayed.** ......................................... 33

**CONCLUSION** ................................................................. 35

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Martin,*
  375 U.S. 399 (1964) ................................................................................................ 5

*Arnold v. Sendak,*
  416 F. Supp. 22 (S.D. Ind. 1976) ......................................................................... 29

*Baker v. Nelson,*
  191 N.W.2d 185 (Minn. 1971) ............................................................................... 8

*Baker v. Nelson,*
  409 U.S. 810 (1972) ................................................................................................ 8

*Bartrom v. Adjustment Bureau, Inc.,*
  618 N.E.2d 1 (Ind. 1993) ...................................................................................... 14

*Bishop v. United States ex rel. Holder,*
  962 F. Supp. 2d 1252 (N.D. Okla. 2014) ................................................... 9, 25, 26

*Boddie v. Connecticut,*
  401 U.S. 371 (1971) .............................................................................................. 12

*Boklovac v. State,*
  98 N.E.2d 250 (Ind. 1951) .................................................................................... 17

*Bostic v. Rainey,*
  No. 2:13-cv-395, 2014 WL 561978 (E.D. Va. Feb. 13, 2014) ........................ passim

*Bourke v. Beshear,*
  No. 3:13-cv-750, 2014 WL 556729 (W.D. Ky. Feb. 12, 2014) ......................... 9, 16

*Bradwell v. Illinois,*
  83 U.S. 130 (1872) ................................................................................................ 14

*Brandt v. Keller,*
  109 N.E.2d 729 (Ill. 1952) .................................................................................... 14

*Bray v. Alexandria Women's Health Clinic,*
  506 U.S. 263 (1993) .............................................................................................. 18

*Brown v. Bd. of Educ. of Topeka,*
  347 U.S. 483 (1954) ................................................................................................ 4

*Califano v. Goldfarb,*
  430 U.S. 199 (1977) .............................................................................................. 14

*Califano v. Westcott,*
  443 U.S. 76 (1979) ................................................................................................ 14

*Cavel Int'l, Inc. v. Madigan,*
  500 F.3d 544 (7th Cir. 2007) ................................................................................ 34

*Christian Legal Soc'y Ch. of the Univ. of Cal., Hastings Coll. of Law v. Martinez*,
   130 S. Ct. 2971 (2010) ................................................................................... 18

*City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985) .......................................................... 21, 22, 24, 26

*Cmty. Pharm. of Ind., Inc. v. Ind. Family and Soc. Servs. Admin.*,
   823 F. Supp. 2d 876 (S.D. Ind. 2011) ................................................. 34

*Collins v. Day*,
   644 N.E.2d 72 (Ind. 1994) ................................................................... 22

*De Leon v. Perry*,
   No. 13-CA-982, 2014 WL 715741 (W.D. Tex. Feb. 26, 2014) ........................... 2, 16

*Debra H. v. Janice R.*,
   930 N.E.2d 184 (N.Y. 2010) ................................................................. 6

*Della Corte v. Ramirez*,
   961 N.E.2d 601 (Mass. Ct. App. 2012) ................................................. 6

*Eisenstadt v. Baird*,
   405 U.S. 438 (1972) ....................................................................... 20, 24

*Elisa B. v. Superior Court*,
   117 P.3d 660 (Cal., 2005) ................................................................... 6

*Ent. Software Ass'n v. Blagojevich*,
   469 F.3d 641 (7th Cir. 2006) ............................................................... 29

*Frontiero v. Richardson*,
   411 U.S. 677 (1973) ............................................................................. 9

*Gartner v. Iowa Dep't of Public Health*,
   830 N.W.2d 335 (Iowa 2013) ............................................................... 6

*Golinski v. U.S. Office of Pers. Mgmt.*,
   824 F. Supp. 2d 9680 (N.D. Cal. 2012) ............................. 18, 25, 26, 27

*Goodridge v. Dep't of Public Health*,
   798 N.E.2d 941 (Mass. 2004) ............................................................... 6

*Gray v. Orr*,
   No. 13 C 8449, 2013 WL 6355918 (N.D. Ill. Dec. 5, 2013) .................... 31

*Heckler v. Mathews*,
   465 U.S. 728 (1984) ............................................................................. 2

*Henry v. Himes*,
   No. 1:14–cv–129, 2014 WL 1418395 (S.D. Ohio Apr. 14, 2014) .................... 10, 16

*Herbert v. Kitchen*,
   134 S. Ct. 893 (Jan. 6, 2014) ............................................................. 33

*Hicks v. Miranda*,
   422 U.S. 332 (1975) ............................................................................. 9

*Hinrichs v. Bosma*,
  440 F.3d 393 (7th Cir. 2006).................................................................. 34, 35

*Hodgson v. Minnesota*,
  497 U.S. 417 (1990).............................................................................. 10

*Hollingsworth v. Perry*,
  133 S. Ct. 2652 (2013) ........................................................................... 2

*Hooper v. Bernalillo Cnty. Assessor*,
  472 U.S. 612 (1985).............................................................................. 21

*In re A & F Enters., Inc. II*,
  742 F.3d 763 (7th Cir. 2014)................................................................. 34

*In re Marriage Cases*,
  183 P.3d 384 (Cal. 2008) ...................................................................... 10

*J.E.B v. Alabama ex rel. T.B.*,
  511 U.S. 127 (1994).............................................................................. 19

*Jackson v. City & Cnty. of Denver*,
  124 P.2d 240 (1942).............................................................................. 12

*Johnson v. Robison*,
  415 U.S. 361 (1974).............................................................................. 26

*Joiner v. Vill. of Washington Park, Ill.*,
  378 F.3d 613 (7th Cir. 2004)................................................................. 33

*Jones v. Lorenzen*,
  441 P.2d 986 (Okla. 1966) .................................................................... 12

*Kelo v. City of New London*,
  545 U.S. 469 (2005).............................................................................. 22

*Kitchen v. Herbert*,
  961 F. Supp. 2d 1181 (D. Utah 2013) ........................................... passim

*Korn v. Korn*,
  242 N.Y.S. 589 (N.Y. App. Div. 1930)................................................. 25

*Lawrence v. Texas*,
  539 U.S. 558 (2003).......................................................... 9, 11, 13, 18

*Lee v. Orr*,
  No. 13-cv-8719, 2013 WL 6490577 (N.D. Ill. Dec. 10, 2013)............. 31

*Levin v. Levin*,
  645 N.E.2d 601 (Ind. 1994)..................................................................... 6

*Lindsey v. Normet*,
  405 U.S. 56 (1972)................................................................................ 21

*Loving v. Virginia*,
  388 U.S. 1 (1967).............................................................. 7, 17, 20, 24

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ................................................................................................ 1

*Mandel v. Bradley*,
  432 U.S. 173 (1977) ................................................................................................ 8

*Mariga v. Flint*,
  822 N.E.2d 620 (Ind. App. Ct. 2005) ................................................................... 25

*Mason v. Mason*,
  775 N.E.2d 706 (Ind. Ct. App. 2002) ................................................................... 16

*McGee v. Cole*,
  No. 3:13-cv-24068, 2014 WL 321122 (S.D. W. Va. Jan. 29, 2014) ........................ 9

*McLaughlin v. Florida*,
  379 U.S. 184 (1964) .............................................................................................. 20

*Miller-Jenkins v. Miller- Jenkins*,
  912 A.2d 951 (Vt. 2006) ......................................................................................... 6

*Morrison v. Sadler*,
  821 N.E.2d 15 (Ind. Ct. App. 2005) ..................................................................... 22

*Naim v. Naim*,
  87 S.E.2d 749 (1955)
  *judgment vacated*, 350 U.S. 891 (1955),
  *adhered to on remand*, 90 S.E.2d 849 (1956) ..................................................... 12

*Ne. Fla. Ch. of the Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*,
  508 U.S. 656 (1993) ................................................................................................ 3

*O'Daily v. Morris*,
  31 Ind. 111, 1869 WL 3351 (Ind. 1869) .............................................................. 13

*Obergefell v. Kasich*,
  No. 1:13-cv-501, 2013 WL 3814262 (S.D. Ohio July 22, 2013) ..................... 3, 31

*Obergefell v. Wymyslo*,
  962 F. Supp. 2d 968 (S.D. Ohio 2013) ....................................................... 3, 15, 27

*People v. Liberta*,
  474 N.E.2d 567 (N.Y. 1984) ................................................................................ 14

*Perez v. Lippold*,
  198 P.2d 17 (Cal. 1948) .......................................................................... 13, 14, 18

*Perry v. Schwarzenegger*,
  704 F. Supp. 2d 921 (N.D .Cal. 2010) ........................................................... 19, 26

*Planned Parenthood of Se. Pa. v. Casey*,
  505 U.S. 833 (1992) .............................................................................................. 11

*Potter v. Murray City*,
  760 F.2d 1065 (10th Cir. 1985) ............................................................................ 14

*Reed v. Reed*,
    404 U.S. 71 (1971) ................................................................. 21

*Robicheaux v. Caldwell*,
    No. 13-5090, 2013 WL 6198279 (E.D. La. Nov. 27, 2013) .................................... 29

*Roche v. Washington*,
    19 Ind. 53 (Ind. 1862) ............................................................. 16

*Romer v. Evans*,
    517 U.S. 620 (1996) ......................................................... passim

*Scott v. State*,
    39 Ga. 321 (1869) .................................................................. 12

*State v. Gibson,*
    1871 WL 5021, 36 Ind. 389 (Ind. 1871) .............................................. 12

*Tanco v. Haslam,*
    __ F. Supp. __, 2014 WL 997525 (M.D. Tenn. Mar. 14, 2014) ........................... 3, 33

*Thompson v. Thompson,*
    218 U.S. 611 (1910) ................................................................ 13

*Trafficante v. Metro. Life Ins. Co.*,
    409 U.S. 205 (1972) ................................................................. 2

*Turner v. Avery,*
    113 A. 710 (N.J. Ch. 1921) ......................................................... 25

*Turner v. Safley,*
    482 U.S. 78 (1987) ........................................................... 5, 12, 19

*U.S. Dep't of Agric. v. Moreno,*
    413 U.S. 528 (1973) .......................................................... 21, 22, 24

*United States v. Virginia,*
    518 U.S. 515 (1996) ............................................................. 4, 20

*United States v. Windsor*,
    133 S. Ct. 2675 (2013) ...................................................... passim

*United States v. Windsor,*
    699 F.3d 169 (2d Cir. 2012) ........................................................ 26

*Varnum v. Brien,*
    763 N.W.2d 862 (Iowa 2009) ......................................................... 27

*W. Va. Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ................................................................. 7

*Warth v. Seldin,*
    422 U.S. 490 (1975) ................................................................. 1

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ................................................................ 15

*Weinberger v. Wiesenfeld*,
    420 U.S. 636 (1975) ............................................................................ 14

*Zablocki v. Redhail,*
    434 U.S. 374 (1978) ............................................................................ 10

*Zobel v. Williams*,
    457 U.S. 55 (1982) .............................................................................. 21

## Statutes

28 U.S.C. § 1257(2) ................................................................................. 8

I.C. § 31-11-1-1 ....................................................................................... 2

I.C. § 31-11-1-1(a) ................................................................................. 19

I.C. § 31-11-1-1(b) ................................................................................. 19

I.C. § 31-11-11-7 .................................................................................... 29

I.C. § 31-11-1-2 ..................................................................................... 25

I.C. § 31-11-4 .......................................................................................... 3

I.C. § 31-11-4-15 ..................................................................................... 3

I.C. § 31-14-10-1 ................................................................................... 25

I.C. § 4-6-1-6 ........................................................................................ 28

I.C. § 4-6-2-1.5(a) ................................................................................. 28

## Other Authorities

Mar. 26, 2013 Press Release, *Defending state's authority is Attorney General's obligation*,
    Office of the Indiana Attorney General, Attorney General Zoeller ......................................... 29

Mar. 7, 2014 Press Release, Office of the Indiana Attorney General ............................................ 30

Virginia L. Hardwick, *Punishing the Innocent: Unconstitutional Restrictions on Prison Marriage
    and Visitation*, 60 N.Y.U. L. Rᴇᴠ. 275 (1985) ........................................................... 12

Defendants' Opposition provides this Court with no reason to deny the relief sought by Plaintiffs.  Defendants have identified no disputed material facts that would preclude the entry of summary judgment, and they have failed to show that Plaintiffs Quasney and Sandler are not entitled to a preliminary injunction.  Defendants' arguments for upholding the marriage ban do not survive constitutional scrutiny.  Accordingly, this Court should—like every other court to have addressed state-law marriage bans post-*Windsor*—strike down Indiana's marriage ban, and issue a preliminary injunction preventing enforcement of the ban against Quasney and Sandler.

## I.    THE MARRIAGE BAN HARMS REAL PEOPLE AND THOSE INJURIES ARE OF A CONSTITUTIONAL MAGNITUDE THIS COURT HAS THE POWER TO ADDRESS.

### A.    Plaintiffs And Their Children Have Asserted Both Tangible And Dignitary Harms Resulting From The Marriage Ban, Which Are All Legally Cognizable, And Which Defendants Do Not And Cannot Dispute.

Defendants erroneously claim that Plaintiffs lack Article III standing.  "[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  Article III standing requires the litigant to prove that he has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  In other words, for a federal court to have authority under the Constitution to settle a dispute, the party before it must seek a remedy for a personal harm.

Plaintiffs clearly have a personal stake in the outcome of the controversy that affords them Article III standing.  Plaintiffs suffer particularized injuries as a direct result of Defendants' enforcement of Indiana's marriage ban, including far-reaching legal and social consequences, and

the pain of humiliation, stigma, and emotional distress that accumulates daily.[1]  Here, there is no dispute that adult Plaintiffs are loving couples in long-term committed relationships who seek to marry in, or have their marriage recognized by, the State of Indiana.  (Defs.' Opp., Dkt. No. 56, at 2.)  Indeed, the unmarried Plaintiffs were denied marriage licenses from their respective county clerks.  (*See* Pls.' Summ. J. Mem., Dkt. No. 39, at 9.)  Even Defendants concede that marriage licenses cannot be issued to Plaintiffs without violating Indiana Code § 31-11-1-1.  (Defs.' Opp. at 1.)  The denial of the marriage license itself establishes an Article III injury.  *See Hollingsworth v. Perry*, 133 S. Ct. 2652, 2662 (2013); *Bostic v. Rainey*, No. 2:13-cv-395, 2014 WL 561978, at *7 (E.D. Va. Feb. 13, 2014); *De Leon v. Perry*, No. 13-CA-982, 2014 WL 715741, at *7 (W.D. Tex. Feb. 26, 2014).

Moreover, Plaintiffs suffer stigma and humiliation as a result of state sanctioned discrimination.  Dignitary or stigmatic injury is sufficient itself to support standing.  *See Allen v. Wright*, 468 U.S. 737, 755 (1984) ("stigmatizing injury often caused by racial discrimination" is a type of "noneconomic injury" sufficient to support standing).  The Supreme Court repeatedly has emphasized that "discrimination itself, by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' and therefore as less worthy…can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group."  *Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984); *see also Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 208, 211 (1972) (persons who were not themselves victims of housing discrimination at a certain apartment complex nevertheless had standing to challenge landlord's discriminatory practices under Civil

---

[1]   This Court correctly recognized that the injuries of Plaintiffs Quasney and Sandler are judicially cognizable.  As this Court noted in its Entry on Plaintiffs' Motion for a Temporary Restraining Order, Quasney drives across state lines to receive medical treatment from a hospital that recognizes her marriage to Sandler.  The family has also been denied a family fitness membership, and suffer from anxiety, sadness, and stress about the non-recognition of their marriage and what it means if and when Quasney succumbs to cancer.  (TRO, Dkt. No. 51, at 4.)

Rights Act because of stigma associated with living in a discriminatory environment and because of loss of the social and economic benefits of an integrated community).  Furthermore, in equal protection cases when the government erects a barrier to prevent one group from obtaining a benefit that another group receives, "[t]he injury in fact…is the denial of equal treatment resulting from the imposition of the [discriminatory] barrier, not the ultimate inability to obtain the benefit."  *Ne. Fla. Ch. of the Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993).[2]

Plaintiffs also satisfy the causation and redressability requirements for standing. Defendant Clerks are proper defendants here because they are the officials responsible for issuing and denying marriage licenses and recording marriages.  *See* I.C. § 31-11-4.  Defendant VanNess is a proper defendant because he is the official responsible for providing forms for marriage and death certificates.  *See* I.C. § 31-11-4-15.  Defendant Zoeller is also a proper party.  *See* Section V, *infra*. An injunction prohibiting Defendants from enforcing Indiana's marriage ban will allow the unmarried Plaintiffs to marry in Indiana, and will allow the valid marriage between Plaintiffs Quasney and Sandler to be recognized in Indiana.  If this Court issues the relief sought by Plaintiffs, their injuries will be redressed.  They will be allowed to be part of married families in Indiana.

**B.     Plaintiff Children Have A Personal Stake In The Outcome.**

Defendants argue that the child Plaintiffs "do not have an actual stake in the outcome" of this lawsuit, and that they have not explained how they would benefit from their parents' marriage.

---

[2]     Accordingly, in an unbroken string of district court decisions in recent months, courts have held that state marriage bans violate the Constitution because they infringe upon the equal dignity of lesbian and gay couples and their children.  *See, e.g.*, *Kitchen v. Herbert*, 961 F. Supp. 2d 1181, 1215-16 (D. Utah 2013); *Tanco v. Haslam*, __ F. Supp. __, 2014 WL 997525, at *7 (M.D. Tenn. Mar. 14, 2014); *Obergefell v. Wymyslo*, 962 F. Supp. 2d 968, 980 (S.D. Ohio 2013); *Obergefell v. Kasich*, No. 1:13-cv-501, 2013 WL 3814262 (S.D. Ohio July 22, 2013).  Thus, even if it were true that Plaintiffs assert solely dignitary injuries (and it is not), such harms are legally cognizable and more than sufficient for standing.

(Defs.' Opp. at 12, 20-24.)   That Defendants would make this argument is ironic given that Defendants' sole justification for the marriage ban relies on an assumption that children benefit directly from their parents' marriage, including as a result of the stability and support for familial relationships that marriage provides to children of different-sex couples.  (*See, e.g.*, Defs.' Opp. at 20, 51-53, 60.)  Defendants never explain why the benefits of marriage would be any different for C.A.G., A.Q.-S., and M.Q.-S, or why these children are any less deserving.

Government-imposed social stigma can have a damaging and long-lasting psychological impact on young people, and when such dignitary injury is imposed, the affected individuals have a right to assert their interests in court.  *See, e.g.*, *Brown v. Bd. of Educ. of Topeka***,** 347 U.S. 483, 494 (1954) (explaining that even if the tangible factors in segregated schools were completely equal, segregating African-American children "solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone," and "the impact is greater when it has the sanction of the law," and listing sources detailing the psychological effects of discrimination); *United States v. Virginia*, 518 U.S. 515, 554, 557 (1996) (emphasizing intangible factors in holding a sex-segregated program for women at another college unequal).  As the Supreme Court recently recognized in *Windsor*, children of same-sex couples experience unique dignitary injuries when government singles out their families and brands them as unworthy of marriage.  In doing so, government "humiliates…children now being raised by same-sex couples," and makes it more difficult for these children "to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives," all in violation of "basic due process and equal protection principles."  *United States v. Windsor*, 133 S. Ct. 2675, 2693-95 (2013); *see also Kitchen*, 961 F. Supp. 2d at 1212-13 (marriage ban harms not only the children of same-sex couples in dignitary ways, but also lesbian or gay children of both same-sex and different-sex

couples by causing them to "grow up with the knowledge that the State does not believe they are as capable of creating a family as their heterosexual friends").[3]  The child Plaintiffs suffer legally cognizable injuries because the State has singled out their families as unworthy of respect, and invited others to discriminate against them as well.  (Greene Decl., Dkt. No. 39-7, ¶ 20; Sandler Decl., Dkt. No. 39-10, ¶ 22; Quasney Supp. Decl., Dkt. No. 42, ¶ 7; *see also Anderson v. Martin*, 375 U.S. 399, 455-56 (1964) (recognizing harm imposed when government invites private discrimination).)[4]

Defendants also erroneously argue that C.A.G., A.Q.-S., and M.Q.-S. have asserted no tangible injury, and that they have no need of the spousal presumption of parentage, as their parents have performed adoptions.  (Defs.' Opp. at 21.)  However, adoption proceedings and other life planning documents that lesbian and gay couples must secure in the absence of marriage to cobble together as many protections as possible are expensive, and often take months after a child's birth to complete, leaving the child and his or her relationship to one of his or her parents vulnerable in the interim.  (*See* Decl. of John Q. Herrin ("Herrin Decl.") ¶¶ 7-12; Decl. of Lesa C. Duvall ("Duvall Decl.") ¶¶ 7-10.)  Had the child Plaintiffs been born during legally recognized marriages in Indiana, they automatically would have been accorded parent-child relationships by

---

[3]   In fact, when summarizing the many intangible and tangible harms caused by DOMA, the *Windsor* Court focused on the intangible as the most significant:  "What has been explained to this point should more than suffice to establish that the principal purpose and the necessary effect of this law are to demean those persons who are in a lawful same-sex marriage.  This requires the Court to hold, as it now does, that DOMA is unconstitutional as a deprivation of the liberty of the person protected by the Fifth Amendment of the Constitution" because the "***Fifth Amendment itself withdraws from Government the power to degrade or demean in the way this law does*** . . . ." *Windsor*, 133 S. Ct. at 2695 (emphasis added).

[4]   Indiana's marriage ban also harms the child Plaintiffs by denying them the legitimacy enjoyed by children of married parents.  *See Turner v. Safley*, 482 U.S. 78, 96 (1987) (explaining that marital status often is a precondition to the receipt of intangible "government benefits," such as "legitimation of children born out of wedlock").  Defendants respond only that an action for "bastardy" is no longer available, and that children of unwed parents are entitled to child support regardless of their parents' marital status.  However, although the status of illegitimacy now has diminished legal force, it is still a status widely considered undesirable and subject to discrimination, and Defendants do not dispute that C.A.G., A.Q.-S., and M.Q.-S. must confront the common assumption, reinforced by Indiana law, that as members of a family headed by an unmarried couple, their bonds and those of their parents are impermanent and insubstantial.

law.   The extraordinary legal measures forced upon same-sex couples and their children to mitigate where possible their lack of access to marital protections have a direct and significant impact on the financial and legal security of these families, leaving them with diminished financial wherewithal.   (*See* Herrin Decl. ¶¶ 9-12; Duvall Decl. ¶¶ 5-9, 11-14.)[5]   In sum, by excluding same-sex couples and their children from marriage, the State has harmed not only the parents, but also the children, in both dignitary and financial ways, and rendered their parent-child relationships vulnerable.

###        C.      It Is The Role Of This Court To Safeguard Plaintiffs' Constitutional Rights.

Defendants would have this Court abdicate its role as an adjudicator of constitutional challenges and grant the State unfettered discretion to determine who is and is not deserving of constitutional protections.   However, it is emphatically the responsibility of this Court to address Plaintiffs' constitutional challenge and to afford Plaintiffs the relief they seek.   *See Bostic*, 2014 WL 561978, at *17 ("When core civil rights are at stake the judiciary must act."); *W. Va. Bd. of*

---

[5]    Defendants dispute whether the spousal presumption of parentage does or should apply to a child of same-sex spouses, arguing that the presumption "works only if it is facially plausible to all the world that the married couple could in fact be the child's biological parents." (Defs.' Opp. at 54.)   Defendants ignore that the spousal presumption in Indiana and elsewhere never has turned upon the existence of a biological link between the child and both parents, but in fact exists for child-centered reasons to protect a child's relationship to both parents regardless of biology.   *See Levin v. Levin,* 645 N.E.2d 601 (Ind. 1994) (child conceived through assisted reproductive techniques, with no genetic connection to husband, is a "child of the marriage," and both spouses are parents with a legal obligation of support).   Indeed, in every state that has permitted same-sex couples to marry, the spousal presumption has continued to operate as it always has done, ensuring that both same-sex spouses are parents of any child of the marriage, and children in these states accordingly receive birth certificates listing both spouses as parents without the delay and expense of an adoption proceeding.   *See, e.g., Gartner v. Iowa Dep't of Pub. Health,* 830 N.W.2d 335 (Iowa 2013) (lesbian spouses entitled to spousal presumption of parentage and two-parent birth certificates for their children); *Della Corte v. Ramirez,* 961 N.E.2d 601, 602-04 (Mass. App. Ct. 2012); *Miller-Jenkins v. Miller- Jenkins,* 912 A.2d 951 (Vt. 2006); *Elisa B. v. Superior Court,* 117 P.3d 660 (Cal. 2005); *Debra H. v. Janice R.,* 930 N.E.2d 184 (N.Y. 2010).   In the absence of the spousal presumption of parentage, if a child's parents should separate without having been married, their interests may diverge, affecting matters such as the child's home and support.   The child may be denied Indiana's predictable and orderly structure for effecting the parents' separation and determining matters of custody, visitation, child support, property, alimony and maintenance.   (*See* Herrin Decl. ¶ 18; Duvall Decl. ¶¶ 12, 15-18.)   Dissolution laws help to ensure that children's best interests come first, both parents are accountable to that end and no child suffers disproportionate financial hardship as a result of the dissolution. *See, e.g., Goodridge v. Dep't of Pub. Health,* 798 N.E.2d 941, 956 (Mass. 2003) (marriage provides "predictable rules of child custody, visitation, support, and removal out-of-State when married parents divorce").

*Educ. v. Barnette*, 319 U.S. 624, 638 (1943) ("The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts.").

Defendants misread the Supreme Court's decision in *Windsor*.  Contradicting every court that has interpreted *Windsor*, Defendants assert that "the core meaning of *Windsor* is to preserve state prerogatives over marriage" and that *Windsor* therefore shields state marriage laws from constitutional review.  (Defs.' Opp. at 32-35.)  But *Windsor* did not so hold.  To the contrary, *Windsor* recognized that "State laws defining and regulating marriage, of course, must respect the constitutional rights of persons."  *Windsor*, 133 S. Ct. at 2691 (citing *Loving v. Virginia*, 388 U.S. 1 (1967)). Moreover, the *Windsor* Court expressly rejected any characterization of its decision as being based on federalism principles, stating that the Court found it "unnecessary to decide whether [DOMA's] federal intrusion on state power is a violation of the Constitution, because it disrupts the federal balance."  *Id.* at 2692.  Instead, *Windsor* held that the federal Defense of Marriage Act (DOMA) "***violates basic due process and equal protection principles***," *id.* at 2693 (emphasis added), and held impermissible and unconstitutional DOMA's "avowed purpose" and "practical effect of…impos[ing] a disadvantage, a separate status, and so a stigma" on same-sex couples relationships.  *Id*; *see also id.* at 2709 (Scalia, J., dissenting) ("[T]he real rationale of today's opinion… is that DOMA is motivated by 'bare…desire to harm' couples in same-sex marriages.  How easy it is, indeed how inevitable, to reach the same conclusion with regard to state laws denying same-sex couples marital status.").[6]  Defendants' strained interpretation of *Windsor* as relying solely on federalism principles ignores the explicit text of that decision.

---

[6]    The Court commented upon the breadth of DOMA's reach and its unprecedented departure from traditional federal deference to states' authority over domestic relations for reasons "quite apart from principles of

7

### D. *Baker v. Nelson* Has No Bearing On This Court's Ability To Address Those Constitutional Questions.

Defendants also invoke *Baker v. Nelson*, 409 U.S. 810 (1972), a 40-year-old summary dismissal of claims by a same-sex couple seeking to marry in early 1970s Minnesota to argue that the Supreme Court has insulated challenges to marriage bans from lower court review.[7]   (Defs.' Opp. at 32.)   However, Defendants misunderstand the limited reach of a summary dismissal, which at most binds lower courts only on the precise questions presented in the statement of jurisdiction, and is not binding even as to that question if there have been intervening changes in governing law.   First, as a limited vehicle for resolving a case, a summary dismissal binds lower courts only on the precise issues presented in the statement of jurisdiction and in no way validates the reasoning of the underlying decision.   *See Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam).   *Baker* presented an equal protection challenge based only on sex discrimination and therefore cannot foreclose Plaintiffs' claims that Indiana's marriage ban discriminates based on sexual orientation, parental status, and with respect to fundamental rights and liberty interests secured by the Due Process Clause.   *See* Jurisdictional Statement for Appellants at 16, *Baker v. Nelson*, 409 U.S. 810 (1972) (specifying that "[t]he discrimination in this case is one of gender") (attached hereto as Exhibit A).   Second, even if *Baker* were relevant to Plaintiffs' claims, subsequent developments in the law have vitiated the decision's limited precedential force.

---

federalism," but instead because "'discriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious'" to guarantees of due process and equal protection.   *Id.* at 2692 (quoting *Romer v. Evans*, 517 U.S. 620, 633 (1996)).   Thus, the Court's discussion of DOMA's unusual intrusion into an area traditionally left to states was simply evidence of the law's "unusual character," necessitating careful consideration to determine whether the law was motivated by an improper animus or purpose, and therefore an unconstitutional infringement of guarantees of equal protection and liberty.

[7]   *Baker* arose from a suit filed in Minnesota state court by a same-sex couple seeking the freedom to marry under the federal constitution.   191 N.W.2d 185, 186 (Minn. 1971).   After the Minnesota Supreme Court rejected their claims, the couple appealed to the U.S. Supreme Court pursuant to former 28 U.S.C. § 1257(2).   Until 1988, this statute afforded the Supreme Court mandatory appellate jurisdiction for review of state supreme court decisions adjudicating the constitutionality of a state law; the statute was subsequently replaced with review by writ of certiorari.   The Supreme Court summarily dismissed the Minnesota couple's appeal, which was based solely on a claim of sex discrimination, "for want of a substantial federal question."   409 U.S. at 810.

Summary dismissals are binding only to the extent that they have not been undermined by subsequent doctrinal developments.  *See Hicks v. Miranda*, 422 U.S. 332, 344 (1975).  In the intervening decades since *Baker*, landmark developments have vastly changed the constitutional landscape.  *Baker* rejected the appellants' sex discrimination claims before the Supreme Court recognized that sex-based classifications require heightened scrutiny, *see Frontiero v. Richardson*, 411 U.S. 677, 688 (1973) (plurality op.); before *Romer* held that a bare desire to harm gay people cannot constitute a legitimate government interest, *see* 517 U.S. at 634-35; before *Lawrence v. Texas* established that lesbian and gay individuals have the same liberty interest in developing and maintaining family relationships as heterosexuals, *see* 539 U.S. 558, 578 (2003); and before *Windsor* invalidated federal anti-marriage legislation because it "impose[d] a disadvantage, a separate status, and so a stigma upon all who enter into same-sex marriages," *see* 133 S. Ct. at 2693.  Accordingly, the courts addressing post-*Windsor* challenges to state marriage bans have unanimously held that *Baker* did not determine the outcome.  *See Bishop v. United States ex rel. Holder*, 962 F. Supp. 2d 1252, 1275-76 (N.D. Okla. 2014); *Kitchen*, 961 F. Supp. 2d at 1194-95; *Bostic*, 2014 WL 561978, at *10; *see also Bourke v. Beshear*, No. 3:13-cv-750, 2014 WL 556729, at *1 (W.D. Ky. Feb. 12, 2014); *McGee v. Cole*, No. 3:13-cv-24068, 2014 WL 321122, at *9 (S.D. W. Va. Jan. 29, 2014).

## II. PLAINTIFFS SEEK THE SAME RIGHT TO MARRY AND RIGHT TO MARITAL RECOGNITION AS ALL OTHER HOOSIERS.

### A. Defendants Err In Attempting To Reframe The Fundamental Right Asserted Here As A "New" Right To Marry Someone Of The Same Sex.

Defendants do not dispute that marriage is a fundamental right.  (*See* Defs.' Opp. at 35-37.) However, in an attempt to persuade the Court to apply rational basis review (which the marriage ban still fails, *see* Section IV, *infra*), Defendants try to reframe this case as being about a right solely to "same-sex marriage," which they assert is too recent a claim to be fundamental.  (Defs.'

Opp. at 35-37.)  This is an improperly narrow description of the liberty interests at stake, and this same argument already has been rejected by numerous courts.  *See, e.g.*, *Henry v. Himes*, No. 1:14–cv–129, 2014 WL 1418395, at *7-8 (S.D. Ohio Apr. 14, 2014); *Kitchen*, 961 F. Supp. 2d at 1202-03; *Bostic*, 2014 WL 561978, at *12-13; *In re Marriage Cases*, 183 P.3d 384, 430 (Cal. 2008).

Contrary to Defendants' claims, in numerous cases upholding and recognizing the fundamental right to marry, the Supreme Court has made clear that the liberty interest at stake in such cases is freedom of *choice* of *whom* to marry, in recognition of the respect for our autonomy that the Constitution commands when it comes to the personal decisions at stake here—decisions about with whom a person will build a life and a family.  *See Zablocki v. Redhail,* 434 U.S. 374, 387 (1978) (finding unconstitutional a burden on the right to marry because it affected individuals' "*freedom of choice* in an area in which we have held such freedom to be fundamental") (emphasis added); *Hodgson v. Minnesota,* 497 U.S. 417, 435 (1990) (explaining that "the regulation of constitutionally protected decisions, such as . . . whom [to] marry, must be predicated on legitimate state concerns other than disagreement with the choice the individual has made").  Defendants fail to appreciate the extent of the liberty at stake here when they try to re-frame the fundamental right asserted as a "new" right solely to marry someone of the same sex.  When a person who has been excluded from exercising a claimed fundamental right steps forward seeking to exercise that right, courts properly frame the right based on the attributes of the right itself, without reference to the identity of the person who seeks to exercise it.  (Pls.' Summ. J. Mem., Dkt. No. 39, at 14); *see also Henry*, 2014 WL 1418395, at *7 ("The Supreme Court has consistently refused to narrow the scope of the fundamental right to marry by reframing a plaintiff's asserted right to marry as a more limited right that is about the characteristics of the couple seeking marriage").  In other words, fundamental rights are defined by the nature of the

autonomy sought, and not based on *who* is trying to exercise it.  Here, the right at issue is the right to marry the person of one's choice, which is among the most deeply rooted and cherished liberties identified by our courts.  *See Kitchen*, 961 F. Supp. 2d at 1202-03; *see also Windsor*, 133 S. Ct. at 2689 (marriage permits same-sex couples to "live with pride in themselves and their union and in a status of equality with all other married persons," and in seeking to marry, same-sex couples seek to "occupy the same status and dignity as that of a man and woman in lawful marriage"); *Bostic*, 2014 WL 561978, at *13.

### B.    Defendants Misapprehend The Role Of History When Considering The Scope Of Fundamental Rights.

Defendants argue that Indiana's history of exclusion forecloses Plaintiffs' claims that the marriage ban violates the fundamental right to marry, and to remain married.  (Defs.' Opp. at 36.) Contrary to Defendants' assertions, the fact that same-sex couples have not historically been allowed to marry is not the end of the analysis.  *See Lawrence*, 539 U.S. at 572 ("[H]istory and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry.") (citation omitted). While courts use history and tradition to identify the interests that due process protects, they do not carry forward historical limitations on which Americans may exercise a right once that right is recognized as protected by due process.

Thus, in numerous cases, the Supreme Court struck down infringements of fundamental rights or liberty interests, even though plaintiffs could not assert a historical claim to those rights. When analyzing fundamental rights, the Supreme Court has consistently focused on the right being asserted, rather than the person asserting it.  *See e.g., Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 847-48 (1992) ("[I]nterracial marriage was illegal in most States in the 19th century, but the Court was no doubt correct in finding it to be an aspect of liberty protected against state interference by the substantive component of the Due Process Clause in *Loving*…."); *Turner*,

482 U.S. 78 (striking down restriction on inmates' ability to marry); Virginia L. Hardwick, *Punishing the Innocent: Unconstitutional Restrictions on Prison Marriage and Visitation*, 60 N.Y.U. L. REV. 275, 277-79 (1985) (right to marry traditionally did not extend to prisoners); *Boddie v. Connecticut*, 401 U.S. 371, 376 (1971) (states may not burden fundamental right to marry a second time, even though traditional right to marry did not include a right to divorce and *remarry*). This critical distinction—that history guides the *what* of due process rights, but not the *who* of which individuals may have them—is central to due process jurisprudence.

Moreover, the history of marriage in Indiana and elsewhere around the country belies Defendants' argument that marriage is static, defined by its historic limitation to different-sex couples, and incapable of becoming more inclusive without damage to the institution. Marriage law has undergone radical changes in past generations to eliminate the subordination of married women, and race-based entry requirements, among other things, and today, seventeen states and the District of Columbia permit same-sex couples to marry.

Defendants' statement that the "traditional parameters of marriage…took no account of race" (Defs.' Opp. at 42) is both astonishing and wrong. Most states banned marriage between persons of different races for much of this nation's history, and courts repeatedly upheld such laws against constitutional challenge, including here in Indiana. *See State v. Gibson,* 1871 WL 5021, 36 Ind. 389 (Ind. 1871). Long into the twentieth century, the sheer weight of cases accepting the constitutionality of bans on interracial marriage was deemed justification in and of itself to perpetuate these discriminatory laws.[8] Not until 1948 did a state high court critically examine

---

[8]   *See, e.g., Jones v. Lorenzen,* 441 P.2d 986, 989 (Okla. 1965) (upholding Oklahoma anti-miscegenation law since the "great weight of authority holds such statutes constitutional"); *Scott v. State*, 39 Ga. 321, 326 (Ga. 1869) ("[M]oral or social equality between the different races . . . . does not in fact exist, and never can."); *Jackson v. City & Cnty. of Denver*, 124 P.2d 240, 241 (Colo. 1942) ("It has generally been held that such acts are impregnable to the [constitutional] attack here made."); *Naim v. Naim*, 87 S.E.2d 749, 753 (Va. 1955) (finding that anti-miscegenation statutes "have been upheld in an unbroken line of decisions in every State [except one] in

these traditions, and strike down an anti-miscegenation law as violating rights of due process and equal protection.  *See Perez v. Lippold*, 198 P.2d 17 (Cal. 1948).  In *Perez*, the California Supreme Court acknowledged the traditional assumption that interracial marriages were "unnatural," *id.* at 22, but held that the long duration of a wrong cannot justify its perpetuation, *id.* at 26.  It was not that the Constitution had changed; rather, its mandates had become more clearly recognized.  *Id.* at 19-21, 32 (Carter, J., concurring) ("[T]he statutes now before us never were constitutional."); *see also Lawrence*, 539 U.S. at 579 ("[T]imes can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress.  As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom."); *Windsor*, 133 S. Ct. at 2689 (explaining that when permitting same-sex couples to marry, New York corrected "what its citizens and elected representatives perceived to be an injustice that they had not earlier known or understood").

Indiana's marriage laws and the laws of other states also have rejected differential treatment based on gender that was a signal element of marriage under the common law.  Under the doctrine of coverture, a married woman lost her separate legal existence as a person by operation of law, and the wife's legal being was subsumed by her husband.  *See, e.g.*, *O'Daily v. Morris,* 31 Ind. 111, 1869 WL 3351 (Ind. 1869); *see also Thompson v. Thompson*, 218 U.S. 611, 614-15 (1910) ("[G]enerally speaking, the wife was incapable of making contracts, of acquiring property or disposing of the same without her husband's consent.").  For centuries, through marriage laws, states and the federal government reinforced the view that a man should be the legal head of the household, responsible for its support and links to external society, and having physical, sexual, economic and legal dominion over his wife.  *See, e.g.*, *Bradwell v. Illinois*, 83

---

which it has been charged that they violate" constitutional guarantees), *judgment vacated*, 350 U.S. 891 (1955), *adhered to on remand*, 90 S.E.2d 849 (1956).

U.S. 130, 141 (1872); *see also Califano v. Westcott*, 443 U.S. 76 (1979); *Brandt v. Keller,* 109 N.E.2d 729, 730 (Ill. 1952) (a married woman "was regarded as a chattel with neither property nor other rights against anyone, for her husband owned all her property and asserted all her legal and equitable rights"); *People v. Liberta*, 474 N.E.2d 567 (N.Y. 1984) (striking down marital rape exemption, which gave possession of a wife's body to her husband).  However, Indiana and all other states have rejected these past requirements for sex-differentiated roles within marriage. *See, e.g.*, *Bartrom v. Adjustment Bureau, Inc.*, 618 N.E.2d 1 (Ind. 1993).  Today, the states and federal law treat both spouses equally and in gender-neutral fashion with respect to marriage, and the Supreme Court has confirmed that such gender-neutral treatment for marital partners is constitutionally required.  *See Califano v. Goldfarb*, 430 U.S. 199 (1977); *Weinberger v. Wiesenfeld*, 420 U.S. 636 (1975).

Thus, marriage today is a vastly different institution from marriage decades ago, but the profound liberty interests at stake have not changed for each individual who has fallen in love and wishes to marry.  The Plaintiff couples here wish either to marry, or to have their out-of-state marriage recognized, for the same timeless and universal reasons couples have expressed throughout history when they choose to dedicate the rest of their lives to each other and build families.  As Rae Baskin puts it, "Esther is my family; she unconditionally loves me, and I cannot imagine my life without her.   She is irreplaceable."   (Baskin Decl., Dkt. No. 39-1, ¶ 8.)[9]

---

[9]   Defendants also argue, just as proponents of interracial marriage bans did in generations past, that to recognize the claims by couples here as implicating the fundamental right to marry would send this nation on a slippery slope resulting in authorized polygamy.  (Defs.' Opp. at 26, 59; *c.f. Perez,* 198 P.2d at 41 (comparing ban on interracial marriage to bans on incest, bigamy, and polygamy) (Shenk, J., dissenting).  However, a challenge to a polygamy ban would raise numerous issues not raised in this case.  Here, by striking down Indiana's marriage ban, this Court would change nothing about how marriage laws in Indiana operate except elimination of the gendered entry barrier.  By contrast, in a challenge to a ban on polygamy, the government would have a vast set of interests to assert that are different from those asserted here, such as issues with respect to who gets to consent to marry, and how spousal and parental rights and presumptions should operate in a marriage with more than two people.  *See, e.g.*, *Potter v. Murray City*, 760 F.2d 1065, 1070 (10th Cir. 1985) (government justified in prohibiting polygamy in part because it "has established a vast and convoluted network of other laws clearly

Accordingly, because the marriage ban infringes upon same-sex couples' fundamental right to marry, this Court should subject the marriage ban to strict scrutiny, which it undoubtedly fails. *See* Section III, *infra*.

### C. Denying Recognition To Marriages Of Same-Sex Couples From Other States Violates Both The Due Process And Equal Protection Guarantee.

As this Court correctly noted, Plaintiff Quasney and Sandler "suffer a cognizable and irreparable harm stemming from the violation of their constitutional rights of *due process* and *equal protection*." (TRO, Dkt. No. 51, at 9 (emphasis added).) The right "not to be deprived of one's already-existing legal marriage and its attendant benefits and protections" is a deeply-rooted aspect of the due process protections long accorded to "*existing* marital, family, and intimate relationships." *Obergefell*, 962 F. Supp. 2d at 978 (emphasis in original); *see also Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (confirming substantive due process protections accorded marriage and childrearing, and noting that "Nation's history, legal traditions, and practices" provide guideposts to discern constitutionally-protected fundamental liberties).

Defendants erroneously attempt to reframe the due process guarantee at stake as merely a right to a license "whether for professional, weapons, driving, or marriage purposes." (Defs.' Opp. at 24-25.) However, the well-settled fundamental right to marry is about *far more than obtaining a marriage license* and having a wedding ceremony—important as these are as the gateway to the institution of marriage. The constitutionally-guaranteed right to marry would be meaningless if the government were free to refuse all recognition to a couple's marriage once entered, and effectively annul the marriage as if it had never occurred. This constitutionally-protected "status is a far-reaching legal acknowledgment of the intimate relationship between two people," *Windsor*, 133 S. Ct. at 2692, a commitment of enormous import that spouses carry

establishing its compelling state interest in and commitment to a system of domestic relations based exclusively upon the practice of monogamy as opposed to plural marriage").

wherever they go throughout their married lives. Yet, Defendants argue that they ought to be entitled to strip them of their rights and dignity as married spouses as soon as they set foot in Indiana. This the State cannot do. [10]

Moreover, Indiana's refusal to recognize Plaintiffs Quasney and Sandler's marriage implicates the very same liberty rights in cases like *Griswold* and *Zablocki*. "When a state effectively terminates the marriage of a same-sex couple married in another jurisdiction, it intrudes into the realm of private marital, family, and intimate relations specifically protected by the Supreme Court." *Henry*, 2014 WL 1418395, at *9; *see also Windsor*, 133 S. Ct. at 2694 (explaining that when one jurisdiction refuses recognition of family relationships legally established in another, "the differentiation demeans the couple, whose moral and sexual choices the Constitution protects…and whose relationship the State has sought to dignify").

Indiana's own history and laws are consistent with the fundamental importance of the marriage recognition principle in U.S. legal history and tradition. As this Court noted, "as a general rule, Indiana recognizes valid marriages performed in other states." (TRO, Dkt. No. 51, at 6); *see also Mason v. Mason*, 775 N.E.2d 706, 709 (Ind. Ct. App. 2002) ("Indiana will accept as legitimate a marriage validly contracted in the place where it is celebrated."); *Roche v. Washington*, 19 Ind. 53, 54 (Ind. 1862) ("Laws giving effect to contracts of marriage are not repugnant to the laws of Indiana, and the proposition is established, as a general one...that an actual marriage, valid in the country where celebrated, will, not as upon a claim of right, but by courtesy, be given effect to in other States, though not celebrated by the forms nor evidenced in

---

[10]   *See also De Leon*, 2014 WL 715741, at *21-24 (noting *Windsor*'s holding that "out-of-state marriage recognition…was a right protected under the Constitution," and concluding likelihood of success that plaintiffs will demonstrate Texas lacked even rational basis for withholding recognition to same-sex marriages, in violation of due process); *Bourke*, 2014 WL 556729, at *6 (finding reasoning in *Windsor* "about the legitimacy of laws excluding recognition of same-sex marriages [] instructive," and concluding that Kentucky laws denying recognition of valid out-of-state same-sex marriages are unconstitutional).

the mode prescribed for marriages in such other States."); *Boklovac v. State*, 98 N.E.2d 250, 254 (Ind. 1951) ("The validity of a marriage depends upon the law of the place where it occurs."). This universal rule of inter-state marriage recognition, while cast as comity rather than a constitutional principle, is an essential point in the constellation of protections accorded the institution of marriage. As the Supreme Court understood in ruling that Virginia's ban on recognition of the Lovings' out-of-state interracial marriage violated due process, the Lovings were denied "vital personal rights essential to the orderly pursuit of happiness by free men." *Loving*, 388 U.S. at 12. In sum, by declaring existing, lawful marriages of same-sex marriage void or non-existent and denying married couples the rights, responsibilities, and benefits of marriage, Indiana denies couples due process and equal protection guaranteed by the Fourteenth Amendment to the U.S. Constitution.

## III. THE COURT MUST APPLY HEIGHTENED SCRUTINY UNDER THE EQUAL PROTECTION CLAUSE.

**The Ban Classifies Persons Based On Sexual Orientation.** Defendants argue that the marriage ban does not constitute a classification based on sexual orientation because lesbian and gay people remain free to marry someone of a different sex, and because the ban uses gendered language rather than "terms drawn according to sexual orientation." (Defs.' Opp. at 40.) According to Defendants, Plaintiff Henry Greene faces no differential treatment based on his sexual orientation because he could marry a woman instead of Glenn, his partner of 22 years, with whom he is rearing their 12 year-old son. This argument is not credible, particularly in light of *Windsor*, which recognized that a federal law defining marriage as "only a legal union between one man and one woman as husband and wife" had the "avowed purpose and practical effect" of "impos[ing] a disadvantage, a separate status, and so a stigma" specifically on same-sex couples and their children. *Windsor*, 133 S. Ct. at 2693. Defendants ignore the core, ordinary meaning of

sexual orientation, and that the act of falling in love with a person of the same sex, and the decision to marry and build a life with that person, are expressions of sexual orientation. As a matter of law, courts repeatedly have rejected efforts to deny that laws targeting conduct closely associated with being gay or lesbian are laws classifying persons based on their sexual orientation. *See Christian Legal Soc'y Ch. of the Univ. of Cal., Hastings Coll. of Law v. Martinez*, 130 S. Ct. 2971, 2990 (2010) (prohibition on same-sex intimate conduct no different from discrimination against the status of being gay or lesbian); *Lawrence*, 539 U.S. at 575 ("When homosexual conduct" is criminalized, that "in and of itself is an invitation to subject homosexual persons to discrimination."); *cf. Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews."). As the California Supreme Court recognized more than half a century ago, "[h]uman beings are bereft of worth and dignity by a doctrine that would make them as interchangeable as trains." *Perez*, 198 P.2d at 25.

In disputing that classifications based on sexual orientation warrant heightened scrutiny, Defendants inexplicably argue that "Plaintiffs make no claim that sexual orientation…is an 'immutable' characteristic," and argue that lesbian and gay people are politically powerful on the theory that it was a "victory" when Indiana legislators amended a measure that would enshrine a marriage ban in the state constitution, which had the effect of delaying it. (Defs.' Opp. at 44.) To the contrary, Plaintiffs relied on and cited numerous cases holding that anti-gay discrimination is unlikely to be rectified by legislative means (as Defendants' own example illustrates in Indiana), and that sexual orientation is immutable because it is highly resistant to change through conscious decision, therapeutic intervention, or any other method, and is so central to one's identity that a person should not be required to abandon it. (*See* Pls.' Summ. J. Mem., Dkt. No. 39, at 21-22, citing, *e.g.*, *Golinski v. U.S. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 985-90 (N.D. Cal. 2012); *see also Bostic*, 2014 WL 561978, at *22 n.16 ("[S]trict scrutiny is the appropriate standard of

review to apply to legislative classifications based on sexual orientation.  All classifications based on sexual orientation appear suspect, as the evidence shows that [the State] would rarely, if ever, have a reason to categorize individuals based on their sexual orientation.") (quoting *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 997 (N.D .Cal. 2010)).  This Court should follow the reasoning of *Bostic* and conclude that the marriage ban is subject to heightened scrutiny because it classifies citizens by their sexual orientation.

**The Ban Classifies Persons Based On Sex.**  Defendants claim that the marriage ban "draws no distinction based on sex."  (Defs.' Opp. at 39.)  This is erroneous for two reasons.  First, the marriage ban *does* discriminate facially by gender, explicitly stating that "[o]nly a female may marry a male" and "[o]nly a male may marry a female," I.C. § 31-11-1-1(a), and that "[a] marriage between persons of the same gender is void in Indiana even if the marriage is lawful in the place where it is solemnized," I.C. § 31-11-1-1(b).  Second, the ban draws upon the same stereotypes that resulted in discriminatory jury selection being struck down in *J.E.B v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994).  By requiring one man and one woman, the ban enforces conformity with the stereotype that men and women perform distinct roles and tasks within a marital relationship.  But cases like *J.E.B.* reject "stereotypes about [men and women's] competence or predispositions," *id.* at 142 n.14, especially where a sex-based distinction serves "to ratify and perpetuate invidious, archaic, and overbroad stereotypes about the relative abilities of men and women," *id.* at 131.  Defendants do not put forth any evidence suggesting that two men or two women cannot form the "expressions of emotional support and public commitment" that are required for marriage.  *Turner*, 482 U.S. at 95.

Defendants' argument that the marriage ban is constitutional because it burdens men and women equally was considered and rejected in *Kitchen*, which held that "the fact of equal application to both men and women does not immunize Utah's [marriage ban] from the heightened

burden of justification that the Fourteenth Amendment requires of state laws drawn according to sex." *Kitchen*, 961 F. Supp. 2d at 1206.  This holding follows from *Loving*'s rejection of "the notion that the mere 'equal application' of a statute containing racial classifications is enough to remove the classifications from the Fourteenth Amendment's proscriptions of all invidious racial discriminations."  *Loving*, 388 U.S. at 8; *McLaughlin v. Florida*, 379 U.S. 184, 191 (1964) (explaining that equal protection analysis "does not end with a showing of equal application among the members of the class defined by the legislation").  Here, Defendants acknowledge this crucial holding from *Loving*, but insist that anti-miscegenation laws were "designed to maintain White Supremacy," whereas the marriage ban passes constitutional muster because "men and women are equally affected."  (Defs.' Opp. at 40.)  However, as discussed above and in Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Summary Judgment (Dkt. No. 39 at 23 n.10), this distorts the holding of *Loving*, which expressly found that, even if race discrimination had not been at play and the Court presumed "an even-handed state purpose to protect the integrity of all races," Virginia's anti-miscegenation statute still was "repugnant to the Fourteenth Amendment." *Loving*, 388 U.S. at 11 n.11; *see also Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972) (holding that rights belong to individuals and not just couples).[11]

Because the marriage ban discriminates on gender, the State must demonstrate an "exceedingly persuasive" justification for its marriage ban.  *Virginia*, 518 U.S. at 531. As discussed in Section IV, *infra*, the marriage ban cannot withstand any level of scrutiny, let alone a searching review.

---

[11]   Similarly, *J.E.B.* would certainly apply heightened scrutiny to a scheme requiring every jury to consist of exactly six men and six women, even though each gender would presumably be equally burdened.

IV.   **EVEN IF THE COURT WERE TO APPLY RATIONAL BASIS REVIEW, THE MARRIAGE BAN MUST BE FOUND UNCONSTITUTIONAL.**

    A.   **Defendants Urge An Erroneous Application Of Rational Basis Review.**

Even if this Court does not apply heightened scrutiny (and it should), it must strike down the marriage ban under rational basis review.  Defendants attempt to avoid that conclusion by advancing a vision of rational basis review that contravenes Supreme Court precedent regarding both the permissible motives and the permissible means for disadvantaging a group of citizens. Indeed, reading Defendants' brief it is hard to imagine *any* classification failing rational basis review.  But the Supreme Court has made clear that where a state singles out a group of its citizens for disadvantage, a court may not turn a blind eye.  *See, e.g.*, *Romer*, 517 U.S. at 633; *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 450 (1985); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).

Defendants fail to acknowledge that even rational basis review places two substantive limitations on legislative action:  (1) the legislative enactments must further legitimate goals *and* (2) the means chosen by the legislature must bear a rational relationship to those goals.  *See, e.g.*, *Kitchen*, 961 F. Supp. 2d at 1210 (citing *Romer*, 517 U.S. at 632).  Accordingly, a court is obligated to strike down a statute as unconstitutional either where it finds that the legislature's goal in passing it was not legitimate, *see, e.g.*, *Hooper v. Bernalillo Cnty. Assessor*, 472 U.S. 612 (1985); *Zobel v. Williams*, 457 U.S. 55 (1982), or that the classification employed by the legislature did not rationally further the legislature's goal, *see, e.g.*, *Lindsey v. Normet*, 405 U.S. 56 (1972); *Reed v. Reed*, 404 U.S. 71, 76-77 (1971).  In particular, when applying rational basis review, courts must strike down legislation where the lack of a rational relationship between the legislative classification and the purported legislative goal suggests that the true goal is

illegitimate.  *See Cleburne*, 473 U.S. at 450; *Moreno*, 413 U.S. at 534.  As set out below, that is precisely the circumstance presented here.[12]

### B.      Defendants Misapprehend The Significance Of An Improper Legislative Purpose Under Any Level Of Review.

Defendants wrongly assert that the legislature's motivation for passing the marriage ban is "irrelevant" because Indiana law historically never permitted same-sex couples the freedom to marry, and therefore the legislature was merely perpetuating the status quo.  (Defs.' Opp. at 49.)  To the contrary, when a state's differential treatment of a class of people "rest[s] on an irrational prejudice," the legislation is unconstitutional under any level of review.  *Cleburne*, 473 U.S. at 450.  Indeed, if the principal purpose or effect of a law is found to impose inequality, such a law is "not within our constitutional tradition," and violates the Equal Protection Clause for this reason alone.  *Romer*, 517 U.S. at 633; *see also Kelo v. City of New London*, 545 U.S. 469, 491 (2005) (Kennedy, J., concurring) ("A court applying rational-basis review under the Equal Protection Clause must strike down a government classification that is clearly intended to injure a particular class of private parties, with only incidental or pretextual public justifications.").  As *Windsor* illustrates, a court may find a statute unconstitutional as impermissibly motivated even though "until recent years, many citizens had not even considered the possibility that two persons of the

---

[12]     It is telling that one of the precedents on which Defendants most heavily rely is the intermediate appellate court decision in *Morrison v. Sadler*, 821 N.E.2d 15 (Ind. Ct. App. 2005), which employed Indiana's uniquely toothless constitutional jurisprudence to uphold Indiana's marriage ban.  Indiana courts consider only whether "the disparate treatment accorded by the legislation" *relates to* "*inherent characteristics* which distinguish the unequally treated classes." *Id.* at 21 (emphasis added) (applying *Collins v. Day,* 644 N.E.2d 72 (Ind. 1994)).  Significantly, Indiana's jurisprudence requires no consideration of "the *purposes* of the legislation" or its burdens.  *Morrison*, 821 N.E.2d at 22.  The test could not be more lenient and is far afield from the standard employed by federal courts applying rational basis analysis under the federal Constitution, let alone the standard applied by the Supreme Court in cases involving governmental restraints on individual liberty and intimate relationships.  Indiana's idiosyncratic standard evolved under its state constitutional privileges and immunities guarantee, which is admittedly "less restrictive of legislative classification than the federal" equal protection guarantee.  *Id.* at 7 n.7 (quotations omitted).  Indiana's standard does not permit consideration of whether the classification reflects intent to discriminate against a disfavored group or whether it suffers from even "*significant* under or overinclusiveness." *Id.* at 28 (emphasis added).  Not surprisingly, this test had "never resulted in a statute or ordinance being declared facially invalid" under the Indiana Constitution.  *Id.* at 22, 28.

same sex might aspire to occupy the same status and dignity as that of a man and a woman in lawful marriage." *Windsor*, 133 S. Ct. at 2689; *see also id.* at 2689, 2693 (explaining that although permitting same-sex couples the freedom to marry was the result of a "new perspective" and "new insight," and no state permitted same-sex couples to marry at the time of DOMA's enactment, "[t]he history of DOMA's enactment and its own text demonstrate that interference with equal dignity of same-sex marriages…was more than an incidental effect of the federal statute. It was its essence.").

Defendants concede that Indiana's marriage ban was passed in the wake of Hawaii litigation on behalf of same-sex couples seeking to marry, in order to prevent Indiana from having to recognize marriages of same-sex couples. (Defs.' Opp. at 42.) This is the precise context in which the federal DOMA was passed, *Windsor*, 133 S. Ct. at 2682-83, and the motives for Indiana's ban are equally impermissible. There is no requirement that there be debate or even legislative history demonstrating overt bigotry and hostility before concluding that a law reveals an improper purpose. It is enough to show the absence of any logical connection to a legitimate purpose, which can "raise the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected." *Romer*, 517 U.S. at 635. As Plaintiffs previously pointed out, the purpose and effect of Indiana's marriage ban are evident on the face of the statutes: to impose inequality on lesbian and gay couples and their children. (Pls.' Summ. J. Mem., Dkt. No. 39, at 31-32.)

> **C.** **Defendants Misapprehend The Significance Of An Outright Exclusion Of A Class Of People Under Rational Basis Review.**

Defendants are likewise wrong to suggest that the "proper constitutional question has nothing to do with justifications for 'excluding'" same-sex couples from marriage, but instead asks only whether allowing different-sex couples to marry "furthers legitimate interests that would

23

not be furthered, or furthered, to the same degree, by allowing same-sex couples to marry."
(Defs.' Opp. at 48-49.)  When a State *excludes* a group from benefits, a court's equal protection
analysis must focus on whether there is a rational relationship between the State's *exclusion* and
the legitimate governmental interest—not on whether there is a legitimate justification for giving
the advantaged group the benefit.  *See Kitchen*, 961 F. Supp. 2d at 1210.  As the *Kitchen* court
pointed out:

> [T]he State poses the wrong question.  The court's focus is not on whether
> extending marriage benefits to heterosexual couples serves a legitimate
> governmental interest.  No one disputes that marriage benefits serve not just
> legitimate, but compelling governmental interests, which is why the Constitution
> provides such protection to an individual's fundamental right to marry.  Instead,
> courts are required to determine whether there is a rational connection between the
> challenged statute and a legitimate state interest.  Here, the challenged statute does
> not grant marriage benefits to opposite-sex couples.  The effect of [Utah's marriage
> ban] is only to disallow same-sex couples from gaining access to these benefits.
> The court must therefore analyze whether the State's [asserted] interests…are
> furthered by prohibiting same-sex couples from marrying.

*Id*. As the *Kitchen* court further explained, the Supreme Court similarly examined the city's
interest in *denying* housing for people with developmental disabilities, not in continuing to allow
residence for others in *Cleburne*, 473 U.S. at 448-50; the federal government's interest in
*excluding* unrelated households from food stamp benefits, not in maintaining food stamps for
related households in *Moreno*, 413 U.S. at 535-36; the state's interest in *excluding* unmarried
couples from lawful access to contraception, not merely an interest in continuing to allow married
couples access in *Eisenstadt*, 405 U.S. at 448-53; and Virginia's *exclusion* of interracial couples
from marriage independent of its interest in providing marriage to same-race couples in *Loving*,
388 U.S. at 9-12.  *Kitchen*, 961 F. Supp. 2d at 1211.

**D.      There Is No Rational Relationship Between The Marriage Ban And Any Asserted State Interest In "Encouraging Responsible Procreation."**

Defendants' sole justification for the marriage ban—"to encourage responsible procreation"—defies logic.  First, Defendants fail to demonstrate how this interest is furthered by marriage in general, let alone by excluding same-sex couples from marriage.  As Plaintiffs have explained, Indiana law does not condition marriage on either the parties' procreative capacity or intent to have children, and children being raised by different-sex parents (whether conceived intentionally or not) are unaffected by whether same-sex couples may marry.[13]  (Pls.' Summ. J. Mem., Dkt. No. 39, at 28-31.)  Further, a parent's obligation of support with respect to his or her children is independent of parental marital status and sexual orientation.  *See, e.g.*, I.C. § 31-14-10-1, *et seq.*; *Mariga v. Flint*, 822 N.E.2d 620, 630 (Ind. App. Ct. 2005).

As the *Bostic* court noted, "recognizing a gay individual's fundamental right to marry can in no way influence whether other individuals will marry, or how other individuals will raise families.  'Marriage is incentivized for naturally procreative couples to precisely the same extent regardless of whether same-sex couples (or other non-procreative couples) are included.'" *Bostic*, 2014 WL 561978, at *18 (quoting *Bishop*, 962 F. Supp. 2d at 1291); *see also Kitchen*, 961 F. Supp. 2d at 1211-12 ("[A]ny relationship between [Utah's marriage ban] and the State's interest in responsible procreation 'is so attenuated as to render the distinction arbitrary or irrational.'")

---

[13]    As the following sampling of authority from around the country illustrates, a spouse's fertility has never been required for marriage or ground for annulment.  *See, e.g.*, I.C. § 31-11-1-2 (first cousins may marry only when both parties are at least 65 years old); *Turner v. Avery*, 113 A. 710 (N.J. Ch. 1921) (denying annulment on the grounds that the wife could not bear children, because she still was able to engage in sexual relations); *Korn v. Korn*, 242 N.Y.S. 589, 591 (N.Y. App. Div. 1930) ("The law appears to be well settled that sterility is not a ground for annulment."); *cf. Goodridge*, 798 N.E.2d at 961 ("Fertility is not a condition of marriage, nor is it grounds for divorce").  In other words, different-sex couples who are incapable of procreating have always had the right to choose to get married, and states have always recognized such marriages as valid.  Defendants argue that such infertile different-sex couples nevertheless serve the purpose of "encouraging responsible procreation" because they "model the optimal, socially expected behavior for other opposite-sex couples whose sexual intercourse may well produce children" (Defs.' Opp. at 51), but Defendants do not and cannot explain why same-sex couples such as Plaintiffs Henry Greene and Glenn Funkhouser, who have adopted their son through Indiana's foster care system, are incapable of being models themselves for optimal, socially expected behavior for both spouses and parents.

(quoting *Cleburne*, 473 U.S. at 446); *Golinski*, 824 F. Supp. 2d at 992 (finding that "a desire to encourage opposite-sex couples to procreate and raise their own children well would not provide a legitimate reason for denying federal recognition of same-sex marriages"); *Perry*, 704 F. Supp. 2d at 972 ("Permitting same-sex couples to marry will not affect the number of opposite-sex couples who marry, divorce, cohabit, have children outside of marriage or otherwise affect the stability of opposite-sex marriage.").  Excluding same-sex couples from marriage has no bearing on how different-sex couples rear the children they may unintentionally produce.  To paraphrase the Court of Appeals in *Windsor*, incentives for different-sex couples to marry and procreate (or not) were the same after the marriage ban was enacted as they were before.  699 F.3d 169, 188 (2d Cir. 2012).  That these incentives did not change with the passage of the marriage ban serves to highlight the fallacy of Defendants' attempt to recast it in terms of inclusion of different-sex couples rather than exclusion of same-sex couples.  *See Windsor*, 133 S. Ct. at 2695 (finding that "DOMA directs its restrictions and restraints" to same-sex couples).[14]

Second, and most critically, the marriage ban actually harms children rather than helps them.  Defendants ***concede*** that marriage benefits children.  Specifically, Defendants state that marriage is "the optimal procreative context" and "optimal childrearing environment" (Defs.' Opp. at 20, 51), that marriage encourages parents "to stay together" and "to care for their children in tandem" (*id.* at 20, 53), and that marriage "protect[s] children" and "ensur[es] that children are properly cared for" (*id.* at 20, 52, 60).  However, Defendants then make no answer to the claims of C.A.G., A.Q.-S., and M.Q.-S. that they are deprived by the ban of *ever* having married parents,

---

[14]    Defendants' reliance on *Johnson v. Robison*, 415 U.S. 361 (1974), is unavailing because this case is "readily distinguishable."  *Bishop*, 962 F. Supp. at 1292 (distinguishing *Johnson*).  Unlike in *Johnson*, the classification here is "so grossly underinclusive that it is irrational and arbitrary." *Id.*  "Same-sex couples are being subjected to a 'naturally procreative' requirement to which no other Oklahoma citizens are subjected, including the infertile, the elderly, and those who simply do not wish to ever procreate.  Rationality review has a limit, and this well exceeds it." *Id.*

and are thereby denied the legitimacy, benefits, and protections of being part of a married family.[15]

As the *Bostic* court noted, "[o]f course the welfare of our children is a legitimate state interest. However, limiting marriage to opposite-sex couples fails to further this interest. Instead, needlessly stigmatizing and humiliating children who are being raised by the loving couples targeted by Virginia's Marriage Laws betrays that interest." 2014 WL 561978, at *18; *see also Golinski*, 824 F. Supp. 2d at 992-93 ("The denial of recognition and withholding of marital benefits to same-sex couples does nothing to support opposite-sex parenting, but rather merely serves to endanger children of same-sex parents by denying them the immeasurable advantages that flow from the assurance of a stable family structure, when afforded equal recognition.") (internal quotation marks omitted); *Varnum v. Brien*, 763 N.W.2d 862, 901 (Iowa 2009) (marriage ban does not serve best interests of children of lesbian and gay parents "who are denied an environment supported by the benefits of marriage" or children of heterosexual parents "who are able to enjoy the environment supported by marriage with or without the inclusion of same-sex couples"). Indiana has just as much interest in the welfare of children of same-sex couples, such as C.A.G., A.Q.-S., and M.Q.-S., as it does in the welfare of different-sex couples' children (whether conceived intentionally or not), and the State may not prefer some children over others based on the circumstances of their birth. *See* Section I(B), *supra*.

---

[15]   Defendants appear to imply that children who have biological relationships to both parents are somehow preferable to children who have been adopted or conceived through assisted reproductive technology. For example, Defendants state: "The male-female relationship alone enables the married persons – in the ideal – to beget children who have a biological relationship to both legal parents" (Defs.' Opp. at 20), and marriage "provides the opportunity for children born within it to have a biological relationship" to their parents (*id.* at 50). In response to similar arguments, the *Obergefell* court put it best: "Among…many remarkable and fundamentally baseless arguments [offered by an *amicus*], one of the most offensive is that adopted children are less emotionally healthy than children raised by birth parents." 962 F. Supp. 2d at 973 n.4. Defendants are careful not to claim that different-sex parents are in any way superior to same-sex parents either with respect to parenting ability or child development outcomes. As Plaintiffs previously have explained, any such claim consistently has been rejected outright by numerous courts, because the notion of any qualitative differences between same- and different-sex parenting has been squarely rejected by overwhelming scientific consensus. (*See* Pls.' Summ. J. Mem., Dkt. No. 39, at 30.)

In sum, Defendants' asserted interest in "encouraging responsible procreation" cannot sustain the marriage ban's constitutionality, particularly in light of its true purpose and effect:  to enshrine moral disapproval of the loving relationships of same-sex couples in law.  As discussed both in Plaintiffs' opening brief and above, this illegitimate purpose cannot justify the marriage ban and it must therefore be held unconstitutional.

**V.      ATTORNEY GENERAL ZOELLER IS A PROPER PARTY DEFENDANT.**

Attorney General Zoeller is a proper party because Defendants have not shown that he has no authority to enforce the Indiana marriage ban.  And Defendants' protests that Zoeller is an improper defendant are squarely contradicted by Zoeller's prior statements that he is ***required*** to defend the constitutionality of Indiana's marriage ban, and his promise to do so in this case.

Defendants claim that the Attorney General is not a proper defendant because he has "no authority to enforce, or other role respecting, Indiana Code Section 31-11-1-1[.]"  (Defs.' Opp. at 6.)   But they cite nothing to support this bald assertion, and thus offer nothing to contradict Plaintiffs' showing that Zoeller has the authority to enforce the statutes of the State of Indiana, including its provisions related to the marriage ban.   The Attorney General's statutory duties explicitly state that he or she "***shall*** represent the state in any matter involving the rights or interests of the state."   I.C. § 4-6-1-6 (emphasis added).[16]   Defendants provide no authority whatsoever that Zoeller *does not* have authority to enforce the marriage ban, and thus cannot avoid the *Ex Parte Young* exception.  *See Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 645 (7th

---

[16]    The fact that this lawsuit names as defendants several Indiana officials further obligates Zoeller to participate in this litigation.  *See* I.C. § 4-6-2-1.5(a) ("Whenever any state government official or employee…is made party to a suit" and the Attorney General determines that the suit has arisen out an act within the scope of the employee's official duties, "the attorney general ***shall*** defend such person throughout such action.") (emphasis added).

Cir. 2006) (no sovereign immunity when the Attorney General has "some connection" to the statute's enforcement).[17]

Additionally, those who solemnize a marriage of a same-sex couple are subject to criminal prosecution in Indiana.  *See* I.C. § 31-11-11-7.  Because the Attorney General has responsibility for enforcing the criminal laws of the State, he is a proper defendant for that reason as well.  *See Arnold v. Sendak*, 416 F. Supp. 22, 23 (S.D. Ind. 1976) (finding the Indiana Attorney General "a proper defendant" in an action challenging the constitutionality of a statute that criminalized certain abortion procedures).

Finally, Attorney General Zoeller's own prior statements in any event refute Defendants' arguments here.  On March 26, 2013—nearly a year before this case was filed—Zoeller explained his duty to defend Indiana's marriage ban as follows:

> [M]y duty as Indiana Attorney General is to represent our state and to uphold and defend our statutes when challenged[.]  …  As Indiana Attorney General, I don't get to define marriage or vote on legislation.  Instead, as state government's lawyer, ***I am obligated to defend our state's laws*** passed by the people's elected representatives in the Indiana Legislature.[18]

Since this case has been filed, Zoeller reaffirmed his intent to defend Indiana's marriage ban, stating that he will "will represent our state and defend our statute now and on any appeal to the best of my skill and ability, as I swore an oath to do.  As state government's lawyer, ***I must defend***

---

[17]    Defendants' reliance on *Robicheaux v. Caldwell*, No. 13-5090, 2013 WL 6198279 (E.D. La. Nov. 27, 2013), is misplaced.  There, the Attorney General argued that he had no connection to the enforcement of the challenge statute because plaintiffs had "made no effort . . . to seek official recognition of their same-sex marriage by the State of Louisiana[.]"  *Id.* at *1.  Here, the unmarried Plaintiffs have applied for and were denied a marriage license.  (*See* Am. Compl., Dkt. No. 30, ¶¶ 42-46.)

[18]    *See* Mar. 26, 2013 Press Release, *Defending state's authority is Attorney General's obligation*, Office of the Indiana Attorney General, Attorney General Zoeller (emphasis added), *available at* http://www.in.gov/activecalendar/EventList.aspx?fromdate=1/1/2013&todate=12/31/2013&display=Year,Month &type=public&eventidn=92274&view=EventDetails&information_id=177693&print=print.

*the state's authority to define marriage* at the state level within Indiana's borders."[19]   Attorney

General Zoeller's own statements make clear that he is a proper Defendant.

## VI.   THIS COURT SHOULD PRELIMINARILY ENJOIN THE STATE FROM ENFORCING THE MARRIAGE BAN AGAINST PLAINTIFFS QUASNEY AND SANDLER.

### A.   Plaintiffs Only Seek Preliminary Relief For Plaintiffs Quasney, Sandler, And Their Two Daughters, And Withdraw The Remaining Plaintiffs' Preliminary Injunction Motion.

Plaintiffs originally filed two motions for preliminary relief:  the first on behalf of

Plaintiffs Niki Quasney, Amy Sandler, A.Q.-S., and M.Q.-S. (Dkt. No. 31), and the second on

behalf of the remaining Plaintiffs (Dkt. No. 35).  Due to the Court's imminent consideration of

Plaintiffs' summary judgment motion and overlap of legal issues, Plaintiffs withdraw the motion

for preliminary injunction filed by Plaintiffs Baskin, Fuller, Everly, Judkins, Carver, Eanes,

Greene, Funkhouser, and C.A.G.   Only the preliminary injunction motion filed by Plaintiffs

Quasney, Sandler, and their two daughters remains for the Court's consideration.

### B.   Plaintiffs Quasney, Sandler, And Their Daughters Face Irreparable Harm.

Defendants' primary arguments why preliminary relief should not issue relate solely to the

unmarried Plaintiff couples who no longer seek a preliminary injunction.  As to the preliminary

relief sought by Niki Quasney and Amy Sandler, Defendants advance two arguments as to why

irreparable harm as not been shown.[20]  First, Defendants assert that "there is no likely irreparable

harm with respect to the accuracy of the certificate of death" because "[i]f the Court were later to

determine on the merits that Quasney's out-of-state same-sex marriage is entitled to recognition in

---

[19]   *See* Mar. 7, 2014 Press Release, Office of the Indiana Attorney General (emphasis added), *available at* http://www.in.gov/activecalendar/EventList.aspx?fromdate=1/1/2014&todate=12/31/2014&display=Year,Month &type=public&eventidn=162570&view=EventDetails&information_id=196983&print=print.

[20]   Defendants also assert that dignitary harm "is insufficiently concrete and particularized even to justify Article III cognizability, let alone a preliminary injunction."  (Defs.' Opp. at 13.)  Plaintiffs address this argument in Section I(A), *supra*.

Indiana, her certificate death—which is an electronic record—could easily be corrected to reflect that fact." (Defs.' Opp. at 11.) This overly-simplistic, mechanical view of harm fails to fully recognize or appreciate the harm to Niki, Amy, and their daughters. While Plaintiffs do not dispute that death certificates can be amended after-the-fact, this remedy fails to address the emotional burden Niki and Amy suffer *now* because Niki may pass away and her death certificate will list her as "never married" and the "surviving spouse's name" section will be empty. The *Obergefell* court addressed this very point and recognized the irreparable harm inflicted *before* death:

> Dying with an incorrect death certificate that prohibits Mr. Arthur from being buried with dignity constitutes irreparable harm. Furthermore, Mr. Arthur's harm is irreparable because his injury is present now, while he is alive. A later decision allowing an amendment to the death certificate cannot remediate the harm to Mr. Arthur, as he will have passed away.

2013 WL 3814262, at *7. Indeed, this Court recognized the insufficiency of amending the death certificate, explaining that it is "not [an] adequate remed[y] because [it] does not address…the dignitary harm Plaintiffs suffer." (TRO, Dkt. No. 51, at 8.) Defendants' argument here fails for the same reasons.[21]

Second, Defendants assert that irreparable harm has not been shown because "[n]one of the Plaintiffs, however, ever substantiate they will, in fact, suffer these harms, but speak in terms only of what *may* occur." (Defs.' Opp. at 16.) According to Defendants, because the Indiana hospital has not yet denied Amy the right to visit Niki or make medical decisions on her behalf, and

---

[21] Defendants also argue that issuing an injunction "requiring the Commissioner to take a particular action concerning Quasney's as-yet-unneeded death certificate would compel affirmative action, not preserve the status quo," and "preliminary injunctions are intended to preserve the status quo." (Defs.' Opp. at 11.) However, Plaintiffs do not seek action any different from how the Commissioner and other state officials treat different-sex couples; Niki and Amy seek no special treatment, just the same treatment afforded different-sex Hoosier couples. Moreover, several courts have issued preliminary relief enjoining the enforcement of marriage bans against couples facing serious illness — *see Obergefell*, 2013 WL 3814262 (granting temporary restraining order); *Gray v. Orr*, No. 13 C 8449, 2013 WL 6355918 (N.D. Ill. Dec. 5, 2013) (granting temporary restraining order); *Lee v. Orr*, No. 13-cv-8719, 2013 WL 6490577 (N.D. Ill. Dec. 10, 2013) (granting motion for temporary restraining order and preliminary injunction) — and the relief sought here is no different.

because Amy has not yet been denied survivor benefits as a result of Niki's death, the harms are too speculative to constitute irreparable harm.  But again, Defendants' myopic view misses the point.  These future events create present and real harm by forcing Niki to seek hospital care in Illinois, where her out-of-state marriage is recognized, rather than her community hospital in Munster that refuses to recognize her, Amy, and their children as a family for a fitness center membership.  (Quasney Decl., Dkt. No. 32-2, ¶¶ 24-25.)  The inevitable denial of survivor and other benefits should Niki pass away also creates present and real harm to Niki, Amy, and their daughters.  Niki explains:  "If something were to happen to me, I fear that Amy wouldn't receive the protections and benefits afforded to surviving spouses whose marriages are legally recognized. … To know that Indiana's disregard for our marriage would jeopardize the security and well-being, not only of Amy, but of our daughters as well, adds a level of anxiety that no one deserves."  (*Id.* at ¶ 30.)  As this Court previously recognized, these dignitary harms constitute sufficient irreparable harm to support preliminary relief.  (*See* TRO, Dkt. No. 51, at 8.)  Further, Defendants assert these harms can be ameliorated by "executing will and trust documents" and "advance directives" (Defs.' Opp. at 16), but not only has this Court already determined that "these are not adequate remedies because they do not address survivor benefits and the dignitary harm Plaintiffs suffer" (TRO, Dkt. No. 51, at 8), but Defendants' suggestion that Plaintiffs must acquire these costly documents to obtain benefits afforded to different-sex married couples *automatically* is itself sufficient proof of harm.

> **C.  Preliminarily Enjoining The State From Enforcing The Marriage Ban Against Plaintiffs Quasney, Sandler, And Their Daughters Serves The Public Interest And Will Not Harm Defendants.**

It is undisputed that preliminarily enjoining enforcement of the marriage ban against the moving Plaintiffs will not harm Defendants, and Defendants make no argument to the contrary.  As to whether the injunction will serve the public interest, Defendants only assert that the moving

Plaintiffs' request for preliminary relief is premature "because it is so highly contingent," and should Niki "pass away during the course of this litigation, either her estate or Sandler could at that point seek a TRO (subject to the same defenses otherwise applicable now) concerning information to be included on her certificate of death." (Defs.' Opp. at 19.) Not only is this argument completely unrelated to whether an injunction will serve the public interest, but waiting until *after* Niki passes away to order relief ignores the present harm, described above, caused by continued enforcement of the marriage ban. Moreover, Defendants do not dispute that enforcement of an unconstitutional statute can never be in the public interest. *See Joiner v. Vill. of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004).

### D.   A Preliminary Injunction Preventing Enforcement Of The Marriage Ban Against Niki And Amy Should Not Be Stayed.

Defendants suggest that this Court should not issue a preliminary injunction to Niki and Amy because the Supreme Court, and subsequently several district courts, have stayed rulings enjoining enforcement of marriage bans. (Defs.' Opp. at 8-10.) However, the Supreme Court's order staying the district court ruling in *Herbert v. Kitchen*, 134 S. Ct. 893 (Jan. 6, 2014), and each of the subsequent district court stays, all related to facial challenges to state marriage bans, not the as-applied relief sought here that is based on a well-developed record involving the particularly urgent need for redress prompted by a party's terminal illness. Indeed, the Sixth Circuit's recent stay in *Tanco v. Haslam*, which quoted the Southern District of Ohio's decision in *Henry v. Himes*, concluded that a stay would best serve the public interest because "[p]remature celebration and confusion do not serve anyone's best interests." *See Tanco*, No. 14-5297 (6th Cir. Apr. 25, 2014) (quoting *Henry*, 2014 WL 1512541, at *1 (S.D. Ohio Apr. 16, 2014)) (attached hereto as Exhibit B). Preliminarily enjoining enforcement of the marriage ban against Niki and Amy does not cause similar concerns. The Court already temporarily enjoined enforcement of the ban

against them, so extending this injunction will not cause any "premature celebration" or "confusion." The courts in *Kitchen*, *Tanco*, and *Henry* were not faced with a couple wishing to marry because one partner was confronting a terminal illness. This shift in the balance of harms should an injunction be stayed dramatically changes the analysis and renders prior stay decisions inapposite.

Moreover, the standard for staying a preliminary injunction is different in the Seventh Circuit. A stay of an injunction pending appeal "is generally considered extraordinary relief and the moving party bears a heavy burden of proof." *Cmty. Pharm. of Ind., Inc. v. Ind. Family and Soc. Servs. Admin.*, 823 F. Supp. 2d 876, 878 (S.D. Ind. 2011) (citation and quotation marks omitted). "To determine whether to grant a stay, we consider the moving party's likelihood of success on the merits, the irreparable harm that will result to each side if the stay is either granted or denied in error, and whether the public interest favors one side or the other. As with a motion for a preliminary injunction, a 'sliding scale' approach applies; the greater the moving party's likelihood of success on the merits, the less heavily the balance of harms must weigh in its favor, and vice versa." *In re A & F Enters., Inc. II*, 742 F.3d 763, 766 (7th Cir. 2014) (citations omitted); *accord Hinrichs v. Bosma*, 440 F.3d 393, 396 (7th Cir. 2006); *see also Cavel Int'l, Inc. v. Madigan*, 500 F.3d 544, 547 (7th Cir. 2007) (applying "sliding scale" approach to decide whether to issue injunction pending appeal). First, this Court has already recognized Plaintiffs' likelihood of success on the merits, explaining that "there will likely be insufficient evidence of a legitimate state interest to justify the singling out of same-sex married couples for non-recognition." (TRO, Dkt. No. 51, at 8.) Because Defendants here cannot show they have "some likelihood on the merits," a stay can be denied without further inquiry. *See Matter of Forty-Eight Insulations, Inc.*, 115 F.3d 1294, 1301 (7th Cir. 1997) (stay movant's failure to show likelihood of success on appeal is enough to deny a stay). Second, even if the Court were to proceed further and balance

the harms, a stay would still be improper.  Unlike other stayed injunctions where facial relief is sought, the harm to Niki, Amy, and their daughters if Defendants enforce the marriage ban against them is grave; conversely, Defendants make no claim of harm if the injunction is granted in error. *See Hinrichs*, 440 F.3d at 402-03 (denying stay of district court's finding that the Indiana House of Representative's practice of opening proceedings with prayer was unconstitutional in part because the State could not show irreparable harm in absence of a stay, while plaintiffs would have suffered harm as a result of this First Amendment violation); *Matter of Forty-Eight Insulations*, 115 F.3d at 1301 (holding that if movant cannot show "some likelihood of success on the merits and that he will suffer irreparable harm" absent a stay pending appeal, "the stay should be denied without further analysis") (citation omitted).  The relief provided to the moving Plaintiffs by this Court's Temporary Restraining Order should continue until final resolution of all Plaintiffs' claims.

## **CONCLUSION**

For the foregoing reasons, this Court should enter summary judgment in favor of Plaintiffs, deny Defendants' motion for summary judgment, and grant preliminary injunctive relief to Plaintiffs Niki Quasney, Amy Sandler, and their children.

Dated:  April 29, 2014                    Respectfully submitted,


                                          /s/  Barbara J. Baird
                                          Barbara J. Baird
                                          LAW OFFICE OF BARBARA J. BAIRD
                                          445 North Pennsylvania Street, Suite 401
                                          Indianapolis, Indiana 46204-0000
                                          (317) 637-2345
                                          bjbaird@bjbairdlaw.com

                                          Paul D. Castillo
                                          LAMBDA LEGAL DEFENSE &
                                          EDUCATION FUND, INC.
                                          3500 Oak Lawn Ave., Suite 500
                                          Dallas, Texas 75219
                                          (214) 219-8585, ext. 242
                                          pcastillo@lambdalegal.org

                                          Camilla B. Taylor
                                          LAMBDA LEGAL DEFENSE &
                                          EDUCATION FUND, INC.
                                          105 West Adams, Suite 2600
                                          Chicago, Illinois  60603
                                          (312) 663 4413
                                          ctaylor@lambdalegal.org

                                          Jordan M. Heinz
                                          Brent P. Ray
                                          Dmitriy G. Tishyevich
                                          Melanie MacKay
                                          KIRKLAND & ELLIS LLP
                                          300 North LaSalle Street
                                          Chicago, Illinois  60654
                                          (312) 862 2000
                                          jordan.heinz@kirkland.com
                                          brent.ray@kirkland.com
                                          dmitriy.tishyevich@kirkland.com
                                          melanie.mackay@kirkland.com

## CERTIFICATE OF SERVICE

I, Jordan M. Heinz, an attorney, certify that on April 29, 2014, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to the following counsel:

Robert V. Clutter
KIRTLEY, TAYLOR, SIMS, CHADD & MINNETTE, P.C.
117 W. Main Street
Lebanon, IN 46052
765-483-8549
Fax: 765-483-9521
Email: bclutter@kirtleytaylorlaw.com
*Counsel for Defendant Penny Bogan, in her official capacity as Boone County Clerk*

Elizabeth A. Knight
PORTER COUNTY ADMINISTRATIVE CENTER
155 Indiana Avenue
Suite 205
Valparaiso, IN 46383
(219) 465-3329
Fax: (219) 465-3362
Email: eknight@porterco.org
*Counsel for Defendant Karen M. Martin, in her official capacity as Porter County Clerk*

Nancy Moore Tiller
NANCY MOORE TILLER & ASSOCIATES
11035 Broadway
Suite A
Crown Point, IN 46307
219-662-2300
Fax: 219-662-8739
Email: nmt@tillerlegal.com
*Counsel for Defendant Michael A. Brown, in his official capacity as Lake County Clerk*

Darren J. Murphy
Assistant Hamilton County Attorney
694 Logan St.
Noblesville, IN 46060
317-774-4212
Fax: 317-776-2369
Email: dmurphy@ori.net
*Counsel for Defendant Peggy Beaver, in her official capacity as Hamilton County Clerk*

Thomas M. Fisher
OFFICE OF THE ATTORNEY GENERAL
302 West Washington Street
IGCS - 5th Floor
Indianapolis, IN 46204
(317) 232-6255
Fax: (317) 232-7979
Email: tom.fisher@atg.in.gov
*Counsel for Defendants Greg Zoeller, in his official capacity as Indiana Attorney General, and William C. Vanness II, M.D., in his official capacity as the Commissioner, Indiana State Department of Health*

The foregoing document was also emailed to the following counsel of record at their above email addresses:  Robert V. Clutter, Elizabeth A. Knight, Nancy Moore Tiller, Darren J. Murphy, and Thomas M. Fisher.

/s/  Jordan M. Heinz